Emily Teplin Fox, OSB No. 121720
efox@oregonlawcenter.org
Marisa Samuelson, OSB No. 144234
msamuelson@oregonlawcenter.org
Beth Englander, OSB No. 980190
benglander@oregonlawcenter.org
Kelsey Heilman, OSB No.140348
kheilman@oregonlawcenter.org
OREGON LAW CENTER
522 SW Fifth Ave, Suite 812
Portland, OR  97204
(503) 473-8325

Jonathan M. Dennis, OSB No. 146256
jdennis@oregonlawcenter.org
OREGON LAW CENTER
35 SE Fifth Ave., Suite 1
Ontario, OR 97914
(541) 889-3296

Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| CINDY MENDOZA; GLORIA BERMUDEZ; CEKAIS TONI GANUELAS; REBECCA HEATH; and KARL WADE ROBERTS, on behalf of themselves and all others similarly situated, | Case No. |
| | **CLASS ACTION ALLEGATION COMPLAINT** |
| Plaintiffs, | **Civil Rights Action (14th Amendment to U.S. Constitution (Due Process and Equal Protection)** |
| v. | |
| MATTHEW GARRETT, in his official capacity as Director of the Oregon Department of Transportation; TAMMY BANEY, in her official capacity as Chair of the Oregon Transportation Commission; SEAN | **DEMAND FOR JURY TRIAL** |

O'HOLLAREN, in his official capacity as
Member of the Oregon Transportation
Commission; BOB VAN BROCKLIN, in his
official capacity as Member of the Oregon
Transportation Commission; MARTIN
CALLERY, in his official capacity as Member
of the Oregon Transportation Commission; and
TOM MCCLELLAN, in his official capacity
as Administrator of Driver and Motor Vehicles
Division, Oregon Department of
Transportation,

                    Defendants.

Plaintiffs file this complaint against the Director of the Oregon Department of

Transportation ("ODOT"), the Chair and Members of the Oregon Transportation Commission

("OTC"), and the Administrator of Driver and Motor Vehicles Division ("DMV"), defined

collectively as "the DMV." Plaintiffs allege as follows:

## I.    INTRODUCTION

1.    During the past ten years, the Oregon DMV suspended Oregonians' driver's

licenses 334,338 times for failure to pay fines, costs, and fees arising from minor traffic citations

("traffic debt"). Of the approximately 3.1 million Oregonians who hold driver's licenses,[1] as

many as 10 percent have had their licenses suspended for failure to pay traffic debt.

2.    Approximately 536,146 Oregonians live below the federal poverty line, about

---

[1] In 2016, there were 3,100,321 "drivers of issuance" in Oregon. This includes all license
holders with active, expired, and non-active driving privileges. *See* 2016 Oregon DMV Driver
Statistics Report (Run date: 1/18/17).

13% of the state's population. "Oregon 2017," *Talk Poverty*, https://talkpoverty.org/state-year-report/oregon-2017-report/ (last visited August 23, 2018). Oregonians living in poverty struggle to pay for basic necessities like food and shelter and cannot afford to pay traffic debt.

3.      The DMV suspends driver's licenses for failure to pay traffic debt without considering an individual's ability to pay her traffic debt and exempting from suspension those low-income individuals who cannot pay.

4.      License suspension may be an appropriate way to secure payment from individuals who can afford to pay traffic debt but willfully refuse to do so. For low-income individuals, this statutory regime punishes them for being poor.

5.      For the vast majority of Oregonians, driving is the only reliable means of transportation to find and maintain employment, to get to medical appointments, to take their children to school, and to shop for necessities, including food.

6.      Without paying down their traffic debt, low-income Oregonians cannot regain their licenses for 20 years.

7.      License suspensions lead to further financial and legal burdens, including charges for driving with a suspended license, and additional fees and fines. A minor traffic infraction – such as failing to buckle a seatbelt or driving with a defective taillight – can plunge low-income people into a legal and financial rut from which any reasonable person would struggle to escape.

8.      Plaintiffs and class members in this case are among tens of thousands of Oregonians who have lost their driver's licenses, and cannot get them back, simply because of their poverty.

9.      Punishing people for being unable to pay traffic debt violates the Due Process and

Equal Protection Clauses of the United States Constitution.

10.     Plaintiffs and class members, on behalf of themselves and all others similarly situated, seek declaratory and injunctive relief against Matthew Garrett, in his official capacity as Director of the ODOT; Tammy Baney, in her official capacity as Chair of the OTC; Sean O'Hollaren, in his official capacity as Member of the OTC; Bob Van Brocklin, in his official capacity as Member of the OTC; Martin Callery, in his official capacity as Member of the OTC; and Tom McClellan, in his official capacity as Administrator of the DMV, to end this unconstitutional statutory scheme.

11.     The DMV should refrain from suspending the driver's licenses of low-income individuals who cannot afford to pay their traffic debt.  Alternatively, the DMV should implement an ability-to-pay determination process that comports with due process and equal protection prior to suspending driver licenses for failure to pay traffic debt, and provide subsequent opportunities to lift suspensions because of indigence.

## II.     JURISDICTION AND VENUE

12.     This Court has jurisdiction over this action pursuant to 28 U.S.C §§ 1331 and 1343, in that Plaintiffs' claims arise under the Fourteenth Amendment and 42 U.S.C. § 1983.

13.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to these claims occurred in the District.

## III.     PARTIES

14.     Plaintiff Cindy Mendoza is a resident of Portland, Oregon.

15.     Plaintiff Gloria Bermudez is a resident of Portland, Oregon.

16.     Plaintiff Cekais Toni Ganuelas is a resident of Mission, Oregon.

17.     Plaintiff Karl Wade Roberts is a resident of Baker City, Oregon.

18.     Plaintiff Rebecca Heath is a resident of Pendleton, Oregon.

19.     Defendant Matthew Garrett is the Director of ODOT.  Director Garrett supervises and has authority over the activities of ODOT, including those designed to promote traffic safety and issuing driving privileges to Oregon residents.  As part of his duties, Director Garrett appoints and supervises the Administrator of the DMV.  DMV's mission is to promote driver safety, and it is responsible for issuing driving privileges to Oregon residents.  Director Garrett is sued in his official capacity.

20.     Defendant Tammy Baney is the Chair, and Defendants Sean O'Hollaren, Bob Van Brocklin, and Martin Callery are Members, of the OTC. Among other things, the Chair and Members of the OTC are responsible for establishing policies and adopting rules and orders governing the operation of ODOT, including policies, rules, and orders related to traffic safety and issuing driving privileges to Oregon residents. Commissioners Baney, O'Hollaren, Van Brocklin, and Callery are sued in their official capacity.

