Emily Teplin Fox, OSB No. 121720
efox@oregonlawcenter.org
Marisa Samuelson, OSB No. 144234
msamuelson@oregonlawcenter.org
Beth Englander, OSB No. 980190
benglander@oregonlawcenter.org
Kelsey Heilman, OSB No.140348
kheilman@oregonlawcenter.org
OREGON LAW CENTER
522 SW Fifth Ave, Suite 812
Portland, OR  97204
(503) 473-8325

Jonathan M. Dennis, OSB No. 146256
jdennis@oregonlawcenter.org
OREGON LAW CENTER
35 SE Fifth Ave., Suite 1
Ontario, OR 97914
(541) 889-3296

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| CINDY MENDOZA; GLORIA BERMUDEZ; CEKAIS TONI GANUELAS; REBECCA HEATH; and KARL WADE ROBERTS, on behalf of themselves and all others similarly situated,<br><br>                    Plaintiffs,<br><br>        v.<br><br>MATTHEW GARRETT, in his official capacity as Director of the Oregon Department of Transportation; TAMMY BANEY, in her official capacity as Chair of the Oregon Transportation Commission; SEAN | Case No.   3:18-cv-01634<br><br>**PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**<br><br>**Pursuant to Fed. R. Civ. P. 65**<br><br><br>**REQUEST FOR ORAL ARGUMENT** |

O'HOLLAREN, in his official capacity as
Member of the Oregon Transportation
Commission; BOB VAN BROCKLIN, in his
official capacity as Member of the Oregon
Transportation Commission; MARTIN
CALLERY, in his official capacity as Member
of the Oregon Transportation Commission; and
TOM MCCLELLAN, in his official capacity
as Administrator of Driver and Motor Vehicles
Division, Oregon Department of
Transportation,

                    Defendants.

## TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................................ 2

TABLE OF AUTHORITIES ...................................................................................... 3

LR 7-1 CERTIFICATION .......................................................................................... 7

MOTION ...................................................................................................................... 7

MEMORANDUM ........................................................................................................ 8

   I.    INTRODUCTION ........................................................................................ 8

   II.   FACTUAL BACKGROUND ...................................................................... 9

      A.   Oregon's License Suspension Regime for Traffic Debtors. ........................... 9

      B.   Cindy Mendoza. ........................................................................................... 14

      C.   Gloria Bermudez. ......................................................................................... 16

      D.   Cekais Toni Ganuelas. ................................................................................. 17

      E.   Rebecca Heath. ............................................................................................. 17

      F.   Karl Wade Roberts. ..................................................................................... 18

      G.   DMV's Failure to Consider Plaintiffs' Indigence. ...................................... 19

   III.  ARGUMENT ............................................................................................. 20

      A.   Legal Standard. ............................................................................................ 20

      B.   Plaintiffs are likely to succeed on the merits; alternatively, they have raised serious
questions going to the merits. ........................................................................... 21

2-    PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

1.    DMV's practice of suspending licenses for failure to pay traffic debt, without consideration of ability to pay, violates due process and equal protection under *Griffin* and its progeny. ........................................................................................... 21

    a.    Punishing criminal defendants for being poor violates the Fourteenth Amendment. ................................................................................................... 21

    b.    The DMV unconstitutionally punishes traffic debtors solely because of their poverty. .................................................................................................... 24

2.    DMV's practice of suspending licenses for failure to pay traffic debt, without consideration of ability to pay, violates equal protection under *Strange* and its progeny. 31

    a.    Traffic debtors who committed bicycle, pedestrian, or parking offenses. .......... 34

    b.    Private debtors generally. ................................................................... 35

    c.    Child support debtors. ........................................................................ 35

3.    DMV's practice of suspending licenses for failure to pay traffic debt, without consideration of ability to pay, deprives plaintiffs of procedural due process. ............... 37

C.    The balance of hardships tips sharply in plaintiffs' favor. ........................................... 40

D.    Granting a preliminary injunction is in the public interest. .......................................... 41

E.    Plaintiffs are likely to suffer irreparable harm in the absence of a preliminary injunction. ................................................................................................................... 42

F.    Plaintiffs' motion warrants statewide relief upon certification of a class. .................... 42

G.    The Court should waive the bond requirement. ........................................................... 43

IV.    CONCLUSION ................................................................................................................ 43

CERTIFICATE OF COMPLIANCE .................................................................................... 45

## TABLE OF AUTHORITIES

**Cases**

*All. For The Wild Rockies v. Cottrell*, 632 F.3d 1127 (9th Cir. 2011) ......................................... 20

*Ariz. Dream Act Coal. v. Brewer*, 855 F.3d 957 (9th Cir. 2017) .................................................. 34

*Armstrong v. Davis*, 275 F.3d 849 (9th Cir. 2001) ..................................................................... 42

*Attorney Gen. of N.Y. v. Soto-Lopez*, 476 U.S. 898 (1986) ......................................................... 27

*Baker v. City of Florissant*, No. 4:16-CV-1693 NAB, 2017 U.S. Dist. LEXIS 203104 (E.D. Mo. Dec. 11, 2017) ...................................................................................................... 36

*Bearden v. Georgia*, 461 U.S. 660 (1983) .......................................................................... passim

*Bell v. Burson*, 402 U.S. 535 (1971) ..................................................................................... 37, 38

*City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432 (1985) ............................................. 21, 32

*Country Classic Dairies, Inc. v. Milk Control Bureau*, 847 F.2d 593 (9th Cir. 1988) ................ 34

*Delaware v. Prouse*, 440 U.S. 648 (1979) .................................................................................. 25

*Easyriders Freedom F.I.G.H.T. v. Hannigan*, 92 F.3d 1486 (9th Cir. 1996) .............................. 42

*Fitch v. Belshaw*, 581 F. Supp. 273 (D. Or. 1984) ....................................................................... 33

*Fowler v. Johnson*, No. 17-11441, 2017 U.S. Dist. LEXIS 205363 (E.D. Mich. Dec. 14, 2017) .................................................................................................................................... 39

*Fowler v. Johnson*, No. 17-11441, 2017 U.S. Dist. LEXIS 209949 (E.D. Mich. Dec. 21, 2017) ("*Fowler II*") ................................................................................................................... 41

*Fuller v. Oregon*, 417 U.S. 40 (1974) ......................................................................................... 33

*Geiger v. Kitzhaber*, 994 F. Supp. 2d 1128 (D. Or. 2014) ......................................................... 34

*Hernandez v. Sessions,* 872 F.3d 976 (9th Cir. 2017) ................................................................. 24

*Latif v. Holder*, 28 F. Supp. 3d 1134 (D. Or. 2014) .................................................................... 27

*Lopez v. Heckler*, 713 F.2d 1432 (9th Cir. 1983) ....................................................................... 40

*M.R. v. Dreyfus*, 697 F.3d 706 (9th Cir. 2012) ........................................................................... 42

*MacFarlane v. Ducharme*, 179 F.3d 1131 (9th Cir. 1999) ................................................... 24, 25

*Marquard v. New Penn Fin., LLC*, No. 3:17-cv-549-SI, 2017 U.S. Dist. LEXIS 82952 (D. Or. May 31, 2017) ................................................................................................................... 43

*Mathews v. Eldridge*, 424 U.S. 319 (1976) ...................................................................... 37, 38, 39

*Melendres v. Arpaio*, 695 F.3d 990 (9th Cir. 2012) .................................................................... 42

*Miller v. Reed*, 176 F.3d 1202 (9th Cir. 1999) ........................................................................... 26

*Mohamed v. Holder*, 266 F. Supp. 3d 868 (E.D. Va. 2017) ....................................................... 27

*R.G. v. Koller*, 415 F. Supp. 2d 1129 (D. Haw. 2006) ............................................................... 40

*Robinson v. Purkey*, No. 3:17-cv-01263, 2018 U.S. Dist. LEXIS 97659 (M.D. Tenn. June 11, 2018) ("*Robinson II*") ........................................................................................................ 9

*Robinson v. Purkey*, No. 3:17-cv-1263, 2017 U.S. Dist. LEXIS 165483 (M.D. Tenn. Oct. 5, 2017) ............................................................................................................................... 9, 37

*Rodriguez v. Robbins*, 715 F.3d 1127 (9th Cir. 2013) ................................................................ 41

*Saenz v. Roe*, 526 U.S. 489 (1999) .............................................................................................. 26

*Sammartano v. First Judicial Dist. Court*, 303 F.3d 959 (9th Cir. 2002).....................................41

*Tate v. Short*, 401 U.S. 395 (1971) ..........................................................................22, 30

*Thomas v. Haslam*, No. 3:17cv5, 2018 U.S. Dist. LEXIS 60969 (M.D. Tenn. Mar. 26, 2018) ................................................................................9, 26, 33, 34

*Thomas v. Haslam*, No. 3:17cv5, Doc. 113, Order of July 2, 2018 ("*Thomas II*") .................9, 29

*Tutor-Saliba Corp. v. City of Hailey*, 452 F.3d 1055 (9th Cir. 2006)...........................23

*United States v. Parks*, 89 F.3d 570 (9th Cir. 1996)....................................................24

*West v. Atkins*, 487 U.S. 42 (1988) ..............................................................................21

*Williams v. Illinois*, 399 U.S. 235 (1970) ....................................................................22

*Winter v. Natural Resources Defense Council*, 555 US 7 (2008)................................20

*Witt v. Dep't of the Air Force*, 527 F.3d 806 (9th Cir. 2008) .......................................23

**Statutes**

42 USC § 1983.................................................................................................................21

ORS § 1.102...................................................................................................................12

ORS § 1.194...................................................................................................................30

ORS § 1.197...................................................................................................................30