21.     Defendant Tom McClellan is the Administrator of the DMV.  Administrator McClellan supervises and is responsible for the activities, policies, and practices of the DMV, including suspending driver licenses of licensees who are unable to pay court debts for traffic violations. He is sued in his official capacity.

…

…

…

…

## IV.    FACTUAL ALLEGATIONS

**A.  The DMV is Unconstitutionally Punishing Low-Income Traffic Debtors Solely Because of their Poverty.**

> **i.  A Driver's License is Necessary to Maintain Employment and to Access Essential Services.**

22.     In Oregon, the majority of workers commute by car.  Approximately 82% of Oregonians over the age of 16 travel to work by car, either alone or in a carpool.[2]  Statewide, only 4.3% of residents commute by public transportation, while 6.4% get to work by bicycle or on foot.[3]

23.     For most Oregonians, public transit is not a viable commuting alternative.  In 32 of Oregon's 34 counties, at least 40% of residents do not live within a .25-mile radius of a stop operated by any transit agency.  In 28 of Oregon's 34 counties, the percentage is more than 50%.  Access is worse in rural areas.  More than 64% of Umatilla County residents and more than 75% of Baker City residents lack access to public transit.

24.     Not having a valid driver's license is a direct barrier to employment because many lower paying jobs require a driver's license.  Alana Semuels, "No Driver's License, No Job," *The Atlantic* (June 15, 2016), https://www.theatlantic.com/business/archive/2016/06/no-drivers-license-no-job/486653/.  A study of New Jersey drivers found that 42% of drivers lost their jobs after their driver's licenses were suspended. Jon A. Carnegie, Ian M. Voohees

---

[2] U.S. Dep't of Transp., Bur. Of Transp. Stats., OREGON: Transportation by the Numbers (2016), https://www.bts.gov/sites/bts.dot.gov/files/legacy/oregon.pdf
[3] *Id.*

Transportation Center, Rutgers, The State University of New Jersey, *Driver's License Suspensions, Impacts and Fairness Study* 56 (2007), http://njgov/transportation/refdata/research /reports/FHW A-NJ-2007-0200-VI.pdf.

25.    Driver's license suspensions also deprive low-income individuals of employment opportunities because private employers often screen out applicants who do not have driver's licenses.[4] People who are able to travel farther distances also have access to a greater number of job opportunities in different locations.[5]

26.    In urban areas, like Portland, where gentrification and a housing crisis have displaced low-income people and people of color, the ability to travel to work longer distances is crucial.[6]

27.    In rural areas of Oregon, most employment is accessible only by car due to the distances between home and work.

28.    A Pew Research Center Study found that 86% of Americans consider a car to be a "necessity of life," higher than the percentage of people who identified cell phones as a necessity at 47% or microwaves at 45%.[7]

29.    The loss of a driver's license affects the driver's basic self-sufficiency.  In addition to requiring a car to travel to work, most Oregonians must drive to obtain medical care, to travel to the grocery store to buy food and clothing, and to ensure the care and education of

---

[4] Stephen Bingham et al., *Stopped, Fined, Arrested: Racial Bias in Policing and Traffic Courts in California*, 26-28 (2016).
[5] *Id.,* referring generally to Adie Tomer et al., Brookings Institute*, Missed Opportunity: Transit and Jobs in Metropolitan America* (2011)*.*
[6] *Id.*
[7] Paul Taylor and Wendy Wang et al., *The Fading Glory of The Television and Telephone,* Pew Research Center 1 (Aug. 10, 2010), http://assets.pewresearch.org/wp-content/uploads/sites/3/2011/01/Final-TV-and-Telephone.pdf

their children.

30.    Even in urban areas, where public transportation is more widely available, taking buses or trains is not a viable option for many people.  Delays create the risk of a late arrival to work or a tardy pick up of a child from a childcare facility.  Multiple transfers require departure early in the morning and return late in the evening, hours when childcare is either very expensive or unavailable.  A low-income person cannot afford to simply pay for a taxi or summon an Uber or Lyft to get them where they need to go.

ii.  **Oregon's License Suspension Regime for Traffic Debtors.**

31.    In Oregon, a minor traffic violation[8] results in the imposition of a fine, based on the violation's statutory classification. *See* ORS §§ 153.012, 153.018-153.021.

32.    Oregon circuit courts abide by a uniform fine schedule. ORS § 153.800.[9]  In general, courts may not "defer, waive, suspend or otherwise reduce the fine" below the statutory minimum. ORS § 153.021.

33.    When a driver is charged with a traffic violation, the officer issues him or her a citation with the corresponding "presumptive fine." ORS §§ 153.019, 153.020.  For example, failing to signal a turn is a Class D violation. ORS § 811.335(1)(b).  The presumptive fine is $115.  ORS § 153.019(1)(d).  Driving 11 to 20 miles per hour in excess of the speed limit, is a Class C traffic violation. ORS § 811.109(1)(b). The presumptive fine for this violation is $165.

---

[8] "Traffic offense" is the umbrella term for actions that violate Oregon traffic laws and ordinances. ORS § 801.555. An offense is a "traffic violation" if the sentence does not include jail time. ORS § 153.008.

[9] *See* Office of the State Court Administrator, *2018 "Schedule of Fines" on Violations (SOF-18), available at* https://digital.osl.state.or.us/islandora/object/osl%3A104207/datastream/OBJ/view.

ORS § 153.019(1)(c).

34.    People who can afford to pay traffic violation fines simply pay them. However, many Oregonians cannot afford a $100 to $200 fine.

35.    According to a recent Federal Reserve survey, approximately 40% of Americans reported that they did not have enough money to cover a $400 emergency expense.[10]  More than 13% of Oregonians live below the federal poverty line.[11]  The rate of food insecurity is even higher, affecting 552,900 Oregonians.[12]

36.    In Oregon, traffic debt is collected by courts, private collections agencies, the Oregon Department of Revenue.  The DMV also collects reinstatement and issuance fees, a portion of the traffic debt.

37.    Circuit courts generally provide a 35-day window for collection of traffic fines and fees; after that time, a "failure to comply" license sanction is entered and the account becomes delinquent.  *See* ORS § 809.210 (2017).  *See also* Oregon Judicial Department Financial Case Processing Manual – Collections (updated Dec. 2017), at p. 5.