ORS § 137.118.........................................................................................................30, 35

ORS § 153.008...............................................................................................................10

ORS § 153.012...............................................................................................................10

ORS § 153.018...............................................................................................................10

ORS § 153.019...............................................................................................................10

ORS § 153.020...............................................................................................................10

ORS § 153.021...............................................................................................................10

ORS § 153.061...............................................................................................................11

ORS § 153.090...............................................................................................................12

ORS § 153.096...............................................................................................................10

ORS § 153.800 .................................................................................................. 10

ORS § 161.665 .................................................................................................. 33

ORS § 18.150 .................................................................................................... 30

ORS § 25.275 .................................................................................................... 36

ORS § 25.280 .................................................................................................... 36

ORS § 25.750 .............................................................................................. 35, 36

ORS § 293.231 .................................................................................................. 12

ORS § 646A.670 ............................................................................................... 35

ORS § 697.105 .................................................................................................. 12

ORS § 801.555 .................................................................................................. 10

ORS § 807.250 .................................................................................................. 36

ORS § 807.370 ................................................................................................ 8, 14

ORS § 809.210 ............................................................................................. 12, 34

ORS § 809.380 .................................................................................................. 14

ORS § 809.415 .................................................................................................. 13

ORS § 809.416 ............................................................................................. passim

ORS § 809.440 .................................................................................................. 13

ORS § 811.175 .................................................................................................. 13

ORS § 811.225 .................................................................................................. 10

ORS. § 809.267 ................................................................................................. 12

**Other Authorities**

Associated Press, *California No Longer will Suspend Driver's Licenses for Traffic Fines*, L.A. Times, June 29, 2017 ........................................................................ 41

Federal Reserve, *Report on the Economic Well-Being of U.S. Households in 2017*, May 2018 ....................................................................................................... 11

Ford Family Foundation, *Oregon by the Numbers*, 2018 edition ................................. 26

Office of the State Court Administrator, *2018 "Schedule of Fines" on Violations (SOF-18)* ............................................................................................................... 10

Oregon Food Bank, *Hunger in Oregon* ...................................................................... 11

Oregon State Police – Patrol Division, Car Care Program ........................................... 31

Paul Taylor and Wendy Wang et al., *The Fading Glory of The Television and Telephone,* Pew Research Center 1 (Aug. 10, 2010) ..................................................................... 10

Susan Sharon, *Maine Drivers Will not Have Licenses Suspended for Failing to Pay Fines*, Bangor Daily News, July 10, 2018 ................................................................. 41

U.S. Census Bureau, *Quick Facts: Oregon* ............................................................... 11

U.S. Dep't of Transp., Bur. Of Transp. Stats., OREGON: Transportation by the Numbers (2016) ......................................................................................................................... 10

U.S. Dept. of Health and Human Services, HHS Poverty Guidelines for 2018 .......................... 13

**Rules**

OAR 137-055-3430 .................................................................................................... 36

OAR 137-055-4420 .................................................................................................... 36

OAR 150-018-0020 .................................................................................................... 30

## LR 7-1 CERTIFICATION

The undersigned counsel hereby certifies that the parties made a good faith effort through telephone conference to resolve the dispute on August 31, 2018, and have been unable to do so.

## MOTION

Plaintiffs, low-income Oregonians whose driver's licenses have been suspended, move the Court for a preliminary injunction compelling defendants, as officials of the Department of Motor Vehicles Division of the Oregon Department of Transportation ("DMV"), to

- remove the suspensions on plaintiffs' driver's licenses for nonpayment of traffic debt under ORS § 809.416, and, if the plaintiff is therefore eligible for reinstatement, waive the reinstatement and issuance fees under ORS § 807.370; and

- refrain from suspending plaintiffs' licenses for failure to pay their traffic debt unless and until plaintiffs have had the opportunity to demonstrate their inability to pay, entitling them to be exempt from suspension, through a procedure that comports with due process.

If the Court grants plaintiffs' Motion for Certification of a Class, they move the Court for a preliminary injunction ordering the DMV to issue this same relief to all persons currently suspended for nonpayment of traffic debt under ORS § 809.416, and provide appropriate notice of those changes to class members.

## MEMORANDUM

### I.    INTRODUCTION

Over the past ten years, the DMV suspended Oregonians' driver's licenses 334,338 times for failure to pay fines, costs, and fees arising from minor traffic violations ("traffic debt"). (Samuelson Decl. ¶ 2, Ex. 1 (suspension chart) at 7.)  Plaintiffs are low-income individuals who are not paying their traffic debt simply because they cannot afford to.

The DMV's failure to consider an individual's ability to pay her traffic debt, and exempt from suspension those who cannot, wreaks havoc on the lives of Oregonians living in poverty. Reliant on their vehicles to transport their children to school, to access medical services, to get and keep their jobs, or to travel inside and outside the state, many Oregonians with unaffordable traffic debt continue to drive even after their licenses are suspended.  They risk further criminal

charges for driving with a suspended driver's license, additional traffic debt they cannot afford, and an even lengthier period of suspension. Unless they pay their traffic debt, these low-income Oregonians cannot regain their licenses for 20 years.

The DMV's practice amounts to the criminalization of poverty. It is unconstitutional, and should be stopped.

District courts considering similar challenges to license suspension or revocation regimes that fail to consider a debtor's ability to pay consistently rule in plaintiffs' favor. *See, e.g.*, *Thomas v. Haslam*, No. 3:17cv5, Doc. 113, Order of July 2, 2018 ("*Thomas II*," attached as Exhibit 2 to the Samuelson Declaration) (concluding as a matter of law that license revocations for failure to pay court debt, without an ability-to-pay determination, are unconstitutional); *Thomas v. Haslam*, 303 F. Supp. 3d 585, 593 (M.D. Tenn. 2018) (prior order denying motion to dismiss, granting class certification, and evaluating cross motions for summary judgment); *Robinson v. Purkey*, No. 3:17-cv-1263, 2017 U.S. Dist. LEXIS 165483, at *2 (M.D. Tenn. Oct. 5, 2017) (granting temporary restraining order reinstating the drivers licenses of traffic debtors unable to pay debt); *Robinson v. Purkey*, No. 3:17-cv-01263, 2018 U.S. Dist. LEXIS 97659, at *175-76 (M.D. Tenn. June 11, 2018) ("*Robinson II*") (finding likelihood of success on the merits to support preliminary injunction and setting evidentiary hearing on other issues). This Court should likewise recognize the unconstitutionality of suspending the licenses of people who cannot afford traffic debt.

## II.    FACTUAL BACKGROUND

### A.  Oregon's License Suspension Regime for Traffic Debtors.

Oregonians drive. Approximately 82% of Oregonians over the age of 16 travel to work

by car, either alone or in a carpool.[1]  A Pew Research Center Study found that 86% of Americans consider a car to be a "necessity of life," higher than the percentage of people who identified cell phones as a necessity, at 47%.[2]

Reflecting the centrality of driving to life in Oregon, committing a minor traffic violation[3] does not automatically result in the suspension of a violator's driver's license under state law.  Instead, it results in the imposition of a fine.  *See* ORS §§ 153.012, 153.018-153.021. Oregon circuit courts abide by a uniform fine schedule, which sets presumptive, maximum, and minimum fines for four classes of traffic violations.  ORS § 153.800(4)(b).[4]  Generally, a court may not "defer, waive, suspend or otherwise reduce the fine" below the statutory minimum. *Id.* § 153.021; *see also id.* § 153.096 (exception for fines pertaining to boating violations).

When an enforcement officer charges a person with a traffic violation, she issues a citation with the corresponding "presumptive fine." *Id.* §§ 153.019, 153.020. (*See, e.g.*, Bermudez Decl., Ex. 1 (citation).)  For example, "failure to properly use safety belts" is a Class D violation. *Id.* § 811.210(4). The presumptive fine is $115, *id.* § 153.019(1)(d), or $220 if in a special zone (e.g., school zone), *id.* § 153.020(4). Unless the law or the court requires the

---

[1] U.S. Dep't of Transp., Bur. Of Transp. Stats., OREGON: Transportation by the Numbers (2016), https://www.bts.gov/sites/bts.dot.gov/files/legacy/oregon.pdf.

[2] Paul Taylor and Wendy Wang et al., *The Fading Glory of The Television and Telephone,* Pew Research Center 1 (Aug. 10, 2010), http://assets.pewresearch.org/wp-content/uploads/sites/3/2011/01/Final-TV-and-Telephone.pdf.

[3] "Traffic offense" is the umbrella term for actions that violate Oregon traffic laws and ordinances. ORS § 801.555. An offense is a "traffic violation" if the sentence does not include jail time.  *Id.* § 153.008(1)(b).

[4] *See* Office of the State Court Administrator, *2018 "Schedule of Fines" on Violations (SOF-18), available at* https://digital.osl.state.or.us/islandora/object/osl%3A104207/datastream/OBJ/view.

defendant to appear in person, the defendant may resolve the matter by paying the fine. *See id.* §
153.061(3)(b).  People who can afford traffic violation fines simply pay them and move on with
their lives.