38.    In Multnomah County, the court imposes the following fees if a debtor fails to satisfy a monetary judgment within 30 days: $50 for amounts up to $149.99; $125 for amounts from $150 to $399.99; or $200 for amounts greater than $400.[14]

---

[10] *Report on the Economic Well-Being of U.S. Households in 2017*, May 2018, at 21, *available at* https://www.federalreserve.gov/publications/files/2017-report-economic-well-being-us-households-201805.pdf.
[11] U.S. Census Bureau, *Quick Facts: Oregon*, *available at* https://www.census.gov/quickfacts/fact/table/or/INC110216.
[12] Oregon Food Bank, *Hunger in Oregon*, *available at* https://www.oregonfoodbank.org/our-work/hunger-in-oregon/.
[14] Schedule available at https://www.courts.oregon.gov/courts/multnomah/payments/Pages/faq.aspx

39.     If an individual does not pay her debt in full within the required time, the court may send the account to a private collections agency or the Oregon Department of Revenue, resulting in even more costs and fees. *See* ORS §§ 1.102(2), 293.231, 697.105. Clackamas County Circuit Court, for example, adds a 28% fee to delinquent account balances when it refers debts to the Department of Revenue or a private collection agency.

40.     When a traffic debtor "fails or refuses to pay" traffic debt, the court may do one of the following: (1) issue a notice of suspension to the Department of Transportation that directs the department to implement procedures under ORS § 809.416 or (2) order a defendant's driving privileges restricted.  ORS § 809.210(1)(a) & (b).

41.     The statute does not require courts to make a pre-suspension ability-to-pay determination.

42.     When the deadline passes without payment from the licensee, court clerks notify the DMV of the nonpayment of the debt.

43.     The clerks automatically send notices of the delinquencies to the DMV without any individualized inquiry into the reason for nonpayment, including the licensee's ability to pay the debt.  Judges are not involved in the process.

44.     Courts impose a $15 fee each time they send notification to the DMV for failure to comply with payment of court fees, fines, and costs. ORS § 809.267.

45.     Pursuant to ORS § 809.416(2)-(3), the DMV suspends a traffic debtor's driver's license upon receipt of a notice of suspension and issuance of a 60-day warning to the traffic debtor.

46.     To avoid or end the suspension, the traffic debtor must present the DMV with a

notice of reinstatement issued by the court showing that she "(A) [i]s making payments, has paid the fine[,] or has obeyed the order of the court; or (B) [h]as enrolled in a preapprenticeship program…or is a registered apprentice." ORS § 809.416(2).

47.     Unless a licensee pays her traffic debt, she generally must wait 20 years "from the date the traffic offense occurred" before the suspension on her driver's license is lifted.  *Id.* ORS § 809.415(4)(a)(B).

48.     While a traffic debtor can request administrative review of her suspension, inability to pay is not a defense.  ORS §§ 809.415(4)(b), 809.440.

49.     Oregon's circuit courts allow, but do not oblige, courts to offer payment plans for traffic debt.  These plans come with additional fees, and minimum monthly payment amounts are calculated based on the amount owed, without consideration of the debtor's financial circumstances.  These courts may add a fee that is at least $50 and as much as $200 "to any judgment that includes a monetary obligation that the court or judicial branch is charged with collecting." ORS § 1.202(1).  *See also* Chief Justice Order No. 11-027 (June 20, 2011). Municipal courts may, or may not, offer any payment plan at all.

50.     If an individual enters into a payment plan, the suspension may be re-imposed "if the person ceases making payments before the fine is paid in full." ORS § 809.210(4)(a).

51.     License holders are not permitted to be heard by the DMV on the question of whether they are able to afford their payment plan or whether their poverty caused them to miss payments.

52.     Once a driver has had her license suspended, she risks being cited for driving with a suspended license.  This is an additional, new traffic violation, ORS § 811.175, with a

presumptive fine of $440, ORS § 153.019(1)(a), subject to the same debt collection and license suspension procedures.

53.    Low-income debtors who manage to pay down their traffic debt within the 20-year suspension period face one final economic barrier: a $75 reinstatement fee, and issuance fees between $26.50 and $68, depending on whether the debtor's driver's license has expired with the passage of time. ORS § 807.370(5), (25), (33).

54.    Fee waivers for reinstatements and issuance fees are available, but not on the basis that the requester is unable to pay. ORS §§ 809.380(6)(a)-(L), 809.380(7).

55.    In 2017 alone, 2,433 Oregonians were eligible for license reinstatement after traffic debt-related suspension, but they did not pay reinstatement and issuance fees.

56.    Low-income Oregonians struggle to supply food for their families, pay utilities, and pay rent.  Even when they scrape together the funds to discharge traffic debt, paying an additional $150 or more for the reinstatement and issuance of their driver's license is a final, significant obstacle.

### iii.    Consequences of Oregon's License Suspension Law.

57.    Between 2012 and 2017, the DMV issued an average of 33,482 license suspensions each year because of a driver's failure to pay court debts arising out of traffic violations.

58.    Oregon's driver's license suspension statute, ORS § 809.416, puts low-income people in an impossible position.  They either stop driving, making it impossible to meet their work and family obligations, or drive illegally, placing themselves at risk of being cited for driving with a suspended license and further compounding their traffic debt.

59.     Tens of thousands of Oregon residents take the risk of driving with a suspended license each year.  In 2010, DMV reported 40,837 drivers were convicted for driving on a suspended license. *See* Joseph Rose, "After 7 Suspensions, Why Hasn't Oregon Revoked Jefferson Smith's License?," *The Oregonian/Oregon Live* (August 22, 2012); *See also* Nick Morgan, "Many Oregon Drivers Undeterred by Suspended Licenses," *The Associated Press* (January 4, 2018); Eric Hidle, "Driving While Suspended in Oregon: Thousands do it, but law officers say little can be done to solve the problem," *The Bulletin* (April 25, 2011).

60.     With each violation for driving on a suspended license – a new traffic violation – low-income residents amass even more traffic debt.  The fine for driving on a suspended license, a class A traffic violation, is presumptively $440, with a minimum fine of $225 and a maximum fine of $2,000. ORS § 153.019.

61.     Low-income people who rely on their vehicles, but cannot afford to pay their traffic debts, risk these additional fines and punishments every time they drive.

## B. The DMV's License Suspension Scheme, Which Provides No Indigency Exception for Traffic Debtors, Is Unconstitutional.

### i. Discriminatory Debt Collection.

62.     Drivers of all income levels are cited for minor traffic violations, but in Oregon, the consequences of these citations are far worse for drivers who are poor.

63.     Moderate and high-income drivers can easily avoid license suspension by simply paying their fines.  Wealthier drivers can get numerous traffic violations, pay the fines, and keep driving.

64.     For low-income drivers, paying a $115 to $440 fine for a traffic violation is an insurmountable obstacle.  Unlike higher-income drivers who can afford to pay these fines, an

indigent driver has no way to avoid suspension.

65.     Under Oregon's wealth-based license suspension regime, indigent drivers can be cited for one minor traffic violation and find themselves plunged deeper into debt as they risk further fines for driving while suspended.

66.     Oregonians who owe traffic debt to county, municipal, or justice courts also are singled out for harsh and discriminatory treatment compared to other types of indigent debtors.