Many Oregonians, however, cannot afford such fines.  According to a recent Federal
Reserve survey, approximately 40% of Americans reported that they did not have enough money
to cover a $400 emergency expense.[5]  More than 13% of Oregonians live below the federal
poverty guidelines.[6]  The rate of food insecurity is even higher, 14.6%, affecting 552,900
Oregonians.[7]

Low-income people who cannot afford a fine arising out of a traffic violation face myriad
additional consequences.  Oregon's circuit courts allow, but do not oblige, courts to offer
payment plans for traffic debt, but the plans come with additional fees.  In addition, minimum
monthly payment amounts are based on the total amount owed, not the debtor's financial
circumstances.  (Samuelson Decl., Ex. 3 (OJD Accounts Receivable Policy) at 11.)  Municipal
courts may, or may not, offer any payment plan at all.  (Mendoza Decl. ¶ 9.)  Ultimately, the
availability of a payment plan is entirely discretionary—low-income drivers have no right to a
payment schedule they can afford.  Individuals who are not paying traffic debt, pursuant to a
payment plan or not, may find their accounts sent to a private collections agency or the Oregon

---

[5] *Report on the Economic Well-Being of U.S. Households in 2017*, May 2018, at 21,
*available at* https://www.federalreserve.gov/publications/files/2017-report-economic-well-being-us-households-201805.pdf.

[6] U.S. Census Bureau, *Quick Facts: Oregon*, *available at*
https://www.census.gov/quickfacts/fact/table/or/INC110216.

[7] Oregon Food Bank, *Hunger in Oregon*, *available at*
https://www.oregonfoodbank.org/our-work/hunger-in-oregon/.

Department of Revenue, resulting in even further costs and fees that augment their existing traffic debt. *See* ORS §§ 1.102(2), 293.231, 697.105.

These fines, fees, and costs are imposed regardless of how poor the traffic debtor is. While indigent drivers may allege that they do not have the ability to pay in full on default judgments of restitution to victims of economic damages resulting from their violation, *id.* § 153.090(2), traffic debt never triggers a consideration of the violator's ability to pay.

When a traffic debtor "fails *or* refuses to pay" traffic debt, the court has two options: it may order the debtor's driving privileges restricted or it may issue "a notice of suspension to the Department of Transportation that directs the department to implement procedures under ORS 809.416." *Id.* § 809.210(1) (emphasis added). This lawsuit concerns only the latter: suspensions by the DMV under ORS § 809.416 pursuant to a notice of suspension. Delinquent payment plans usually result in the automatic generation of a notice of suspension (Samuelson Decl., Ex. 4 (Collections Manual) at 48), which triggers yet another fee. ORS. § 809.267. A traffic debtor has no right to avoid a notice of suspension by arguing that his failure to pay traffic debt is not willful, but rather a result of his poverty and consequential inability to pay.

Pursuant to sections (2) and (3) of ORS § 809.416, the law plaintiffs challenge as unconstitutional, the DMV suspends a traffic debtor's driver's license upon receipt of a notice of suspension and issuance of a 60-day warning to the traffic debtor. To avoid or end the suspension, the traffic debtor must present the DMV with a notice of reinstatement issued by the court showing that she "(A) [i]s making payments, has paid the fine[,] or has obeyed the order of the court; or (B) [h]as enrolled in a preapprenticeship program . . . or is a registered apprentice." *Id.* § 809.416(2)(a). Otherwise, the suspension continues until "[t]wenty years have elapsed

from the date the traffic offense occurred." *Id.* § 809.416(2)(b).  A traffic debtor cannot avoid suspension by the DMV on the ground of inability to pay.

A traffic debtor can request administrative review of her suspension.  *Id.* § 809.415(4)(b). However, the scope of administrative review is narrow; the debtor must prove that the offense did not involve a motor vehicle, that it was based on an out-of-state conviction not comparable to an Oregon offense; or that the DMV identified the wrong person. *Id.* § 809.440(2)(b). Administrative review excludes any consideration of ability to pay.

An initial suspension often sets up a cascade of traffic violations, each further compounding the traffic debt and making it harder for indigent drivers to regain their licenses. Faced with an impossible choice between breaking the law and failing to meet the basic needs of their families, indigent traffic debtors often choose to drive while their licenses are suspended. That often leads to a citation for driving with a suspended driver's license.  (*See, e.g.*, Bermudez Decl. ¶¶ 10, 14; Ganuelas Decl. ¶ 5.)  That is an additional, new traffic violation, ORS § 811.175, with a presumptive fine of $440, ORS § 153.019(1)(a), subject to the same debt collection and license suspension procedures described above. For a single person living at or below the 2018 federal poverty guidelines, that presumptive $440 fine is more than 43% of her monthly income.[8]

Even indigent traffic debtors who either manage to pay down their traffic debt, or who live with a suspended license for the maximum suspension period of 20 years, face a final economic barrier.  To reinstate her driving privileges, an eligible requestor must pay a $75

---

[8] U.S. Dept. of Health and Human Services, HHS Poverty Guidelines for 2018, *available at* https://aspe.hhs.gov/poverty-guidelines ($12,140 annually for single person household).

reinstatement fee, and issuance fees between $26.50 and $68, depending on whether her license

has expired with the passage of time.  ORS § 807.370(5), (25), (33).  The DMV will waive

reinstatement fees in certain circumstances—e.g. if the suspension occurred resulted from an

insurance company's error—but not on the basis that the requestor is unable to pay. *Id.* §

809.380(6)(a)-(L), (7).  The DMV is not required by any statute or regulation to offer payment

plans.  These reinstatement and issuance fees on their own can constitute insurmountable traffic

debt.  (*See* Heath Decl. ¶¶ 13-14 (unable to obtain license reinstatement after over 20 years

because of prohibitively expensive DMV testing and reinstatement fees).)  In 2017 alone, there

were 2,433 Oregonians who were eligible for license reinstatement after a traffic debt-related

suspension, but did not pay reinstatement and issuance fees.  (Samuelson Decl. ¶ 3, Ex. 1

(suspension chart) at 19.)

　　　　In sum, a minor traffic violation may cost a wealthy individual $110 and a stamp.  For

low-income people who do not have $110 to spare, a minor traffic violation may grow into

traffic debt of many hundreds, even thousands, of dollars, and a 20-year suspension of her

driver's license, without consideration of her ability to pay before or during the suspension.

### B.  Cindy Mendoza.

　　　　Plaintiff Cindy Mendoza is a single mother of three children in Portland, Oregon.

(Mendoza Decl. ¶ 2.)  She lives in extreme poverty, only recently moving out of a homeless

shelter into subsidized housing and relying on free boxes at food pantries to keep her children

fed.  (*Id.* ¶¶ 3-4.)

　　　　In 2010, while unemployed and caring for a new baby, Ms. Mendoza received a $400

speeding ticket in Wasco County that she could not afford. The amount increased to $812 with

court costs and fees. (*Id.* ¶ 7.)  The debt was sent to a collections agency and the DMV suspended Ms. Mendoza's driver's license.  After five years, Ms. Mendoza managed to pay off this debt and the DMV lifted the related suspension in April 2015.  However, before she was able to pay down the debt, Ms. Mendoza was cited a few more times for driving with a suspended license.  (*Id.* ¶ 8.)  As Ms. Mendoza explains, these additional traffic violations, followed by additional DMV suspensions, "put me in a downward spiral, making it impossible for me to ever get caught up."  (*Id.*)  Her license is still suspended today.  (*Id.* ¶ 5.)

Ms. Mendoza's current traffic debt, in addition to other court-imposed debt, totals $11,282.77, almost as much as Ms. Mendoza receives in assistance, including food stamps, annually.  (*Id.* ¶¶ 4, 14.)  Without steady employment, Ms. Mendoza cannot afford to make any payments on her traffic debt.  Doing so would imperil her ability to feed, clothe, and house herself and her children.  (*Id.* ¶¶ 12, 16.)

Having a suspended license has created additional challenges beyond those Ms. Mendoza already faced.  In addition to tickets for driving with a suspended license, leading to further traffic debt and further suspensions, Ms. Mendoza has struggled to find a job that does not require a driver's license and that is close enough to her apartment as to facilitate a commute without driving.  (*Id.* ¶ 21.)

 Ms. Mendoza relies on her vehicle to provide basic necessities for her family.  For example, when she runs out of food at the end of the month, Ms. Mendoza must often travel increasingly far to access food pantries. (*Id.* ¶ 18.)  Every day, Ms. Mendoza must choose between providing for her family and risking additional debt and further suspension of her driver's license.

15-  PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

### C.  Gloria Bermudez.

Plaintiff Gloria Bermudez is a single mother of four children who lives in Portland, and is her family's sole wage earner.  (Bermudez Decl. ¶¶ 2-3.)  Her only income, beyond food assistance, is approximately $1600 a month as a restaurant cook.  (*Id.* ¶ 4.)  Ms. Bermudez struggles to keep up with her gas, electric, and phone bills, and often relies on food pantries towards the end of the month to feed her family. (*Id.* ¶ 5.)

In 2003, Ms. Bermudez was issued a $175 ticket for failing to obey a traffic control device.  (*Id.* ¶ 8 & Ex. 1 (citation).)  Her traffic debt on that one citation nearly doubled, and the DMV suspended her license.  Ms. Bermudez's license was reinstated in 2010 when she entered into a payment plan, but she could not keep up with the monthly payments so the DMV suspended her license again in 2012.  (*Id.*)

The DMV has since suspended Ms. Bermudez's driver's license, on multiple additional occasions, for her failure to pay traffic debt.  (*Id.* ¶¶ 9-13.)  She was recently cited for driving with a suspended license while driving home from work, incurring another $440 ticket, which she expects will grow and result in yet another suspension from the DMV.  (*Id.* ¶ 14.)  Ms. Bermudez has paid hundreds of dollars towards her traffic debt over the years, but she always falls behind.  In 2012, when she was offered a payment plan of $75 a month, Ms. Bermudez submitted a letter to the court explaining that, as a new mother to a premature baby, she had no money to spare. (*Id.* ¶ 15, Ex. 3 (payment plan), Ex. 4 (letter).)  At this time, traffic debt payments would deprive her of her ability to provide basic necessities for her family.  (*Id.* ¶ 19.)