67.     ORS § 809.416 differentiates between traffic debtors who committed bicycle, pedestrian, or parking offenses and other traffic debtors. *See also* ORS § 809.210(7) (prohibiting courts from sending a notice of suspension to those who have failed to pay fines for bicycle, pedestrian or parking offenses).

68.     A low-income person who is cited for failing to signal or stop on a bicycle, ORS § 814.440, but who cannot afford to pay the fine, will not have her license suspended.  By contrast, an indigent person who owes a fine for driving with a broken taillight and cannot pay her court debt is punished with a license suspension and related negative consequences.

69.     Similarly, private judgment debtors in civil actions in Oregon, such as individuals indebted to credit card companies, are not subject to a suspension of their driver's licenses if they are too poor to pay their debt.

70.     While both debtors may find themselves subject to collection actions by private collection firms, a private debt holder does not risk losing his driver's license if he cannot afford to make payments or pay the balance in full.  By contrast, traffic debtors receive an automatic punishment of suspension simply because they owe a debt to the state.

71.     Indigent child support debtors also receive more procedural protections than do

traffic debtors.

72.    Oregon suspends driver's licenses for failure to pay child support.  ORS §
25.750(1)(a).  However, child support debtors have the ability to avoid suspension of their
driver's licenses at the following three stages: (1) at the establishment of a support obligation,
ORS § 25.275(1)(a)-(d); (2) at any modification proceeding, ORS § 25.280, 25.287(5), OAR
137-055-3430(3)(c)(B) ("substantial change" warranting modification includes financial
changes); and (3) once the child support debtor's payments are in arrears, ORS § 25.750(1)(a).

73.    Unlike traffic debtors, child support debtors also are accorded a six-month,
indefinitely renewable "hardship exception" to reduce or eliminate the parent's obligations upon
demonstration of that parent's inability to pay.  OAR 137-055-4420(10).

74.    Accordingly, in Oregon, a parent who owes child support can avoid suspension of
his driver's license by demonstrating he cannot afford his child support obligation.  By contrast,
a single parent who receives no child support, and is responsible for her children, will lose her
driver's license simply because she is too poor to pay a fine for a broken tail light violation.

C.  **The DMV's License Suspension Scheme Deprives Traffic Debtors of Procedural
    Due Process.**

   i.  **Indigent Traffic Debtors Are Not Afforded an Ability-to-Pay Hearing.**

75.    For low-income traffic debtors in Oregon, having a driver's license to operate a
car is much more than a mode of transportation.  It is an essential tool to maintain self-
sufficiency, to find or keep a job, and to care for one's children.

76.    Unlike child support debtors who have several opportunities to establish their
indigence to avoid license suspensions, traffic debtors have no right to have their indigence
determined, by any entity, at any point prior to or during their suspension.  The DMV does not

evaluate ability-to-pay nor ensure that any entity has made such a determination prior to or during the period of suspension.

77.    Although the Oregon Judicial Department allows circuit courts to offer payment plans, minimum payment amounts are tied to the total debt amount rather than to the amount the debtor can afford to pay each month.  In addition, these plans involve additional fees.  Some municipal courts may not offer any payment plan.

78.    Delinquent payment plans generally result in courts automatically generating a notice of suspension.

79.    Once the DMV issues a driver's license suspension notice, debtors can only avoid suspension by obtaining a notice of reinstatement from the court indicating full payment or payment plan compliance, or engagement in certain apprenticeship programs.  ORS § 809.416(2)(a)-(b).  Debtors have no opportunity to avoid or challenge the suspension based on inability to pay.

80.    Administrative review of the DMV's suspension does not stay the suspension and is limited to an evaluation of criteria unrelated to the debtor's ability to pay or indigency.  ORS § 809.415((4)(b) and ORS § 809.440(2);

81.    At no point during the process of suspending driver's licenses does the DMV provide a procedure for low-income traffic debtors to demonstrate that they are unable to pay their traffic debt.

82.    For indigent traffic debtors who cannot afford to pay their traffic debt or make the minimum payments under a payment plan, Oregon's lack of pre-suspension procedural safeguards results in hundreds of thousands of low-income individuals systematically being

punished for being poor.

**D. The Named Plaintiffs.**

       i. <u>**Cindy Mendoza**</u>

83.      Cindy Mendoza is 28-year-old resident of Portland, Oregon.  Ms. Mendoza is raising three sons on her own: a 2-year-old toddler, a 7-year old, and a 9-year old.

84.      Ms. Mendoza lives in a two-bedroom subsidized apartment.  Until recently, Ms. Mendoza and her children lived in a motel room; they were forced to move to the motel after their previous residence, a homeless shelter, became uninhabitable after the roof caved in from a heavy leak.

85.      Ms. Mendoza is currently unemployed.  She is looking for work, but has had difficulty finding a job without a valid driver's license.  She receives approximately $1,100 monthly in assistance, including food stamps.  She has no other source of income, placing her family well below the federal poverty line.

86.      Near the end of every month, Ms. Mendoza's family struggles without enough food.  She has to try to find free food boxes at pantries so that her family has something to eat.

87.      The first time Ms. Mendoza's driver's license was suspended was on June 8, 2010, after getting a traffic violation in Wasco County for speeding.  The ticket was for $400. Ms. Mendoza was unemployed at the time and had a new baby.  She could not afford to pay the traffic fine.  The amount increased to $812 with court costs and fees and the debt was referred to a collections agency.

88.      It took Ms. Mendoza five years, but after obtaining steady employment, she was finally able to pay off her debt to Wasco County Circuit Court and her license was reinstated in

April 2015.

89.     However, prior to paying off that debt, Ms. Mendoza was cited a few more times for driving on a suspended license.  These additional traffic citations put her in a downward spiral, making it impossible for her to ever get caught up.

90.     Ms. Mendoza's driver's license is currently suspended because she owes $1,660.37 to Milwaukie Municipal Court for various traffic violations, including a January 8, 2016, citation for driving on a suspended license.  DMV suspended her license on April 8, 2016 due to her inability to pay her court debt for these traffic violations.

91.     Ms. Mendoza also owes $2,020.40 to Beaverton Municipal Court for non-payment of court fines and fees for another driving on a suspended license traffic violation that occurred on August 24, 2013.  The DMV suspended her license for non-payment of her court debt on July 29, 2015.[13]

92.     Additionally, Ms. Mendoza owes $7,602 in unpaid court fines and fees to Clackamas County Circuit Court for failing to appear at her arraignment for a misdemeanor traffic case involving a car accident with property damage only.  Ms. Mendoza is on a payment plan for this case, but she cannot afford to pay $100 per month to the court when she is unemployed and is the sole provider for her three children.  Because Ms. Mendoza has missed her payments, in June 2018 Clackamas Circuit Court referred her debt to collections.  She anticipates that the court will also send a notice to the DMV to suspend her driver's license.