Like Ms. Mendoza, Ms. Bermudez must choose between incurring more traffic violations and debt for driving with a suspended license, or taking her children to school and medical

appointments and maintaining her job. (*Id.* ¶¶ 20-24.)

### D. Cekais Toni Ganuelas.

Plaintiff Cekais Ganuelas is a single mother who lives with her daughter in Mission, Oregon. (Ganuelas Decl. ¶ 2.) The DMV suspended her driver's license in 2012, after she could not pay a ticket for failure to display plates. (*Id.* ¶ 3.) Since then, she has been cited at least three times for driving with a suspended license, and she has received multiple additional suspension notices from the DMV. (*Id.* ¶¶ 4, 5, Ex. 1 (DMV notice).)

Her license suspension has profoundly impacted Ms. Ganuelas' life. She used to commute to her bartender job on foot, requiring her to cross a busy four-lane highway with no crosswalk between 11:00 pm and 1:00 am. (*Id.* ¶ 9.) When she moved farther away from her work, Ms. Ganuelas commuted to every shift by paying a taxi or friends. (*Id.* ¶ 10.) Ms. Ganuelas recently lost that job, her primary income source, when she could not persuade friends to lend her a vehicle to get to work from a camping trip because of her license suspension. (*Id.* ¶ 7.) She now earns only $140 a month. (*Id.* ¶ 8.) While Ms. Ganuelas is actively seeking other employment, not having a valid driver's license dims her prospects. (*Id.* ¶ 17.) Her license suspension has restricted Ms. Ganuelas' ability to travel to family events, especially those out of state, as well as her daughter's school events. (*Id.* ¶¶ 12-17.) Ms. Ganuelas would pay down her traffic debt if she could, but daily necessities make e payments impossible. (*Id.* ¶¶ 22-23.)

### E. Rebecca Heath.

Plaintiff Rebecca Heath, a resident of Pendleton, Oregon, lives on Social Security Disability Income and less than $200 a month in food stamps. (Heath Decl. ¶¶ 2-3.) Ms. Heath has not maintained regular employment since around 1997, in part because the DMV suspended

her driver's license on September 29, 1995, and approximately six additional times since, based on her nonpayment of traffic debt she could not afford. Without a valid license, Ms. Heath walked 11 miles round-trip to get to and from her last job. (*Id.* ¶¶ 4-6.)

During a period of homelessness, Ms. Heath's lack of a valid driver's license created extreme difficulties. She carried all of her earthly possessions with her in a backpack. (*Id.* ¶ 12.) Ms. Heath has had to pay expensive cab fares, and walk long distances in hot, cold, and wet weather. (*Id.* ¶ 11.) Public transportation in Pendleton is slow and extremely limited; Uber and Lyft are not options. (*Id.* ¶ 10.) Because of her suspension, Ms. Heath has missed funeral services for family members and tribal events. (*Id.* ¶ 11.)

After more than 20 years, the suspension on Ms. Heath's driver's license for failure to pay traffic debt has now expired, and she is eligible for reinstatement. (*Id.* ¶ 13.) Yet she cannot afford the DMV's testing and reinstatement fees of $149, and thus remains without a valid license. (*Id.* ¶ 14.)

### F. Karl Wade Roberts.

Plaintiff Karl Wade Roberts lives in Baker City, Oregon. (Roberts Decl. ¶ 2.) Social Security is the only income Mr. Roberts and his wife receive. (*Id.* ¶ 3.) The DMV suspended Mr. Roberts' license on December 30, 1994, when he failed to pay a traffic ticket he could not afford. (*Id.* ¶ 6.) Since then, the DMV has sent Mr. Roberts no fewer than 20 additional notices of suspension, based in full or in part on nonpayment of traffic debt arising out of minor violations. (*Id.*) He has paid on his traffic debt when he can, but Mr. Roberts and his wife often struggle to make ends meet and never have money left over at the end of the month. (*Id.* ¶¶ 5, 7.)

Not having a valid driver's license has impacted Mr. Roberts in many ways, beyond his

incurring subsequent, additional traffic debt for driving with a suspended license.  As a Native American, hunting and fishing are part of his cultural heritage, but it has been "pretty much impossible" for him to engage in these activities without the lawful ability to drive.  (*Id.* ¶ 13.) Avoiding driving as much as he can, Mr. Roberts has ridden his bicycle through harsh Baker City winters to purchase groceries, a task that has become increasingly difficult as he ages and contends with chronic pain and disability.  (*Id.* ¶ 15.)  There is little to no public transportation where Mr. Roberts lives, and he needs a way to transport his wife to frequent medical appointments.  (*Id.* ¶¶ 16-17.)  Mr. Roberts' adult children live out of state.  He cannot afford to travel by air to visit them, but without a valid license he rarely visits.  (*Id.* ¶ 14.)

Beyond the continuous and increasing financial, physical, and psychological toll of his driver's license suspension, Mr. Roberts was also incarcerated for nearly a month in Baker City Jail based on nonpayment of some of his traffic debt.  (*Id.* ¶ 19.)

He lives in fear, knowing that he risks additional jail time if he receives additional traffic tickets he cannot afford to pay, but lacking resources that would allow him to provide for his and his wife's basic needs without driving in rural Oregon.  (*Id.* ¶ 20.)

### G. DMV's Failure to Consider Plaintiffs' Indigence.

Before suspending plaintiffs' licenses, the DMV did not inquire into any plaintiff's ability to pay his or her traffic debt.  It did not provide them, or make sure they had, any opportunity to avoid suspension by explaining that they could not afford to make payments.  And the DMV has not provided them, or ensured they had, any subsequent opportunity to have the suspension lifted as a result of their indigency.  (Mendoza Decl. ¶¶ 10-11; Bermudez Decl. ¶¶ 16-17; Ganuelas Decl. ¶¶ 24-25; Heath Decl. ¶ 7; Roberts Decl. ¶ 11.)  Each plaintiff would

have, and would still, take such an opportunity if the DMV had presented or does present one. (*Id*.)

In August, counsel on behalf of Ms. Mendoza, Ms. Bermudez, Ms, Heath, and Mr. Roberts made a formal request to the DMV to lift the restrictions on their driver's licenses for failure to pay traffic debt, unless or until they have an opportunity to have the restriction lifted by establishing that their nonpayment is the result of indigency.  (Samuelson Decl., Ex. 5 (8/14/18 letter).)  The DMV denied their request.  (*Id.*, Ex. 6 (8/21/18 letter).)  This lawsuit followed.

## III.    ARGUMENT

### A.  Legal Standard.

A plaintiff seeking a preliminary injunction generally must show that: (1) she is likely to succeed on the merits; (2) she is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in her favor; and (4) that an injunction is in the public interest.  *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 20 (2008).  The Ninth Circuit, however, applies a "sliding scale" approach to the issuance of preliminary injunctions, pursuant to which "'serious questions going to the merits' and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest."  *All. For The Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011).  Here, whichever formulation of the test is applied, all four factors militate strongly in favor of granting a preliminary injunction.

**B.  Plaintiffs are likely to succeed on the merits; alternatively, they have raised serious questions going to the merits.**

In order to establish a claim for relief under 42 USC § 1983, plaintiffs must demonstrate that "a person acting under color of state law" caused plaintiffs to suffer "the violation of a right secured by the Constitution and laws of the United States[.]" *West v. Atkins*, 487 U.S. 42, 48 (1988).  The Due Process Clause of the Fourteenth Amendment secures plaintiffs' right not to be deprived of property without due process of law, U.S. Const. amend. XIV, § 1, while the Equal Protection Clause "commands that no State shall deny to any person within its jurisdiction the equal protection of the laws, which is essentially a direction that all persons similarly situated should be treated alike."  *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985) (quotation marks omitted).

Plaintiffs are likely to succeed on the merits of their due process and equal protection claims; they have raised at least serious questions going to the merits.

**1.  DMV's practice of suspending licenses for failure to pay traffic debt, without consideration of ability to pay, violates due process and equal protection under *Griffin* and its progeny.**

**a.  Punishing criminal defendants for being poor violates the Fourteenth Amendment.**

A long line of United States Supreme Court precedent spanning over six decades establishes that the Fourteenth Amendment's guarantees of due process and equal protection prohibit penalizing people simply because they are poor.  In *Griffin v. Illinois*, 351 U.S. 12, 13 (1956), the Court considered Illinois' policy of granting appellate review only to criminal defendants who paid for trial transcripts.  The absence of an exception for criminal appellants who could not afford a transcript, the Court explained, violated both the Due Process and Equal Protection Clauses.  *Id.* at 19.  The law, Justice Frankfurter explained in a concurrence,

"addresses itself to actualities," and "[i]t does not face actuality to suggest that Illinois affords every convicted person, financially competent or not, the opportunity to take an appeal," if indigent appellants cannot access the necessary transcript because of their poverty. *Id.* at 23.

The Court elaborated on this principle in *Williams v. Illinois*, 399 U.S. 235, 242 (1970), concluding that an indigent defendant's imprisonment cannot, on the ground that he is unable to pay fines resulting from his conviction, be extended past the statutory maximum. Like the unconstitutional statute in *Griffin*, the *Williams* statute was facially nondiscriminatory, "extend[ing] to all defendants an apparently equal opportunity for limiting confinement to the statutory maximum simply by satisfying a money judgment." *Id.* But the Court recognized that

> this is an illusory choice for . . . any indigent who, by definition, is without funds.
> Since only a convicted person with access to funds can avoid the increased
> imprisonment, the . . . statute in operative effect exposes only indigents to the risk
> of imprisonment beyond the statutory maximum.