93.     The DMV never considered whether Ms. Mendoza could afford to pay her traffic

_____

[13] The DMV also suspended Ms. Mendoza's license on October 11, 2013 due to her failure to appear for a hearing in that same case, but that suspension is no longer active.

debt before suspending her license.

94.    The DMV has not offered Ms. Mendoza any opportunity to reinstate her license based on her inability to pay.

95.    In total, Ms. Mendoza owes $11,282.77 to three courts. If she could afford to, Ms. Mendoza would pay these debts, or make periodic payments to reduce the amounts of debt she owes.

96.    Due to her poverty, it impossible for Ms. Mendoza to pay this sum to get her driver's license reinstated.  In fact, she is too poor to pay anything at all.  Therefore, she cannot benefit from a payment plan, even though one has been offered to her.

97.    Meanwhile, Ms. Mendoza continues to drive, risking further traffic violations for driving on a suspended license.  She is looking for employment, but is limited in the types of jobs that she can apply for because she does not have a driver's license.  Recently she inquired about a position as a street "flagger" for construction jobs, but she was turned away because the job required a valid driver's license.  Ms. Mendoza has also had a difficult time finding work that is close to her apartment so that she can avoid using her car for transportation.

98.    Nevertheless, Ms. Mendoza continues to drive so that she can get her children to medical appointments and to buy clothes and food for her family.

99.    Ms. Mendoza knows she is taking a risk driving on a suspended driver's license, but she feels as though she has no other choice because she is too poor to pay enormous sums of traffic debt and relies on her vehicle to provide necessities for herself and her family.

### ii.  **Gloria Bermudez**

100.    Gloria Bermudez is a 36-year-old resident of Portland, Oregon.  She is a single

mother with four children, ages 11, 8, 7 and 6. She is the sole wage earner for her family. Ms. Bermudez works as a cook at a restaurant in a shopping mall. She earns $14 per hour or approximately $1,600 per month. She also receives approximately $420 per month in food stamps to help feed her family.

101.    Ms. Bermudez struggles to keep up with her electric, gas, and phone bills every month. Frequently, by the end of the month, she seeks free food at pantries to put food on the table.

102.    Ms. Bermudez's driver's license is currently suspended because she is unable to pay a total of $2,812.38 in traffic debt to two courts, Multnomah County Circuit Court and Washington County Justice Court.

103.    Ms. Bermudez owes $1,902.38 to Multnomah County Circuit Court related to three different traffic violation cases.

104.    In one of the cases, she was cited on February 22, 2003 for failing to obey a traffic control device. The ticket – originally for $175 – grew to $299.16 with additional court fees and costs. Initially, her license was suspended, in May 2003, because she failed to appear at her arraignment. Her debt was sent to collections. The court later set her up on a payment plan and her license was reinstated on May 12, 2010. However, she couldn't afford to keep up with these $50 payments, so the DMV suspended her license again – this time based on her failure to pay her traffic debt – on September 14, 2012.

105.    In another case, she was cited on July 1, 2013 for failing to use proper child seats for her two children. This was originally a $120 ticket, but grew to $237 with added fees. The DMV suspended her license due to her inability to pay that amount on October 7, 2013.

106.    At the time that Ms. Bermudez was cited for improper use of child seats, she was also cited for driving on a suspended license, driving with expired tags, and driving while uninsured.  In this related case, Ms. Bermudez owes $1,306 in unpaid court fines and fees to Multnomah County Circuit Court for failing to appear at her arraignment.  The DMV suspended her driver's license in that case on January 21, 2014.

107.    Ms. Bermudez estimates that, during the past ten years, she has paid hundreds of dollars in payments to Multnomah County Circuit Court, but she always fell behind on these payments because she did not have enough money to keep up.

108.    Ms. Bermudez also owes Washington County Justice Court a total of $910 for traffic debt.

109.    In one of the cases, she was cited on July 2, 2012 for driving while operating a cell phone, driving without proof of insurance, and for driving with a suspended license.  Due to her inability to pay $470 in fines and fees for that case, the DMV suspended her driver's license on October 7, 2013.

110.    In her 2012 case, Ms. Bermudez was offered a payment plan of $75 per month to pay her traffic debt.  However, she was not able to make her initial payment on August 24, 2012 because she had recently given birth to a premature baby and had no money to spare.  She hand-delivered a letter to the court explaining these circumstances.  The court did not offer to eliminate or further reduce her payments under the plan.

111.    More recently, on February 24, 2018, Ms. Bermudez was stopped by the police while driving home late after work.  She was cited for driving on a suspended license.  Ms. Bermudez owes another $440 for this traffic violation.  She received a letter, on April 6, 2018,

from Washington County Justice Court informing her that if she is unable to pay this amount or begin making payments by April 20, 2018, the court would send a notice of suspension to the DMV. Ms. Bermudez cannot afford to pay this debt either. She fears receiving another notice by mail from the DMV informing her that her driver's license will be suspended for failing to pay this additional traffic debt.

112.    The DMV never considered whether Ms. Bermudez could afford to pay her traffic debt before suspending her license.

113.    DMV has not offered Ms. Bermudez any opportunity to reinstate her license based on her inability to pay.

114.    If Ms. Bermudez could afford to pay down her court debts, she would. However, her poverty makes it impossible for her to apply any amount of money towards this debt.

115.    Ms. Bermudez has continued to drive despite the risk that she may be cited again for driving on a suspended license. Her workplace is about seven miles away from her home. It takes her 25 minutes to drive to work. It would take her about an hour to get to work on city buses.

116.    Ms. Bermudez also drives her four children to school, which is a 5- to 10-minute car ride. The alternative, that her children board a school bus at 6:45am to take an hour-long bus ride to their school, would result in her young children becoming sleep-deprived, jeopardizing their ability to learn at school, as well as increasing their chances of numerous health problems.[14] Ms. Bermudez also drives to buy groceries at the store and to take her children to medical

---

[14] *See* https://www.nichd.nih.gov/health/topics/sleep/conditioninfo/sleep-deprivation; *See also* https://www.cdc.gov/healthyschools/sleep.htm.

appointments.

117.    Ms. Bermudez knows she risks getting more traffic violations for driving on a suspended license, which also means amassing more court debt.  However, she feels as though she has no other choice to maintain her job and transport her family.

### iii.  **Cekais Toni Ganuelas**

118.    Cekais Toni Ganuelas is a 27-year-old resident of Mission, Oregon, which is about six miles outside of Pendleton.  She and her 8-year-old daughter live in a room they rent from a friend.