*Id.* The Court concluded that the Fourteenth Amendment "requires that the statutory ceiling placed on imprisonment for any substantive offense be the same for all defendants irrespective of their economic status." *Id.* at 244. Likewise, a state cannot incarcerate indigent individuals based on their failure to pay fines arising out of offenses punishable by fines only. *See Tate v. Short*, 401 U.S. 395, 398 (1971). In short, a defendant's poverty cannot result in additional punishment beyond that imposed upon financially solvent defendants.

Accordingly, governments must assess an individual's indigence prior to the imposition of any punishment that could run afoul of the constitutional principle that people should not be penalized just for being poor. The Supreme Court reached that conclusion in *Bearden v. Georgia*, 461 U.S. 660, 662-63 (1983), in which a Georgia court revoked the probation of a low-income individual because he had not paid court-imposed fines, and sentenced him to serve the remainder of his probation period incarcerated. The Court found that the failure to determine

whether the petitioner's failure to pay was willful contravened the "fundamental fairness required by the Fourteenth Amendment." *Id.* at 673. "[I]f the probationer has made all reasonable efforts to pay the fine or restitution, and yet cannot do so through no fault of his own, it is fundamentally unfair to revoke probation automatically without considering whether adequate alternative methods of punishing the defendant are available." *Id.* at 668-69.

Substantive due process claims ordinarily require the court to determine whether a fundamental right is at stake, in order to assess whether the state action in question will be subject to rational basis review or heightened scrutiny. *Witt v. Dep't of the Air Force*, 527 F.3d 806, 813 (9th Cir. 2008). Similarly, courts considering equal protection claims generally apply rational basis review unless the alleged discriminatory conduct implicates a fundamental right or a suspect classification. *Tutor-Saliba Corp. v. City of Hailey*, 452 F.3d 1055, 1061 (9th Cir. 2006). But certain narrow types of cases defy such clean categorization. *See Witt*, 527 F.3d at 820 (noting that the typical "all-or-nothing substantive due process approach" does not "reflect the complexity of the Court's due process analysis" in some cases) (alterations normalized).

The Supreme Court has made clear that, in cases involving the treatment of indigent criminal defendants, courts must eschew the usual tiers-of-scrutiny approach and engage in a more searching inquiry. In *Bearden*, the Court acknowledged the parties' "vigorous" debate over "whether strict scrutiny or rational basis is the appropriate standard of review." 461 U.S. at 665. Rather than resolving that question in either party's favor, the Court noted that "[d]ue process and equal protection principles converge in the Court's analysis" in *Griffin*, *Williams*, and other cases considering the treatment of indigent criminal defendants, and reasoned that "the issue cannot be resolved by resort to easy slogans or pigeonhole analysis, but rather requires a

careful inquiry into such factors as the nature of the individual interest affected, the extent to which it is affected, the rationality of the connection between legislative means and purpose, [and] the existence of alternative means for effectuating the purpose[.]" *Id.* at 666-67 (internal quotation marks omitted). The Ninth Circuit has cited this passage as delineating the factors a court must balance in considering a constitutional claim "involving a lack of financial resources and the working of the criminal justice system[.]" *MacFarlane v. Ducharme*, 179 F.3d 1131, 1139 (9th Cir. 1999).

The Ninth Circuit has repeatedly upheld the constitutional principles established by *Griffin* and its progeny, namely that the state cannot punish people only because they are poor and that an evaluation of ability to pay will often be necessary to comport with the Fourteenth Amendment. *See, e.g.*, *Hernandez v. Sessions,* 872 F.3d 976, 990-91 (9th Cir. 2017) (affirming a preliminary injunction requiring consideration of financial circumstances when setting a bond amount for people held on ICE detainers); *United States v. Parks*, 89 F.3d 570, 572 (9th Cir. 1996) (judges must consider a defendant's financial circumstances before applying a Sentencing Guidelines enhancement based on a failure to pay fines and fees, because sentences must serve a legitimate purpose rather than simply being "due to poverty").

Plaintiffs in this case are not asking this Court to break new ground, but rather to make a straightforward application of the *Griffin* line of cases discussed above.

> **b. The DMV unconstitutionally punishes traffic debtors solely because of their poverty.**

A challenge like plaintiffs' to a "wealth-based classification" in the criminal justice context requires this Court to consider "the nature of the individual interest affected, the extent to which it is affected, the rationality of the connection between legislative means and purpose, and

the existence of alternative means for effectuating the purpose." *MacFarlane*, 179 F.3d at 1141

(*citing Bearden*, 461 U.S. at 666-67).  Doing so here demonstrates that the DMV's failure to

make an indigency determination for traffic debtors prior to license suspension is

unconstitutional under the *Griffin* line of caselaw.

###### i.    Nature of the interest affected.

The individual interest affected by ORS § 809.416 is nothing short of the right to basic

self-sufficiency.  The *Thomas* court took judicial notice of the variety of obstacles preventing

non-motorized transportation in Tennessee.  Because of the centrality of driving to the lives of so

many low-income people, "the loss of one's driver's license works a substantial hardship on the

former license holder's capacity for self-sufficiency, such that a license revocation would be

counterproductive to fostering an indigent debtor's ability to pay his debts."  303 F. Supp. 3d at

623; *see also Delaware v. Prouse*, 440 U.S. 648, 662 (1979) ("Automobile travel . . . is a basic,

pervasive, and often necessary mode of transportation to and from one's home [and]

workplace.").  The actualities of license deprivation on an indigent Tennessean are a threat to the

accomplishment of the tasks of basic living:

> The damage that the lack of a driver's license does to one's employment
> prospects is just the beginning.  Being unable to drive is the equivalent of a
> recurring tax or penalty on engaging in the wholly lawful ordinary activities of
> life—a tax or penalty that someone who was convicted of the same offense, but
> was able to pay his initial court debt, would never be obligated to pay.  When the
> State of Tennessee takes away a person's right to drive, that person does not,
> suddenly and conveniently, stop having to go to medical appointments, stop
> having to report to court dates, or stop having to venture into the world to obtain
> food and necessities.  Maybe public transportation will work for some of those
> activities some of the time, and maybe it will not. . . .  What, then, is a person on a
> revoked license to do? . . . .  By defying his license revocation, . . . the indigent
> debtor puts himself at the risk of incurring more fines, more court costs, and more
> litigation taxes that will be likely to render the restoration of his rights an even
> more improbable proposition.

*Thomas*, 303 F. Supp. 3d at 616.

The same is true in Oregon.  For most Oregonians, public transit is not a viable commuting alternative.  In 32 of Oregon's 34 counties, at least 40% of residents do not live within a .25-mile radius of a stop operated by any transit agency.[9]  In 28 of Oregon's 34 counties, the percentage is more than 50%.  Access is worst in rural areas.  In Umatilla County, where Ms. Heath and Ms. Ganuelas live, more than 64% of residents lack access to public transit; in Baker County, where Mr. Roberts lives, the percentage is higher than 75%.  Even in Portland, a strong majority of workers commute by car; in Ms. Heath's home, Pendleton, approximately 90% of workers commute by car, truck, or van. (Samuelson Decl. ¶¶ 9-10, Exs. 7 & 8 (American Community Survey Results).)  Taxi, Uber, Lyft, and private car services are prohibitively expensive to Oregonians like plaintiffs who are struggling to make ends meet, and unavailable in some parts of the state.  (Mendoza Decl. ¶ 20; Heath Decl. ¶ 10.)  Plaintiffs ask the Court to take judicial notice of the fact that traveling within and outside the state of Oregon without a car is extremely, and often prohibitively, difficult.

The limitations resulting from the deprivation of a driver's license implicate the fundamental constitutional right to travel, which is so "firmly embedded in our jurisprudence" and "so important" that a law restricting it is subject to strict constitutional scrutiny.  *Saenz v. Roe*, 526 U.S. 489, 498 (1999).  "[B]urdens on a single mode of transportation do not implicate the right to interstate travel[,]" and there is no "fundamental 'right to drive'" a motor vehicle.  *Miller v. Reed*, 176 F.3d 1202, 1205-06 (9th Cir. 1999).  However, the Supreme Court has

---

[9] *See* the Ford Family Foundation, *Oregon by the Numbers*, 2018 edition, at 130, *available at* http://www.tfff.org/sites/default/files/OregonByTheNumbers2018.pdf.

explained that "[a] state law implicates the right to travel when it actually deters such travel, when impeding travel is its primary objective, or when it uses any classification which serves to penalize the exercise of that right." *Attorney Gen. of N.Y. v. Soto-Lopez*, 476 U.S. 898, 903 (1986) (plurality op.) (internal quotation marks and citations omitted).  ORS § 809.416, by failing to provide an indigency exception, does not "burden" a single mode of travel, driving; it entirely forecloses that mode. *See also Mohamed v. Holder*, 266 F. Supp. 3d 868, 879–80 & n.13 (E.D. Va. 2017) (applying strict scrutiny to no-fly list because it burdens interstate travel and noting that *Miller* did not involve a "*complete ban* on any particular mode of travel.") (emphasis in original);  *Latif v. Holder*, 28 F. Supp. 3d 1134, 1148 (D. Or. 2014) (fundamental right to international travel impaired by no-fly list because it "operates as a complete and indefinite ban on boarding commercial flights").