119.    Until recently, Ms. Ganuelas worked as a bartender at a restaurant in Pendleton. She worked about twenty hours per week and earned minimum wage plus tips, or about $400 per week.  She was fired in late July 2018 when she failed to show up for work due to transportation difficulties.  Since Ms. Ganuelas lost her job, her only source of income is $140 per month from teaching yoga.  She does not currently receive food stamps or cash assistance.

120.    Ms. Ganuelas is an enrolled member of the Confederated Tribes of the Umatilla Indian Reservation.  The Tribes operate a shuttle service between Pendleton and Mission, Oregon.  Ms. Ganuelas is able to use the shuttle some days.  However, the shuttle runs only between about 8 a.m. and 5 p.m. Monday through Saturday.  The shuttle was not a viable option for Ms. Ganuelas when she was working as a bartender because her shifts began and ended at irregular hours, including late at night.  In addition, the shuttle stopped on the opposite side of a busy four-lane highway, requiring her to make a dangerous crossing on foot to get to work.

121.    In 2012, Ms. Ganuelas was cited for failure to display plates.  She was unable to pay her $150 ticket, so the Pendleton Municipal Court notified the DMV.  The DMV suspended

her driver's license on July 16, 2012.

122.    Since Ms. Ganuela's license suspension in 2012, she has received multiple

additional suspension notices for failure to pay traffic debt.

123.    Most recently, the DMV sent Ms. Ganuelas a notice of suspension on October 27,

2016, notifying her that her license would be suspended effective December 25, 2016.  That

suspension was in connection with her failure to pay a $195 speeding ticket in Umatilla County

Circuit Court.

124.    Ms. Ganuelas has also been cited at least three times for driving with a suspended

license.

125.    The DMV never considered whether Ms. Ganuelas could afford to pay her traffic

debt before suspending her license.

126.    DMV has not offered Ms. Ganuelas any opportunity to reinstate her license based

on her inability to pay.

127.    Ms. Ganuelas believes that she currently owes in excess of $750 in traffic debt to

three courts: Umatilla County Circuit Court, Pendleton Municipal Court, and Lower Kittitas

County District Court in Washington State.

128.    When Ms. Ganuelas can afford to, she has made payments to the courts to pay for

her traffic debt.  Currently, it is impossible for her to pay any amount of money toward her traffic

debt.  Without a steady source of income, paying any amount toward traffic debt would make it

even harder to keep herself and her daughter clothed, fed, and housed.

129.    Not having a valid driver's license makes it difficult for Ms. Ganuelas to provide

for herself and her daughter.  In order to buy groceries, clothes, necessary household goods, she

must find a ride into Pendleton, which cost of at least $10 each way by taxi.

130.    Ms. Ganuelas' daughter loves to play soccer and wants to play with the Pendleton

Youth Soccer Association.  That group has strict rules about parental involvement and being on

time for practices and games.  Because Ms. Ganuelas has to rely on friends to get to Pendleton,

her daughter has not been able to play on a soccer team for the past two years.

131.    Ms. Ganuelas has also missed many events at her daughter's school because her

license is suspended.  In December 2017, she was unable to attend an awards ceremony at her

daughter's school, where he daughter received an award, because she could not drive there.

132.    Family is very important to Ms. Ganuelas and her extended family lives in

Alaska, Washington, and other parts of Oregon.  Not being able to drive with a valid license

means she cannot travel to family functions out of state.  Ms. Ganuelas' grandparents, who are

more than eighty years old, live in Yakima, Washington, 150 miles away from my home.  She

laments not being able to visit them and to attend important family events at their home because

her license is suspended.

133.    Ms. Ganuelas knows the consequences of driving without a valid license.  To

return home after her grandmother's 84th birthday in Yakima in July 2015, Ms. Ganuelas took

the risk of driving her mother's car so that she could make it to work on time.  She had no other

transportation option.  She was stopped for speeding and for driving on a suspended license.

134.    Ms. Ganuelas has been trying to find work, but having a suspended license is a

hurdle.  For the past three weeks, she have been looking for a job through the Tribal

Employment Rights Office.  One of the questions on the sign-in form is "do you have a valid

license?"  Many of the jobs also require a driver's license.  ODOT was hiring flaggers through

TERO, but she did not qualify because her license is suspended.  It is also difficult for her to follow up on applications or attend interviews without being able to drive.

135.    If Ms. Ganuelas had an opportunity now, or at any time since her license has been suspended, to get her suspensions lifted by showing that she cannot afford to pay her traffic debt, she would take it.

136.    Every day without a driver's license makes it hard for Ms. Ganuelas to shop for groceries, provide for her daughter, and find a job.

### iv.  Karl Wade Roberts

137.    Plaintiff Karl Wade Roberts is 57-year-old resident of Baker City, Oregon.  Mr. Roberts lives with his wife.  He and his wife each receive $562 per month in social security income.  They do not receive income from any other source.  Their combined monthly income of $1,124 places them below the federal poverty line.

138.    Mr. Roberts has been unable to work since March 2003 due to the combined effects of injuries from an automobile accident in 1984 and a traumatic brain injury in 2003.

139.    On December 30, 1994, DMV suspended Mr. Roberts's license after he failed to pay a traffic ticket.  His driving privileges have not been restored since then.

140.    During the last twenty-five years, Mr. Roberts has received at least twenty additional notices of suspension based in full or in part upon his failure to pay tickets for minor traffic violations, such as driving while suspended or illegal display of plates.  The DMV most recently suspended his license on September 4, 2018.

141.    Mr. Roberts currently owes traffic debt for approximately 11 unpaid traffic tickets.  He owes $3,580 in fees and fines to the Baker County Justice Court.  He also owes $465

to a collection agency on a traffic debt assigned to that agency by the Arlington County Justice Court.

142.    Before becoming disabled, Mr. Roberts made payments to the Baker County Justice Court, hoping to get his license reinstated.  Since then, he has acquired more traffic debt, making it impossible for him to make the payments with his limited income.

143.    For Mr. Roberts's amount of traffic debt, the Baker County Justice Court will not approve a payment plan with a monthly payment of less than $50 per month.  He cannot pay $50 per month toward those debts.

144.    Mr. Roberts has been jailed for not paying traffic fines and fees that he could not afford to pay.

145.    The DMV never considered whether Mr. Roberts could afford to pay his traffic debt before suspending his license.

146.    The DMV has not offered Mr. Roberts any opportunity to reinstate his license based on his inability to pay.

147.    Mr. Roberts' wife does not have a driver's license and requires frequent transportation to medical appointments due to her health.

148.    Mr. Roberts used to ride his bicycle, even during Baker City's harsh winters, to purchase groceries and other necessities for his family.  As he has aged, it has become difficult for him to carry groceries by bike.

149.    Mr. Roberts is an enrolled member of the Western Cherokee Nation of Arkansas and Missouri.  As part of his Native heritage, he grew up fishing and hunting. Loss of driving privileges severely diminished his ability to enjoy these important cultural and recreational

activities.