ORS § 809.416 also "actually deters" travel by low-income people like plaintiffs, because they struggle to access alternate means of transportation.  (*See, e.g.*, Mendoza Decl. ¶¶ 17-20; Roberts Decl. ¶ 14.)  As the *Thomas* court observed, "[a] right to intrastate travel that assumes that a homeless person who cannot afford to pay court costs can simply hop into a cab or summon an Uber or a Lyft on a regular basis would not seem to be a right that recognizes the specific solicitude afforded to indigent persons in the criminal justice system under *Griffin, Williams, Tate*, . . . and *Bearden*."  *Thomas*, 303 F. Supp. 3d at 613.  The law must "address[] itself to actualities[.]" *Griffin*, 351 U.S. at 22 (Frankfurter, J., concurring).  It does not face actuality to presume a low-income single mother of four can buy groceries, shuttle her children to school and medical appointments, and commute to and from work, without a driver's license. (Bermudez Decl. ¶¶ 20-24.)  It does not face actuality to countenance a historically homeless

person getting to work in an area without Uber or Lyft services and without reliable public transportation. (Heath Decl. ¶¶ 10-12.) Oregon's license suspension statutes infringe on plaintiffs' fundamental constitutional right to travel.

In short, the interest affected by ORS § 809.416's lack of an indigency exception is far more than the pleasure of driving a vehicle. For low-income Oregonians, license suspensions threaten their self-sufficiency and fundamental constitutional right to travel.

### ii. Extent to which the interest is affected.

The second issue, the extent to which the interest is affected, also weighs in plaintiffs' favor. The plaintiffs' declarations demonstrate the impact their suspensions have had not only on their ability to travel freely, but also on their ability to work, to obtain medical care, and to ensure the care and education of their children. Cindy Mendoza, for example, relies on her vehicle to buy clothes and food for herself and the three children she is raising on her own. (Mendoza Decl. ¶¶ 18-22.) Although she is trying to find employment, she was recently turned away from a potential job as a street flagger for construction sites because the job required a valid driver's license. (*Id.* ¶ 21.) Cekais Ganuelas recently lost her bartender job as a result of her license suspension. (Ganuelas Decl. ¶ 7.) For Rebecca Heath, not having a valid license meant an unsustainable 11-mile daily commute by foot to her job. (Heath Decl. ¶ 4.) She has missed funeral services for family members and tribal events because of her two-decade license suspension. (*Id.* ¶ 11.) Without a valid license, Wade Roberts has refrained from visiting his adult children out of state and missed Native American cultural activities. (Roberts Decl. ¶¶ 13-14.) Buying groceries often involved biking through harsh winter conditions, despite his disabilities. (*Id.* ¶ 15.) Having been jailed because of his unpaid traffic debt, Mr. Roberts lives

28-  PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

in constant fear about the risks of further debt and incarceration when he does drive by necessity, as when he takes his wife to frequent medical appointments.  (*Id.* ¶¶ 16-20.)

In sum, plaintiffs' interests in traveling freely and in ensuring basic self-sufficiency are profoundly affected by the suspension of their driver's licenses.

### iii.    Rational connection between purpose and means.

Third, there is no rational connection between the purpose behind suspending driver's licenses for failure to pay and the challenged means, namely doing so without an inquiry into the traffic debtor's ability to pay before or during suspension.  Presumably, ORS § 809.416 is intended to coerce traffic debtors to pay their debt.  The means of accomplishing that goal— suspending the license of debtors who do not pay—may be rational as to traffic debtors who *could* pay.  Plaintiffs, however, and the putative class they seek to represent, are low-income individuals who cannot afford payments on their traffic debt.  "Visiting a harsh consequence on 'someone who through no fault of his own is unable to make' the payment sought 'will not make [payment] suddenly forthcoming.'"  *Thomas*, 303 F. Supp. 3d at 614 (quoting *Bearden*, 461 U.S. at 670).  "No person can be threatened or coerced into paying money that he does not have and cannot get."  *Id.*; *accord Thomas II*, at 8.

Not only is depriving traffic debtors of their licenses because of their failure to pay traffic debt not rationally connected to the collection of such debt, it *undermines* the statutes' objective of obtaining payments on traffic debt.  As set forth above, deprivation of a license impedes indigent traffic debtors' ability to find and maintain employment.  *See Thomas II*, at 9-10 ("[A]s applied to indigent drivers, the law is not merely ineffective; it is powerfully counterproductive. . . . [L]osing one's driver's license simultaneously makes the burdens of life more expensive and

renders the prospect of amassing the resources needed to overcome those burdens more remote."). If indigent traffic debtors continue to drive despite their revocation, they risk falling into an even deeper hole of debt out of which it will be even more difficult to climb. Moreover, discovery will reveal the financial burden imposed on the *state* in imposing a license revocation scheme on indigent traffic debtors. *Cf. Tate*, 401 U.S. at 399 ("Imprisonment in such a case is not imposed to further any penal objective of the State. It is imposed to augment the State's revenues but obviously does not serve that purpose; the defendant cannot pay because he is indigent and his imprisonment, rather than aiding collection of the revenue, saddles the State with the cost of feeding and housing him for the period of his imprisonment."). There is simply no rational basis for punishing people too poor to pay traffic debt by depriving them of a tool likely necessary to make payments on traffic debt.

### iv.    Alternative means.

Finally, the fourth factor also weighs in plaintiffs' favor, because there are robust, alternative means for collecting traffic debt. The state can, among other remedies, send collection letters (Samuelson Decl., Ex. 3 (OJD Accounts Receivable Policy) at 13); assign a delinquent account to a private collections agency or to the Department of Revenue for set offs, ORS §§ 137.118; 1.197; and garnish a traffic debtor's wages, *id.* § 1.194(1); OAR 150-018-0020 (1). If a traffic debtor owns real property, a financial balance can create an automatic real property lien. ORS § 18.150. The state only ceases collection efforts and inactivates a collection case after "collection efforts have been exhausted[.]" (Samuelson Decl., Ex. 3 (OJD Accounts Receivable Policy) at 16.) Yet even then, the traffic debtor's license remains suspended.

Moreover, the state could choose to avoid the *creation* of uncollectible traffic debt by adopting policies such as the Car Care Program employed by the Oregon State Police. Under that program, drivers stopped for equipment violations, instead of a ticket they cannot afford to pay which may result in the suspension of their driver's license, a voucher for a discount on automotive parts. "Every OSP Trooper," the agency explains, "understands they can influence the trajectory of a person's life[.]"[10]

In sum, the DMV is punishing indigent traffic debtors because of their poverty by suspending their driver's licenses for non-payment of traffic debt without an ability-to-pay determination before or at any time during the 20 year period of their suspension. Doing so is irrational; it is cruel; and under the *Griffin* line, it is unconstitutional.

> **2. DMV's practice of suspending licenses for failure to pay traffic debt, without consideration of ability to pay, violates equal protection under *Strange* and its progeny.**

Plaintiffs are also likely to succeed on, or have raised serious questions going to, the merits of their Equal Protection claim based on *James v. Strange*, 407 U.S. 128 (1972). The constitutional deficiency in ORS § 809.416 arising out of *Strange*—the dearth of an indigency exception for traffic debtors facing or experiencing license suspension—is the same deficiency set forth above. *Strange*, however, allows the Court to arrive at the same conclusion from a different angle. ORS § 809.416 is unconstitutional under the *Griffin* line of cases because it punishes indigent traffic debtors more harshly than traffic debtors who can afford their traffic

---

[10] Oregon State Police – Patrol Division, Car Care Program, *available at* https://www.oregon.gov/OSP/PATROL/Pages/Car-Care-Program.aspx (viewed July 16, 2018).

debt.  Under *Strange*, ORS § 809.416 is unconstitutional because it empowers the DMV to treat

indigent traffic debtors worse than other kinds of indigent debtors.

Under the Equal Protection Clause, "all persons similarly situated should be treated

alike." *City of Cleburne*, 473 U.S. at 439.  *Strange* concerned a Kansas recoupment statute

pursuant to which the state could recover legal defense fees from indigent defendants.  407 U.S.

at 128.  If the defendant did not pay within 60 days, a civil judgment would issue allowing the

state to employ a variety of collection methods including a real estate lien.  *Id.* at 131.  Under the

statute, exemptions available to other indigent judgment debtors (e.g. protections on garnishment

during times of illness, limitations on wage garnishment) were not available to debtors owing

legal defense fees.  *Id.* at 135.

A unanimous Supreme Court concluded that such a statute "embodies elements of

punitiveness and discrimination which violate the rights of citizens to equal treatment under the

law." *Id.* at 142.  A state, the Court reasoned, may not constitutionally "impose unduly harsh or

discriminatory terms merely because the obligation is to the public treasury rather than to a

private creditor." *Id.* at 138.  *Strange* reflects the Supreme Court's continuing concern with

"actualities" of laws applicable to criminal defendants, and the irrationality of attempting to

coerce debt payments from indigent defendants by threatening their economic stability.  *See id.*

at 139 ("To deprive him of all protection for his wages and intimate personalty discourages the

search for self-sufficiency which might make of the criminally accused a contributing citizen.").

Cases subsequent to *Strange* have affirmed its central holding, striking down statutes that

provide more of a safety net to indigent private debtors than to indigent criminal debtors, and

upholding statutes relating to debt collection that do provide for an indigency determination and

exception.  For example, in *Fuller v. Oregon*, 417 U.S. 40 (1974), the Supreme Court upheld

Oregon's recoupment statute because it, unlike the one at issue in *Strange*, did not impose costs

"unless [the defendant] 'is or will be able to pay them.'"  *Id.* at 45 (quoting ORS § 161.665(3) as

it existed in 1973).  "Defendants with no likelihood of having the means to repay are not put

under even a conditional obligation to do so, and those upon whom a conditional obligation is

imposed are not subjected to collection procedures until their indigency has ended and no

manifest hardship will result."  *Id.* at 46 (internal quotation marks omitted).  Those safeguards

rendered Oregon's recoupment statute constitutional.  Consistent with these decisions, the

District of Oregon struck down a 1979 recoupment statute ten years later in because it contained

"none of the safeguards [for indigent defendants] approved in *Fuller*[.]"[11]  *Fitch v. Belshaw*, 581

F. Supp. 273, 276 (D. Or. 1984).

     In sum, what *Strange* provides, and what subsequent decisions have reiterated, is "a firm

command that a state's uniquely harsh treatment of a class of indigent debtors cannot be carried

out in 'such discriminatory fashion' that it 'blight[s] . . . the hopes of indigents for self-

sufficiency and self-respect.'"  *Thomas*, 303 F. Supp. 3d. at 628 (quoting *Strange*, 407 U.S. at

142-43).  Oregon's license suspension scheme does precisely what the *Strange* cases forbid: it

singles out indigent traffic debtors for uniquely worse treatment relative to other kinds of

indigent debtors.