150.    Mr. Roberts' adult children live in Boise, Idaho and St. Louis, Missouri.  He

cannot afford to fly to see them. Without a license, he rarely gets to visit them.

151.    There is very little public transportation where Mr. Roberts lives.

152.    Mr. Roberts continues to drive on a limited basis.  He lives in fear, knowing that

he risks accumulating more traffic debt for driving with a suspended license, and additional jail

time, if he receives additional traffic tickets that he cannot afford to pay.  However, he needs to

drive to provide for his wife's and his own basic needs.

### v.    Rebecca Heath

153.    Plaintiff Rebecca Heath is 60-year-old resident of Pendleton, Oregon.

154.    Ms. Heath receives $750 per month in SSDI and $189 per month in food stamps.

155.    Ms. Heath is an enrolled member of the Confederated Tribes of the Umatilla

Indian Reservation.  Each quarter, she receives $400 in casino dividends.  In the months she

receives a casino dividend check, her SSDI check is reduced by $400.

156.    Ms. Heath does not receive income from any other source.  Her monthly income

of $939 places her below the federal poverty line.

157.    Ms. Heath suffers from a debilitating back injury.  She also fought a years-long

battle with a tuberculosis.  Due to these health problems, she was homeless for seven years, from

2010 to 2017.

158.    Ms. Heath was found disabled and began receiving SSDI in 2017.  Prior to that,

she attempted to make ends meet by collecting cans, selling beadwork, and performing Native

dance.  She has not been able to maintain regular employment since 1997.

159.    Ms. Heath's driver's license was originally suspended on September 29, 1995, after she failed to appear on an out-of-state traffic ticket.  Her driving privileges have not been restored since then.

160.    Over the past 23 years, Ms. Heath has received approximately six additional notices of driver's license suspension from the DMV as a result of her inability to pay her traffic debt.  At the time of each suspension, she was too poor to afford to pay the traffic debt.

161.    Because more than 20 years have passed since Ms. Heath's license was suspended for failure to pay traffic debt, she is eligible for reinstatement.  However, she cannot reinstate her license because she cannot afford DMV's testing and reinstatement fees of $149.

162.    Ms. Heath has been jailed for paying traffic fines and fees that she could not afford to pay.

163.    The DMV never considered whether Ms. Heath could afford to pay her traffic debt before suspending her license.

164.    The DMV has not offered Ms. Heath any opportunity to reinstate her license based on her inability to pay.

165.    The DMV does not waive or reduce reinstatement fees based on inability to pay.

166.    Being unable to drive made it very difficult for Ms. Heath to find and maintain regular employment.  At her last regular job, in 1997, she had to walk 5.5 miles each way to get to work without driving.

167.    Due to her inability to drive, Ms. Heath has had to pay expensive cab fares; walk long distances in extreme weather; and take slow public transit systems.  She has missed important family and cultural events such as funeral services and tribal gatherings.  During the

seven years she was homeless, Ms. Heath's inability to drive meant that she had to carry all her possessions with her in a backpack.

168.    Plaintiffs Mendoza, Bermudez, Roberts and Heath, through their attorney, sent a letter to Administrator McClellan of the DMV on August 14, 2018, requesting that their driver's licenses be reinstated, that their reinstatement fees be waived, and that the agency stop its practice of suspending driver's licenses for non-payment of traffic debt.  Alternatively, these Plaintiffs requested that the DMV provide an opportunity, through a hearing, to lift their suspensions based on their inability to pay their traffic debt.

169.    The DMV denied Plaintiffs' requests in a letter, dated August 21, 2018.

## V.    CLASS ACTION ALLEGATIONS

170.    This action is brought and may properly be maintained as a class action pursuant to Federal Rules of Civil Procedure 23(a)(1)-(4) and 23(b)(2).

171.    This lawsuit satisfies the numerosity, commonality, typicality, and adequacy requirements of those provisions.

### A.  Numerosity – Fed. R. Civ. P. 23(a)(1)

172.    The class in this suit is so numerous that joinder of all of its members is impracticable.  During the last ten years, the Oregon DMV suspended Oregonians' driver's licenses 334,338 times for failure to pay traffic debt.  In 2017 alone, the DMV issued 32,280 license suspensions for failure to pay traffic debt.  Many of the individuals whose driver's licenses were suspended are, like the named plaintiffs, low-income people who are not paying traffic debt solely because they cannot afford to.

### B.  Commonality – Fed. R. Civ. P. 23(a)(2)

173.    The relief sought is common to all class members, and common questions of law and fact exist as to all class members. All of the named Plaintiffs have had their driver's licenses suspended for non-payment of traffic debt. All of the Plaintiffs were and are unable to pay because of their poverty.

174.    The DMV automatically suspends driver's licenses for failure to pay court fees and fines as mandated under Or Rev. Stat. § 809.416 and Or. Rev. Stat. § 809.210(4)(b). The requirements of the suspension statutes apply equally to class members, and the resolution of these legal and factual issues will determine whether all class members are entitled to the relief they seek.

175.    The named Plaintiffs seek relief concerning whether the DMV's policy and practice of suspending the driver's licenses of those who are too poor to pay their traffic debt violates the rights of class members. Plaintiffs also seek relief mandating that Defendants end their policy and practice so that the constitutional rights of the class will be protected in the future.

176.    The questions of law and fact common to the class predominate over any questions affecting solely individual members of the action, and include:

  a.    Whether Defendants' policy and practice of suspending driver's licenses for non-payment of traffic debt without considering the license-holder's ability to pay deprives Plaintiffs and class members of substantive due process and equal protection, in violation of the Fourteenth Amendment to the United States Constitution;

  b.    Whether Defendants' wealth-based suspension scheme violates procedural due

process because it does not provide an ability-to-pay hearing;

    c.   Whether Defendants' wealth-based suspension scheme violates equal protection and substantive due process because indigent traffic debtors are treated differently than traffic debtors who can afford to pay their traffic violation fines to avoid driver's license suspensions;

    d.   Whether Defendants violate the Equal Protection Clause by treating indigent traffic debtors differently from other similarly situated indigent debtors;

    e.   Whether Plaintiffs and members of the class are entitled to declaratory relief; and

    f.   Whether Plaintiffs and class members are entitled to injunctive relief.

## C. Typicality – Fed. R. Civ. P. 23(a)(3)

177.   Plaintiffs' claims are typical of the class. Plaintiffs, like all other members of the class, are Oregon residents who had their driver's licenses suspended for their inability to pay their traffic debt to Oregon courts. They are all affected by the Defendants' suspension of their driver's licenses and continue to risk further traffic violations – and traffic debt – by driving with suspended driver's licenses.