     "The first step in equal protection analysis is to identify the state's classification of

groups."  *Country Classic Dairies, Inc. v. Mont., Dep't of Commerce Milk Control Bureau*, 847

---

[11] Oregon's current recoupment statute prohibits a Court from sentencing a defendant to pay costs "unless the defendant is or may be able to pay them" and requires consideration of the defendant's financial resources.  ORS § 161.665(4).

F.2d 593, 596 (9th Cir. 1988).  The groups "do not need to be similar in all respects" to each

other, "but they must be similar in those respects that are relevant to [the state's] own interests

and its policy."  *Ariz. Dream Act Coal. v. Brewer*, 855 F.3d 957, 966 (9th Cir. 2017).  "The next

step in an Equal Protection analysis is to determine the applicable level of scrutiny."  *Id.* at 969.

"Most classifications are presumed to be valid and receive less-exacting judicial scrutiny, known

as rational basis review."  *Geiger v. Kitzhaber*, 994 F. Supp. 2d 1128, 1139 (D. Or. 2014).

However, as the Supreme Court has made clear, an evaluation of the constitutionality of laws

pertaining to indigent criminal defendants often defies "easy slogans or pigeonhole analysis[.]"

*Bearden*, 461 U.S. at 666; *see, e.g.*, *Thomas*, 303 F. Supp. 3d at 612 ("[A]n at least somewhat

elevated version of rational basis review would seem to be required in a case where a scheme

was alleged to discriminatorily endanger an indigent person's basic subsistence and capacity for

self-sufficiency.").

### a.   Traffic debtors who committed bicycle, pedestrian, or parking offenses.

On its face, ORS § 809.416 differentiates between traffic debtors who committed bicycle,

pedestrian, or parking offenses and all other traffic debtors.  The statute explicitly excludes the

latter group from the harsh punishment challenged in this lawsuit—the suspension of a driver's

license for failure to pay traffic debt.  *See* ORS § 809.416(3); *see also id.* § 809.210(7)

(prohibiting courts from sending a notice of suspension).  Accordingly, a low-income person

owing a fine for driving with a broken taillight can see her basic self-sufficiency threatened as a

result of her indigency.  A similarly situated low-income person who jaywalked or parked

illegally and likewise could not afford the resulting fine, however, is spared from license

suspension and its consequences.  Under *Strange*, the Equal Protection Clause bars such

irrational distinctions on the face of the statute.  There is no rational basis for this discrepancy, particularly when the stakes of license suspension for low-income people are so high.

### b.  Private debtors generally.

Traffic debtors are also similarly situated to private debtors, such as people with delinquent credit card accounts.  Both groups owe money, and both groups may find themselves subject to collection actions by private collection firms.  *Id.* § 137.118(2)(a) (state may assign a judgment to a private collection agency); *see also id.* § 646A.670 (setting forth pleading requirements for debt buyers bringing collection actions).   However, there is no mechanism by which a private debtholder—a credit card company, for example—can attempt to coerce payment from a delinquent debtor by having the DMV suspend his driving privileges.  Yet that penalty is imposed automatically on most traffic debtors, simply because their debt is owed to the state.  Under *Strange*, plaintiffs should not find their self-sufficiency threatened simply because they happen to owe debt to the state rather than to a private debt holder.  In *Strange*, the Kansas recoupment statute explicitly removed from court debtors a provision that protected private debtors; here, ORS § 809.416 imposes an additional penalty on most traffic debtors not imposed on private debtors.  The result is the same: unduly harsh treatment of traffic debtors in violation of the Equal Protection Clause.

### c.  Child support debtors.

 Indigent child support debtors, who are also similarly situated to traffic debtors, are accorded what plaintiffs are not, namely relief from license suspension as a tool to coerce payment of debt.  Oregon suspends driver's licenses for failure to pay child support.  *Id.* § 25.750(1)(a).  Yet child support debtors are granted consideration of their ability to pay at three

stages: at the establishment of a support obligation, *id.* § 25.275(1)(a)-(d); at any modification

proceeding, *id.* §§ 25.280(1)-(4), 25.287(5), OAR 137-055-3430(3)(c)(B); and again once their

payments are in arrears and the DMV is contemplating suspending the debtor's license, ORS §

25.750(1)(a), OAR 137-055-4420(3).  Further, a six-month, indefinitely renewable "hardship

exception" is available to reduce or eliminate the parent's obligations upon demonstration of that

parent's inability to pay.  OAR 137-055-4420(10).   Hardship exceptions preclude license

suspensions.  *Id.*  Accordingly, by the time the DMV suspends a child support debtor's license,

the debtor has had myriad opportunities to avoid suspension by establishing his indigency and/or

reliance on his license.

In contrast, the DMV suspends licenses of indigent traffic debtors such as plaintiffs

without their having had any opportunity, at any stage, to show that their non-payment is due to

poverty.  Traffic debtors are explicitly exempt from any kind of hardship permit, including the

restricted type sometimes extended even to people convicted of reckless driving.  ORS §

807.250(1)(a), (4).

The result of these two regulatory regimes is that, in Oregon, a parent who is a child

support debtor can avoid suspension of his driver's license by demonstrating he cannot afford his

child support obligation.  Yet a single parent like Ms. Ganuelas, who is solely financially

responsible for her child and receives no child support (Ganuelas Decl. ¶ 8), can lose her job,

miss school events, and struggle to provide for her family, because she is too poor to afford a

fine for a minor traffic violation.  A rational basis for this distinction is difficult to imagine.  *See*

*Baker v. City of Florissant*, No. 4:16-CV-1693 NAB, 2017 U.S. Dist. LEXIS 203104, at *21

(E.D. Mo. Dec. 11, 2017) (denying motion to dismiss *Strange*-based Equal Protection claim by

court debtors incarcerated for failure to pay because "they have clearly been subjected to debt-collection efforts that would never be tolerated if utilized against a private civil judgment debtor whose creditor is not the government").

In granting a preliminary injunction similar to the one plaintiffs seek here, one district court found a likelihood of success on the merits of a *Strange*-based Equal Protection challenge to a license-suspension regime "that offers no exemptions or accommodations whatsoever that are designed to protect even the barest survival resources." *Robinson*, 2017 U.S. Dist. LEXIS 165483, at *29. That phrase perfectly describes the statutory regime plaintiffs challenge here. Indigent traffic debtors in Oregon are uniquely disfavored and unprotected relative to other kinds of indigent debtors, including those convicted of parking, bicycling, or pedestrian offenses, child support debtors, and other private debtors. The result of this unequal treatment—license suspension—threatens their survival resources, as set forth above. This Court should conclude that ORS § 809.416's dearth of any indigency exception likely violates Equal Protection under *Strange*.

### 3. DMV's practice of suspending licenses for failure to pay traffic debt, without consideration of ability to pay, deprives plaintiffs of procedural due process.

Oregon's license suspension scheme for traffic debtors suffers from an additional constitutional infirmity—it deprives indigent traffic debtors of an important property interest without the process required by the Due Process Clause. Because the "continued possession [of a driver's license] may become essential in the pursuit of a livelihood[,]" it is "not to be taken away without that procedural due process required by the Fourteenth Amendment." *Bell v. Burson*, 402 U.S. 535, 539 (1971). Pursuant to *Mathews v. Eldridge*, 424 U.S. 319 (1976), what

process is due depends on a balancing of factors: "the private interest" affected by the

deprivation; "the risk of an erroneous deprivation of such interest through the procedures used,

and the probable value, if any, or additional or substitute procedural safeguards"; and the

government's interest, "including the function involved and the fiscal and administrative burdens

that the additional or substitute procedural requirement would entail." *Id.* at 335. "Except in

emergency situations[,]" due process requires that states afford "notice and opportunity for

hearing appropriate to the nature of the case *before*" terminating an individual's driving

privileges. *Bell*, 402 U.S. at 542 (emphasis added) (internal quotation marks omitted).

      As the *Thomas* court observed, the determination of the process due to indigent traffic

debtors before suspending their driver's license for failure to pay is interwoven with the

adjudication of those debtors' substantive due process and equal protection claims "because the

substantive nature of the rights and facts at issue affects the application of the *Eldridge* factors."

*Thomas*, 303 F. Supp. 3d at 632. As set forth in depth above, the private interest at issue—the

first *Eldridge* factor—is, for low-income traffic debtors like plaintiffs, the ability to maintain

self-sufficiency and to travel freely as the constitution guarantees.