178.   If the named Plaintiffs succeed in their claim that the Defendant's policy and practice of suspending driver's licenses of residents who are too poor to pay traffic debt violates their constitutional rights, that ruling would benefit every class member.

## D. Adequacy – Fed. R. Civ. P. 23(a)(4)

179.   Plaintiffs will fairly and adequately protect the interests of the class. There are no known conflicts among class members, all of whom have a similar interest in asserting their constitutional rights.

…

**E. Rule 23(b)**

180.    This case is appropriate for class certification under Fed. R. Civ. P. 23(b)(2)

because Defendants' policy and practice of suspending driver's licenses for non-payment of

traffic debt warrants declaratory and injunctive relief that is appropriate to the class as a whole.

A declaration and injunction stating that the DMV cannot suspend driver's licenses when

someone is too poor to pay their traffic debt would provide relief to every member of the class.

181.    Concentrating this litigation in one forum, as opposed to separate individual cases

in various courts, will promote judicial economy, consistency and parity among the claims of

individual class members.  Allowing this lawsuit to proceed as a class action will permit the class

of similarly situated persons to prosecute their common claims in a single forum simultaneously

and efficiently.

182.    Plaintiffs are not aware of any difficulty that could be encountered in the

management of this action that would preclude its maintenance as a class action.


## VI.    FIRST CLAIM FOR RELIEF

**Fourteenth Amendment to the U.S. Constitution (Due Process/Equal Protection *Bearden***

**and *Griffin* Violation)**

183.    Plaintiffs incorporate by reference the allegations above as if fully set forth

herein.

184.    The Due Process Clause of the Fourteenth Amendment provides that "[n]o State

shall … deprive any person of life, liberty, or property without due process of law." U.S. Const.

amend. XIV, §1.

185.    The Equal Protection Clause of the Fourteenth Amendment provides that "[n]o State shall … deny to any person within its jurisdiction the equal protection of the laws."

186.    *Griffin v. Illinois*, 351 U.S. 12 (1956), and its progeny, establishes the principle that people should not be penalized just for being poor.  Under *Griffin*, states must provide an evaluation of ability to pay to assess an individual's indigence prior to any taking any measures that could result in any additional punishment beyond that imposed upon financially solvent individuals.

187.    The Fourteenth Amendment's Due Process and Equal Protection Clauses prohibit punishing individuals for non-payment without first determining that they had the ability to pay and willfully refused to make a monetary payment.  *See Bearden v. Georgia*, 461 U.S. 660 (1983).

188.    Under *Griffin* and *Bearden,* DMV's automatic suspension of driver's licenses for nonpayment of traffic debt without any inquiry into or consideration of the license holder's ability to pay violates the right to substantive due process and equal protection.

## VII.    SECOND CLAIM FOR RELIEF

### Fourteenth Amendment to the U.S. Constitution (Equal Protection Under *Strange*)

189.    Plaintiffs incorporate the allegations above as if fully set forth herein.

190.    Defendants' policy and practice of suspending driver's licenses as a means of debt collection for state courts from people who are too poor to pay their traffic debts, but not suspending the driver's licenses of other indigent judgment debtors, violates the right to equal protection under the law guaranteed by the Fourteenth Amendment to the United States

Constitution.

191.    Under *James v. Strange*, 407 U.S. 128 (1972), the Defendants' policy and practice of suspending driver's licenses under ORS § 809.416 violates the equal protection clause because it empowers the DMV to treat indigent traffic debtors worse than traffic debtors who committed bicycle, pedestrian, or parking offenses, private debtors with delinquent credit card debt, and child support debtors.  In Oregon, only indigent traffic debtors are punished with driver's license suspensions without any inquiry into or consideration of their ability to pay their traffic debt.

## VIII.    THIRD CLAIM FOR RELIEF

### Fourteenth Amendment to the U.S. Constitution (Procedural Due Process – Failure to Provide Pre- and Post-Deprivation Hearings)

192.    Plaintiffs incorporate the allegations above as if fully set forth herein.

193.    Plaintiffs have protected property and liberty interests in their driver's licenses and their ability to drive legally.  Defendants violate Plaintiffs' procedural due process rights by suspending their licenses without affording them a pre-suspension hearing to determine whether they are able to pay their traffic debt.  Defendants also violate Plaintiffs' procedural due process rights by not affording them a post-suspension hearing to determine if they are unable to pay their traffic debt.

194.    Plaintiffs are entitled to prospective relief under 42 U.S.C. § 1983, because they have demonstrated that Defendants, acting under color of state law, caused them to suffer a violation of a right secured by the Constitution. *See West v. Atkins*, 487 U.S. 42, 48 (1988).

## IX.    DEMAND FOR JURY TRIAL

195.    Plaintiffs hereby demand a trial by jury.

## X.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and all members of the proposed class, pray for:

(a)    An order designating this action as a class action;

(b)    A declaration that Defendants' practices with respect to suspensions of driver's licenses as alleged herein have violated and continue to violate the Due Process and Equal Protection Clauses of the Fourteenth Amendment to the U.S. Constitution as to the class;

(c)    An order and judgment preliminarily and permanently ordering Defendants, their subordinates, agents, employees, representatives, and all others acting or purporting to act on their behalf, from suspending driver's licenses for unpaid traffic debt against Plaintiffs and class members until such time as the DMV and the State of Oregon implement a system that complies with the United States Constitution;

(d) An order and judgment preliminarily and permanently ordering Defendants to remove Plaintiffs' and class members' suspensions for non-payment of traffic debt that were effected prior to the date of judgment in this matter and enjoining the Defendants from requiring the Plaintiffs and class members to pay reinstatement fees as a condition of reinstatement;

(e) An award of reasonable attorney fees pursuant to 42 U.S.C. § 1988, and costs and disbursements incurred herein;

(f) Prejudgment interest; and

(g) Such other and further legal and equitable relief as this Court deems just and proper.

DATED this 7th day of September, 2018.


                              OREGON LAW CENTER


                              /s/ Marisa Samuelson
                              Emily Teplin Fox, OSB No. 121720
                              efox@oregonlawcenter.org
                              Marisa Samuelson, OSB No. 144234
                              msamuelson@oregonlawcenter.org
                              Beth Englander, OSB No. 980190
                              benglander@oregonlawcenter.org
                              Kelsey Heilman, OSB No. 140348
                              kheilman@oregonlawcenter.org
                              522 SW Fifth Ave., Suite 812
                              Portland, OR 97204
                              (503) 473-8310

                              Jonathan M. Dennis, OSB 146256
                              jdennis@oregonlawcenter.org
                              35 SE Fifth Ave., Suite 1
                              Ontario, OR 97914
                              (541) 889-3296

                              Of Attorneys for Plaintiffs