      Regarding the second *Eldridge* factor, there is a high risk of an erroneous deprivation of a

driver's license, and by extension an erroneous denial of basic self-sufficiency for low-income

traffic debtors, through the procedures currently used. Unlike the child support debt context,

where a debtor has had multiple opportunities to establish his indigency and make payment

arrangements he can afford before *and* after the DMV takes action, traffic debtors facing DMV

suspensions under ORS § 809.416 have no right, at any time, to request that the DMV or any

other entity take into account her ability to pay. At no point during the process of suspending the

license of an indigent traffic debtor, and at no point during the possible two decades of suspension that follow, does the DMV determine whether the debtor is able to pay. That failure does more than create a high risk of an erroneous deprivation—it makes it virtually certain that people who are too poor to pay traffic fines *will* lose their licenses. What makes the deprivation erroneous are the constitutional prohibitions against being punished for one's poverty.

Meanwhile, the "probable value of additional procedural safeguards" —specifically, a pre-suspension ability-to-pay determination and opportunity for a post-suspension determination—is high. Had Ms. Heath avoided license suspension in the past two decades due to her poverty, she might have been able to find a job that does not require 11 miles of daily walking. (Heath Decl. ¶ 4.) With an indigency determination exempting her from license suspension, Ms. Mendoza might have found gainful employment as a flagger. (Mendoza Decl. ¶ 21.) All of the plaintiffs might have avoided the additional debt and suspensions resulting from violations for driving while suspended. For individuals like plaintiffs, the loss of a driver's license can change their lives, plunging them into an (even deeper) pit of poverty from which they will struggle to escape.

The third *Eldridge* factor, the government's interest, likewise supports a procedural due process interest in a pre-suspension ability-to-pay determination. As one district court, granting a preliminary injunction similar to the one plaintiffs seek here, explained last year, "instituting a mechanism whereby an individual's ability to pay his or her traffic debt is considered early in the process will eliminate fiscal and administrative burdens imposed on the State under the current scheme when that individual unwillingly fails to pay that debt." *Fowler v. Johnson*, No. 17-11441, 2017 U.S. Dist. LEXIS 205363, at *32-33 (E.D. Mich. Dec. 14, 2017). The same is true

here.  Any governmental interest in collecting traffic debt is harmed by the absence of an indigency determination, both because indigent debtors cannot pay no matter how coercive the collection mechanism and because suspension of a license cuts off most avenues to the income necessary to repay the debt.

The *Fowler* court concluded that that plaintiffs were likely to succeed on the merits of their claim that Michigan's procedures for suspending traffic debtors' licenses without an ability-to-pay hearing violate procedural due process.  This Court should reach the same conclusion.

### C.  The balance of hardships tips sharply in plaintiffs' favor.

The balance of hardships tips sharply in plaintiffs' favor.  Absent injunctive relief, plaintiffs risk additional traffic violations, additional debt, and possible incarceration arising from that debt; the loss of employment opportunities that could alleviate their poverty; missed opportunities for family bonding, important life events, and cultural activities; and continuing struggles to provide food and ensure medical treatment of children being raised by single parents.  (Mendoza Decl. ¶¶ 18-22; Bermudez Decl. ¶¶ 20-24; Ganuelas Decl. ¶¶ 12-15, 27-29; Heath Decl. ¶¶ 10-12, 16; Roberts Decl. ¶¶ 13-20)

When "[f]aced with such a conflict between financial concerns and human suffering," the Ninth Circuit has had "little difficulty concluding that the balance of hardships tips decidedly in plaintiffs' favor."  *Lopez v. Heckler*, 713 F.2d 1432, 1437 (9th Cir. 1983); *see, e.g.*, *R.G. v. Koller*, 415 F. Supp. 2d 1129, 1162 (D. Haw. 2006) (finding the "administrative inconvenience" of ensuring a safe environment for children in a state institution outweighed by the harm of children being subjected to harassment and abuse).  Here, not only will human suffering continue and grow in the absence of an injunction, it is not clear that the DMV will face any hardship

from the injunction plaintiffs seek. Instead of implementing an ability-to-pay procedure, which would involve administrative work, the DMV could simply stop suspending licenses for failure to pay traffic debt. That is a step at least two states recently took voluntarily,[12] and would likely ultimately result in less administrative work than the current regime. As the *Fowler* court stated in denying defendant's motion to stay the preliminary injunction similar to the one sought by plaintiffs here,

> the legislature granted the power to suspend licenses for failure to pay traffic debt only to Defendant. Defendant therefore must guarantee that individuals receive the process they are due before their licenses are revoked. If Defendant cannot make this happen promptly or without 'herculean . . . efforts', she can simply stop suspending driver's licenses until a system is in place to adequately inform drivers of their opportunity for a pre-revocation ability-to-pay hearing and to afford such a hearing.

*Fowler v. Johnson*, No. 17-11441, 2017 U.S. Dist. LEXIS 209949, at *13 (E.D. Mich. Dec. 21, 2017) ("*Fowler II*").

### D. Granting a preliminary injunction is in the public interest.

"The public interest inquiry primarily addresses impact on non-parties rather than parties." *Sammartano v. First Judicial Dist. Court*, 303 F.3d 959, 974 (9th Cir. 2002). "Generally, public interest concerns are implicated when a constitutional right has been violated, because all citizens have a stake in upholding the Constitution." *Rodriguez v. Robbins*, 715 F.3d 1127, 1146 (9th Cir. 2013) (internal quotations omitted). In addition, if the Court certifies the class, the injunction plaintiffs seek would affect not only plaintiffs, but also thousands of other

---

[12] Susan Sharon, *Maine drivers will not have licenses suspended for failing to pay fines*, Bangor Daily News, July 10, 2018, *available at* https://bangordailynews.com/2018/07/10/politics/maine-drivers-will-not-have-licenses-suspended-for-failing-to-pay-fines/; Associated Press, *California no longer will suspend driver's licenses for traffic fines*, L.A. Times, June 29, 2017, *available at* http://www.latimes.com/local/lanow/la-me-ln-driver-license-fees-20170629-story.html.

indigent traffic debtors who may see their own livelihoods threatened because of the state's unconstitutional failure to evaluate ability to pay prior to suspending their driver's license. This factor weighs heavily in plaintiffs' favor.

### E.  Plaintiffs are likely to suffer irreparable harm in the absence of a preliminary injunction.

"It is well established that the deprivation of constitutional rights unquestionably constitutes irreparable injury." *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (internal quotation marks omitted). All of plaintiffs' claims are constitutional. Moreover, the plaintiffs' declarations detail the harm they have suffered from their license suspensions and will continue to suffer absent injunctive relief. The plaintiffs in this litigation all face, every day, the impossible choice between driving with a suspended license, risking deeper debt, and providing the basic necessities of life for themselves and their families. Such threats to self-sufficiency strongly support this factor. *See M.R. v. Dreyfus*, 697 F.3d 706, 732 (9th Cir. 2012) (irreparable injury to Medicaid beneficiaries whose services were reduced, and thus risked institutionalization, as the result of regulation challenged under anti-discrimination statutes).

### F.  Plaintiffs' motion warrants statewide relief upon certification of a class.

Generally, class-wide relief requires the certification of a class. *See Easyriders Freedom F.I.G.H.T. v. Hannigan*, 92 F.3d 1486, 1501 (9th Cir. 1996). Accordingly, absent class certification, plaintiffs move the Court for a preliminary injunction pertaining only to them. If, however, the Court certifies a class in this case, a statewide injunction pertaining to all individuals whose licenses have been or will be suspended for failure to pay traffic debt under ORS § 809.416 is appropriate. *See Armstrong v. Davis*, 275 F.3d 849, 870 (9th Cir. 2001).

### G. The Court should waive the bond requirement.

A district court may dispense with the bond requirement under Fed. R. Civ. P. 65(c) in numerous circumstances, including where requiring security would effectively nullify the benefits of the preliminary injunction or where the plaintiff is indigent. *See, e.g.*, *Marquard v. New Penn Fin., LLC*, No. 3:17-cv-549-SI, 2017 U.S. Dist. LEXIS 82952, at *22 (D. Or. May 31, 2017). Plaintiffs are people living in poverty who cannot afford their traffic debt, or basic life necessities, let alone post a bond. (Mendoza Decl. ¶ 16; Bermudez Decl. ¶¶ 5, 19; Ganuelas Decl. ¶ 23; Heath Decl. ¶ 15; Roberts Decl. ¶ 10.) Plaintiffs request that the Court waive the security requirement associated with compelling the DMV to fulfill its constitutional obligations.

## IV.    CONCLUSION

For the reasons stated above, the Court should grant plaintiffs' motion for a preliminary injunction.

DATED this 7th day of September, 2018.


OREGON LAW CENTER


/s/ Emily Teplin Fox
Emily Teplin Fox, OSB No. 121720
efox@oregonlawcenter.org
Marisa Samuelson, OSB No. 144234
msamuelson@oregonlawcenter.org
Beth Englander, OSB No. 980190
benglander@oregonlawcenter.org
Kelsey Heilman, OSB No. 140348
kheilman@oregonlawcenter.org
522 SW Fifth Ave., Suite 812
Portland, OR 97204
(503) 473-8310

Jonathan M. Dennis, OSB 146256
jdennis@oregonlawcenter.org
35 SE Fifth Ave., Suite 1
Ontario, OR 97914
(541) 889-3296

Of Attorneys for Plaintiffs

## CERTIFICATE OF COMPLIANCE

This brief complies with the applicable word-count limitation under LR 7-2(b), 26-3(b), 54-1(c), or 54-3(e) because it contains 10,834 words, including headings, footnotes, and quotations, but excluding the caption, table of contents, table of cases and authorities, signature block, exhibits, and any certificates of counsel.

DATED this 7th day of September, 2018.

OREGON LAW CENTER

/s/ Emily Teplin Fox
Emily Teplin Fox, OSB No. 121720
522 SW Fifth Ave., Suite 812
Portland, OR 97204
efox@oregonlawcenter.org
(503) 473-8310

Of Attorneys for Plaintiffs