IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| CINDY MENDOZA; GLORIA BERMUDEZ; JEREMY CHASE; CEKAIS TONI GANUELAS; REBECCA HEATH; and KARL WADE ROBERTS, on behalf of themselves and all others similarly situated, | No. 3:18-cv-01634-HZ |
| Plaintiffs, | |
| v. | |
| MATTHEW GARRETT, in his official capacity as Director of the Oregon Department of Transportation; TAMMY BANEY, in her official capacity as Chair of the Oregon Transportation Commission; SEAN O'HOLLAREN, in his official capacity as Member of the Oregon Transportation Commission; BOB VAN BROCKLIN, in his official capacity as Member of the Oregon Transportation Commission; MARTIN CALLERY, in his official capacity as Member of the Oregon Transportation Commission; and TOM MCCLELLAN, in his official capacity | OPINION & ORDER |

as Administrator of Driver and Motor Vehicles
Division, Oregon Department of Transportation,

        Defendants.

Emily Teplin Fox
Marisa Samuelson
Beth Englander
Kelsey Heilman
OREGON LAW CENTER
522 S.W. Fifth Ave., Suite 812
Portland, Oregon 97204

Jonathan M. Dennis
OREGON LAW CENTER
35 S.E. Fifth Ave., Suite 1
Ontario, Oregon 97914

        Attorneys for Plaintiffs

Ellen Rosenblum
ATTORNEY GENERAL
Renee Stineman
ATTORNEY-IN-CHARGE
Beth Andrews
ASSISTANT ATTORNEY GENERAL
Sadie Furzley
ASSISTANT ATTORNEY GENERAL
Department of Justice
100 S.W. Market Street
Portland, Oregon 97201

        Attorneys for Defendants

HERNANDEZ, District Judge:

        Plaintiffs bring this action on behalf of themselves and a putative class, challenging

Oregon's practice of suspending an individual's driver's license for failure to pay "traffic debt."[1]

---

        [1] The term "traffic debt" is used by the parties to refer to fines imposed for traffic
violations as well as any additional fees or costs associated with a fine. *See, e.g.*, Or. Rev. Stat.
§§ 1.202(1), (2), 809.267, 809.380 (fee added whenever a court gives a defendant a period of

More specifically, the six named Plaintiffs, each of whom lives on an extremely limited income and has had a driver's license suspended because of the inability to pay one or more traffic violation fines, contend that suspending a driver's license for failure to pay traffic debt absent an assessment of an individual's ability to pay violates the Fourteenth Amendment of the United States Constitution. Defendants are the Director of the Oregon Department of Transportation (ODOT), members of the Oregon Transportation Commission, and the Administrator of ODOT's Driver and Motor Vehicles Division. Collectively, they are "the DMV." Simultaneously with filing the Complaint, Plaintiffs moved for a preliminary injunction and to certify the class. This Opinion addresses the preliminary injunction motion only. At oral argument on that motion, I deferred any further briefing on the class certification motion, and any other activity in the case, until resolution of the preliminary injunction motion.

Plaintiffs bring three claims, each alleging a violation of either due process, equal protection, or both. Because Plaintiffs fail to demonstrate a likelihood of success on the merits as to any of their claims, I deny the motion.

BACKGROUND

Oregon, like other states, has a statutory scheme in which the failure to pay a court-adjudicated traffic violation fine can result in the suspension of a driver's license. Recently, some states have addressed the practice through legislation. In California, for example, according to a *Los Angeles Times* article cited by Plaintiffs, the California Legislature passed a bill, signed by the Governor in June 2017, preventing the suspension of driver's licenses because of unpaid

---

time to pay a financial obligation after its imposition; fee added when court uses a private collection agency or revenue department to recover debt; fee added when a court issues a notice of suspension; requiring fee for post-suspension reinstatement).

fines.[2]  Other states are in litigation over the practice.  *E.g.*, *Fowler v. Johnson*, No. 17-11441,

2017 WL 6379676 (E.D. Mich. Dec. 14, 2017) (challenge to Michigan statutes allowing

suspension of driver's licenses of individuals who fail to pay court-ordered fines, costs, fees, and

assessments resulting from traffic violations) ("*Fowler I*")[3]; *Robinson v. Purkey*, No. 3:17-cv-

1263, 2017 WL 4418134 (M.D. Tenn. Oct. 5, 2017) (challenge to Tennessee statutes allowing

suspension of driver's licenses for nonpayment of fines or costs imposed for conviction of driving

offenses) ("*Robinson I*").[4]  This case, however, involves Oregon's statutory scheme.  Thus, I

---

[2] *See*
http://www.latimes.com/local/lanow/la-me-ln-driver-license-fees-20170629-story.html (also
noting that the law did not apply retroactively and that a related bill which would allow low-
income individuals who cannot afford their traffic tickets to ask a judge to lower the fine or
substitute the fine with community service, was advancing through the California Legislature).

Plaintiffs also assert that Maine has abolished the practice.  Pls.' Mot. for Pre. Inj. ("Pls.
Mot.") 41 n.12, ECF 2.  However, the article they rely on indicates that the legislation in Maine
concerned criminal fines for "non-driving-related violations."  *See*
https://bangordailynews.com/2018/07/10/politics/maine-drivers-will-not-have-licenses-suspende
d-for-failing-to-pay-fines (reporting that Maine lawmakers were "putting an end to the practice of
automatic drivers' license suspensions for failing to pay fines for most non-driving-related
violations"; further describing the previous practice as: "failure to pay a fine for a criminal
offense and your driver's license is automatically suspended.").

[3] *Fowler I* granted in part and denied in part the plaintiffs' preliminary injunction motion.
The defendants appealed.  No. 17-2504 (6th Cir. Dec. 19, 2017).  The district court denied the
defendants' request for a stay pending appeal. 2017 WL 6540926 (E.D. Mich. Dec. 19, 2017)
("*Fowler II*").  In February 2018, the Sixth Circuit remanded the case for the district court to
address the plaintiffs' standing, and the district court issued an opinion and order addressing that
issue on April 11, 2018.  2018 WL 1737122 (E.D. Mich. Apr. 11, 2018) ("*Fowler III*").

[4] In an October 5, 2017 decision, the court in *Robinson* granted a temporary restraining
order to the plaintiffs who challenged Tennessee's practice of suspending an individual's driver's
license for failure to pay "traffic debt."  2017 WL 4418134 ("*Robinson I*").  In a later decision
issued in June 2018, the court denied in part the defendants' motion to dismiss, granted the class
certification motion, and scheduled a hearing at a later date on the preliminary injunction motion.
326 F.R.D. 105 (M.D. Tenn. 2018) ("*Robinson II*"), *appeal filed*, No. 18-6121 (6th Cir. Oct. 24,
2018).  Meanwhile, the same district court judge handling the *Robinson* case issued a decision in

begin there before turning to other evidence in the record submitted in support of, and in opposition to, the motion.

I.  Oregon's Statutory Scheme

The Oregon Vehicle Code defines "traffic violation" as "a traffic offense that is designated as a traffic violation in the statute defining the offense, or any other offense defined in the Oregon Vehicle Code that is punishable by a fine but that is not punishable by a term of imprisonment."  Or. Rev. Stat. § (O.R.S.) 801.557; *see also* O.R.S. 153.008(1)(a), (b) (providing generally that an "offense" is a "violation" if it is "designated as a violation by the statute defining the offense," or the "statute prescribing the penalty for the offense provides that the offense is punishable by a fine but does not provide that the offense is punishable by a term of imprisonment.").

Violations are classified into categories.  O.R.S. 153.012 (designating categories as Class A, Class B, Class C, and Class D, as well as "unclassified violations as described in O.R.S. 153.015," and "[s]pecific fine violations as described in O.R.S. 153.015.").  "The penalty for committing a violation is a fine."  O.R.S. 153.018(1).  There are maximum, presumptive, and minimum fines for each category of violation.  O.R.S. 153.018(2) (maximum fines); O.R.S. 153.019 (presumptive fines); O.R.S. 153.020 (increasing presumptive fines for violations

---

a related case challenging Tennessee's practice of suspending an individual's driver's license for failure to pay "court debt."  *Thomas v. Haslam*, 303 F. Supp. 3d 585 (M.D. Tenn. 2018) (denying motions to dismiss, ordering further briefing on summary judgment motions, granting class certification motion) ("*Thomas I*").  In July 2018, the district court in the *Thomas* case issued a decision granting summary judgment to plaintiffs and denying summary judgment to defendants. 329 F. Supp. 3d 475 (M.D. Tenn. 2018) ("*Thomas II*"), *appeal filed*, No. 18-5766 (6th Cir. July 27, 2018).

committed in a highway work zone, school zone, or safety corridor); O.R.S. 153.021 (minimum fines). The Chief Justice of the Oregon Supreme Court is required to establish a uniform fine schedule for violations prosecuted in circuit courts. O.R.S. 153.800(4)(b). Courts other than circuit courts are required to establish schedules of the amounts of penalties to be imposed for first, second, and subsequent violations, designating each violation specifically or by class. O.R.S. 153.800(4)(a).

When law enforcement officers issue a citation and summons to a driver for a traffic violation, certain information must be included as specified in O.R.S. 153.045-153.051. This includes the amount of the presumptive fine, if there is one for the violation. O.R.S. 153.051(4) (requirements of the summons). The summons must notify the person that a monetary judgment may be entered for up to the maximum amount of fines, restitution, and other costs allowed by law if the person fails to make all required appearances at proceedings. O.R.S. 153.051(5). And, the summons must notify the person that if he or she pleads no contest and pays the presumptive fine, the person may submit an explanation of the circumstances of the violation and the court may consider that explanation in establishing the amount of the fine, but the court cannot impose a fine less than the statutory minimum. O.R.S. 153.051(7). The summons must also notify the person that if the person pleads not guilty and requests a trial, the fines still cannot be less than the minimum unless the person is found not guilty. O.R.S. 153.051(8).

A person who has been issued a citation must make an appearance in person at the time indicated in the citation/summons, request a trial, or deliver payment of the presumptive fine to the court. O.R.S. 153.061(1), (3). Circuit courts, municipal courts, and justice courts adjudicate traffic violations. In cases where the defendant pleads no contest by delivering payment of the

presumptive fine to the court under O.R.S. 153.061(3), the amount of the fine may not exceed the presumptive fine. *Id.* Additionally, a judge may suspend operation of any part of a judgment entered under the "Violations and Fines" chapter of the Oregon statutes upon condition that the defendant pay the nonsuspended portion of a fine within a specified period of time. O.R.S. 153.090(4).

When a traffic violation fine remains unpaid, a court may use a private collection agency to seek recoupment of the debt or refer the debt to the Oregon Department of Revenue (ODOR). O.R.S. 1.197(1). In addition to these options, "[a] court may . . . (a) issue a notice of suspension to the [DMV] that directs the department to implement procedures under ORS 809.416[,] or (b) [o]rder a defendant's driving privileges restricted." O.R.S. 809.210(1). This case concerns only (a), the issuance of the notice of suspension. Although an unpaid traffic violation fine allows a court to send a suspension notice to the DMV, a court is prohibited from sending a notice of suspension for those who have failed to pay fines for bicycle, pedestrian, or parking offenses. O.R.S. 809.210(7).

Upon receipt of the notice of suspension from a court, suspension of a driver's license by the DMV is mandatory. A person "is subject to suspension under ORS 809.415(4) if the department receives a notice of suspension from a court under ORS 809.210 indicating that the person has failed or refused to pay a fine[.]" O.R.S. 809.416(2). The "department *shall* suspend driving privileges when provided under ORS 809.416." O.R.S. 809.415(4) (emphasis added); *see also* O.R.S. 809.210(4)(b) (providing that if the court issues a notice of suspension that directs the DMV to implement procedures under O.R.S. 809.416, the DMV shall take action on the suspension as provided under O.R.S. 809.416).

A person is subject to suspension under O.R.S. 809.416(2) until one of the following occurs: (1) the person presents the department with a notice of reinstatement issued by the court showing that the person (a) is making payments or has paid the fine; or (b) has enrolled in a preapprenticeship program as defined or is a registered apprentice as defined; or (2) twenty years has elapsed from the date of the traffic offense.  O.R.S. 809.416(2); *see also* O.R.S. 809.415(4)(a) (the mandatory suspension shall continue until the earlier of (1) the person establishes that she or he has performed all acts necessary under O.R.S. 809.416 to make the person not subject to suspension; or (2) twenty years from the date the traffic offense occurred if the suspension is imposed for a reason described in O.R.S. 809.416(2) (failure or refusal to pay a fine)).  Echoing the exception in O.R.S. 809.210(7), O.R.S. 809.416(3) exempts from suspension persons who fail or refuse to pay a fine relating to any pedestrian, bicycle, or parking offense.

While mandatory unless excepted under O.R.S. 809.416(2)(a) or (b), the suspension does not take effect immediately.  Instead, the department, upon receipt of a notice of suspension from a court, must send a letter by first class mail advising the person that suspension will begin sixty days from the date of the letter unless the department is presented with a notice of reinstatement by the court under O.R.S. 809.416(2)(a).  O.R.S. 809.416(3); *see also* O.R.S. 809.210(4)(a) (providing that if the court issues a notice of suspension that directs the DMV to implement suspension procedures under O.R.S. 809.416, and if at any time within the period of suspension, a person pays the fine or has begun making payments according to the payment schedule established with the court, the court shall immediately send to the department a notice of reinstatement; further stating that the notice of suspension may be reissued if the person ceases making payments before the fine is paid in full).

A person whose license has been suspended under O.R.S. 809.415(4)(a) is entitled to administrative review under O.R.S. 809.440. O.R.S. 809.415(4)(b). This review is an "informal administrative process to assure prompt and careful review by the department of the documents upon which an action is based." O.R.S. 809.440(2)(a). A person may defend against the department's action by showing (1) that the conviction did not involve a motor vehicle and the department's action is permitted only if the offense involves a motor vehicle; (2) an out-of-state conviction on which the department's action is based was for an offense that is not comparable to an offense under Oregon law; or (3) the records relied on by the department identify the wrong person. O.R.S. 809.440(2)(b). Judicial review of a department order affirming a suspension is allowed. O.R.S. 809.440(2)(e).

The statutes do not appear to address the contents of the sixty-day notice sent by the DMV. However, the preliminary injunction record contains copies of such notices sent to several of the Plaintiffs. First, a sixty-day notice was sent to Plaintiff Gloria Bermudez on October 7, 2013 and makes clear that her driving privileges will be suspended beginning at 12:01 AM on December 6, 2013. Bermudez Decl., Ex. 2, ECF 4-2. The information in the notice is comprehensive and includes information indicating that the suspension can be prevented by contacting the applicable court. It states, at various places in the notice:

> To prevent this suspension you must make certain the action required below is completed and received by DMV no later than 5:00 pm on the last business day prior to December 06, 2013.
>
> * * *
>
> You can stop this suspension by contacting the court named below and completing all the requirements necessary to clear this matter. If we receive a clearance notice from the court before the date the suspension begins, this

suspension will not go into effect.

*Id.* The notice urges the recipient to contact the court as soon as possible. *Id.* It states that no hardship permit is available. *Id.* It also informs the recipient of the right to administrative review, how to obtain that review, and what the department will review. *Id.* ("In this review we will look at our records and the documents concerning this matter to determine if we took appropriate action" and further stating that the DMV will review the person's evidence to determine if "you are the same person" named on the notice from the court, if the DMV received notice from the court that you failed to pay a fine, and if the DMV received a clearance notice from the court).

Next, a notice dated October 27, 2016 was sent to Plaintiff Cekais Toni Ganuelas. Ganuelas Decl., Ex. 1, ECF 6-1. It indicates the date and reason for the suspension. *Id.* It also states that the suspension will last until the DMV receives a "court clearance (notice of reinstatement) or 20 years have elapsed from the date the traffic offense(s) occurred." *Id.* A separate section provides:

> CAN I STOP THIS SUSPENSION?
> To stop the suspension, DMV must receive a court clearance. Contact the court to determine how to obtain a court clearance for the docket(s) shown. You will find court contact information on DMV's website.

*Id.* The notice provides additional information on the right to obtain an administrative review, how to obtain that review, and what the DMV will consider. *Id.* Notices identical to the one sent to Ganuelas were issued to Plaintiff Cindy Mendoza on July 29, 2015, and to Plaintiff Karl Wade Roberts on July 6, 2018. Mendoza Decl., Ex. 2, ECF 8-2; Roberts Decl., Ex. 1, ECF 9-1.

Even if suspension has begun, a court may still issue a notice of reinstatement and the

suspension will be terminated. *E.g.*, Bermudez Decl., Ex. 2 ("You can stop this suspension after it begins by meeting the court's requirements and obtaining a court clearance notice."; "If we receive the clearance notice on or after the date the suspension begins, you will have to pay a reinstatement fee to DMV[.]"); Ganuelas Decl., Ex. 1 ("If DMV receives the court clearance after the suspension begins, you will have to pay a DMV reinstatement fee.").

II. Plaintiffs' Suspensions & Personal Circumstances

Each of the six named Plaintiffs currently has a suspended license for failure to pay traffic debt. Bermudez Decl. ¶ 6; Ganuelas Decl. ¶ 3, ECF 6; Heath Decl. ¶¶ 5, 6, ECF 7; Mendoza Decl. ¶ 5, ECF 8; Roberts Decl. ¶ 6, ECF 9; Chase Decl. ¶ 12, ECF 34. Some have had multiple suspensions over many years. *E.g.*, Bermudez Decl. ¶¶ 8, 10 (license suspended in 2003 and again in 2014); Heath Decl. ¶¶ 5, 6 (license suspended in 1995 and has received six notices of suspension since then); Mendoza Decl. ¶¶ 5, 7, 13 (license suspended in 2010, again in 2016, and expects another as a result of unpaid fines).

The underlying violations which resulted in fines include (1) failing to obey a traffic control device, failing to use proper child seats, driving with expired tags, driving while using a cell phone; Bermudez Decl. ¶¶ 8, 9, 10, 13; (2) failing to display plates or illegal display of plates; Ganuelas Decl. ¶ 3; Roberts Decl. ¶ 6; (3) speeding; Ganuelas Decl. ¶ 4; Mendoza Decl. ¶ 7; Chase Decl. ¶¶ 7, 8; and (4) failing to appear at arraignment for misdemeanor traffic case involving a car accident with property damage only; Mendoza Decl. ¶ 12. Additionally, Plaintiffs have received citations, and thus fines, for driving with a suspended license. *E.g.*, Bermudez Decl. ¶¶ 10, 13; Ganuelas Decl. ¶ 5; Mendoza Decl. ¶¶ 5, 6; Roberts Decl. ¶ 6.

Some Plaintiffs have attempted to work out payment plans. Bermudez states that she was

cited in 2003 for failing to obey a traffic control device. Bermudez Decl. ¶ 8; *id.*, Ex. 1 (copy of citation). Because she failed to appear at her arraignment and apparently did not pay the presumptive fine, her license was suspended in May 2003. *Id.* ¶ 8. The debt was sent to collections but the court later set up a payment plan, allowing her license to be reinstated in 2010. *Id.* However, she could not keep up with the $50/month payments and her license was suspended again in 2012. *Id.* In July 2012, Bermudez was cited for several violations. *Id.* ¶ 13. She worked out a payment plan with the court. *Id.* ¶ 15; *id.*, Ex. 3. She was to pay $75 per month, on the 24th of each month, until the total of $435 was paid. *Id.* On August 24, 2012, the date her first payment was due, she wrote a letter to the court explaining that she could not make the payment because she just had a premature baby. *Id.*, Ex. 4. A handwritten note dated the same day states "allow 30 days extra." *Id.* However, she still could not make the payments. *Id.* ¶ 13. She states that her license was suspended in 2013 as a result. *Id.*

Since 2012, Ganuelas has been cited at least three times for driving with a suspended license. Ganuelas Decl. ¶ 5. On one of those occasions, in 2015, she was offered a payment plan for the $485 owed. *Id.* ¶ 20. She made $50 monthly payments for a time but was unable to pay a $160 balance at which point the court notified the DMV which suspended her license. *Id.* Heath states that "various courts have forced me into payment plans that I couldn't afford." Heath Decl. ¶ 8. Most required her to make a minimum $50 monthly payment. *Id.* Most recently, the Pendleton Municipal Court imposed that requirement on her. *Id.* She began making $20 monthly payments instead, which subjected her to a show cause hearing during which the court agreed to allow her to continue making $20 monthly payments. *Id.*

Mendoza does not remember being offered a payment plan for traffic debt owed to the

Beaverton or Milwaukie Municipal Courts. Mendoza Decl. ¶¶ 9. She currently is on a payment plan for traffic debt owed to Clackamas County Circuit Court, but she has missed some of the $100 monthly payments and that court has now sent the debt to collections. *Id.* ¶¶ 12, 13. She expects that the court will send a suspension notice to the DMV which will suspend her license. *Id.* Roberts states that at one point, he made payments to the Baker County Justice Court but since then, he has acquired more traffic tickets which he cannot pay off with his limited income. Roberts Decl. ¶ 7. It is his belief that the Baker County Justice Court will not ask the DMV to lift his suspension unless he is able to make $50 monthly payments to that court. *Id.* ¶ 10.

Chase was offered payment plans in Gilliam and Sherman County Justice Courts when he explained he could not pay the fines and fees for speeding citations. Chase Decl. ¶¶ 7, 8. However, each county told him the longest term possible was twelve months which resulted in a monthly payment more than he could afford. *Id.* Both of the debts were eventually sent to collections. *Id.* ¶ 10. He also received traffic violations in 2006 and 2008 in Beaverton. *Id.* ¶ 11. Consistent with what he was told by the Gilliam and Sherman County Justice Courts, the Beaverton Municipal Court also told him that a payment plan was available, but it could not extend beyond twelve months. *Id.* This debt was also assigned to a private debt collector. *Id.* Chase worked out payment plans with the private collection agencies beginning in 2013 to pay off the debts to the Gilliam and Sherman County Justice Courts. *Id.* ¶¶ 15-17. Both of those debts have been discharged. *Id.* He has attempted to negotiate a payment plan with the Beaverton Municipal Court but was told that because the debt had been referred to a private collection agency, the debt was "out of house" and he could not meet with a judge. *Id.* ¶¶ 18-19. The private collection agency has refused to enter into a payment plan extending longer than

twelve months which would result in monthly payments greater than $100, an amount Chase cannot afford. *Id.* ¶ 20. Nonetheless, in January 2018, Chase began to pay the debt collection agency $75 per month and then $50 per month beginning in April 2018. *Id.* ¶ 22. At $50 per month, it will take him more than two more years to pay the debt in full at which point he can get his license reinstated. *Id.*

Several Plaintiffs state that the DMV never inquired about an ability to pay the traffic debt before suspending a license. Bermudez Decl. ¶ 16 (stating that before each suspension, no one from the DMV or any court asked if she was able to pay the debt); Mendoza Decl. ¶ 10 (same); Ganuelas Decl. ¶ 24 (no one from the DMV asked about ability to pay before suspending license); Heath Decl. ¶ 7 (same); Roberts Decl. ¶ 11 (same); Chase Decl. ¶ 13 (same). Plaintiffs further state that if given the chance to avoid suspension by explaining an inability to pay, he or she would have done so. Bermudez Decl. ¶ 16; Ganuelas Decl. ¶ 24; Heath Decl. ¶ 7; Mendoza Decl. ¶ 10; Roberts Decl. ¶ 11; Chase Decl ¶ 13.

By any measurable standard, each Plaintiff is impoverished. All live on very limited incomes. Bermudez Decl. ¶¶ 3-5 (single parent of four children; works as a cook in a shopping mall restaurant earning $14 per hour; receives $420 per month in food stamps); Ganuelas Decl. ¶¶ 2, 6, 7, 8 (single parent of one child; lost job in July 2018 where she earned $400 per week; now earns $140 per month teaching yoga; has received $117 per week in child support but father of child stopped paying two months ago); Heath Decl. ¶ 3 (receives $750 per month in social security disability; four times per year receives $400 in casino dividends from the Confederated Tribes of the Umatilla Indian Reservation but receipt of casino dividends results in a corresponding reduction in social security payments; receives $189 per month in food stamps;

has not maintained regular employment since 1997); Mendoza Decl. ¶¶ 2-4 (unemployed single parent of three children; recently moved to subsidized two-bedroom apartment but previously spent four months living in a motel room and in a homeless shelter; receives approximately $1,100 monthly in assistance, including food stamps); Roberts Decl. ¶¶ 3-4 (lives with wife and each receive $562 per month in social security income; has not had substantial paid work since March 2003 due to disabilities); Chase Decl. ¶ 2 (receives $817 per month in social security disability and approximately $190 per month in food stamp with no other sources of income).

Plaintiffs struggle to obtain basic life necessities such as housing and food, and some have medical issues and are on disability. Bermudez Decl. ¶ 5 (earnings not enough to support her family resulting in struggles to pay monthly electric, gas, and phone bills; often seeks free food at food pantries at end of the month); Ganuelas Decl. ¶ 10 (recently moved from apartment to renting a room from a friend because the apartment rent was too high); Heath Decl. ¶ 3, 12 (on disability; homeless for seven years until December 2017); Mendoza Decl. ¶ 4 (assistance and food stamp amounts not enough to support family requiring her to find free boxes at food pantries every month); Roberts Decl. ¶¶ 3-5 (disabled for several years; social security income received by Roberts and his wife not enough for the family with no money left after paying bills and buying groceries); Chase Decl. ¶¶ 2, 14 (disabled since 2009).

Regardless of residence in an urban or rural community, each Plaintiff describes the difficulties of life without the ability to drive a car. For example, Bermudez, who lives in Portland, explains that she still drives because it cuts her work commute from one hour on the bus to twenty-five minutes by car, and given her children's needs, she cannot afford the extra time on the bus. Bermudez Decl. ¶ 20. She drives her children to school in five to ten minutes to

spare them an hour-long bus ride starting at 6:45 a.m. which would cause sleep deprivation with negative health and learning impacts. *Id.* ¶ 21. She buys groceries by car because of the amount of food needed for a family of five. *Id.* ¶ 22. Each day without a driver's license makes it hard for her to shop for groceries, take her children to school, get to medical appointments, and get to work. *Id.* ¶ 24.

Ganuelas recently moved from Pendleton to Mission, about six miles away, because Pendleton's rent was too high. Ganuelas Decl. ¶¶ 2, 10. Before she moved, her job as a bartender was one mile away and she walked, even though she had to cross a busy four-lane highway and walking home from her late-night shift made her feel unsafe. *Id.* ¶ 9. After moving, she had to pay a friend to take her to work or use a taxi. *Id.* ¶ 10. In July 2018, she lost her bartending job because she missed a shift. *Id.* ¶ 7. She had gone away with friends who decided to stay longer than planned. *Id.* This left her with no way to return. *Id.* No one would lend her a car given that her license was suspended. *Id.* She was fired at the end of the pay period for failing to show up for her shift. *Id.* Ganuelas can use a tribal shuttle to get from Mission to Pendleton but it runs only six days per week from 8 a.m. to 5 p.m. and thus, was not an option when she still was bartending. *Id.* ¶ 11. Not having a license makes it difficult for her to provide for herself and her daughter. *Id.* ¶ 12. To buy groceries, clothes, and necessary household goods, she has to find a ride and pay $10 each way. *Id.* Her daughter has been unable to play on a youth soccer team because Ganuelas lacks a reliable way to get her to practices and games. *Id.* ¶ 13. Ganuelas has missed events at her daughter's school because of her inability to drive. *Id.* ¶ 14. It is difficult for her to visit extended family in Washington, Alaska, and other parts of Oregon without a car. *Id.* ¶ 15.

Heath explains that when she last worked, in 1997, she walked five and one-half miles each way because her license was suspended. Heath Decl. ¶¶ 4, 5. She lives in Pendleton, where, she states, the public transportation is slow and limited. *Id.* ¶ 10. There are no ride-hailing services such as Uber or Lyft. *Id.* Taxis are expensive. *Id.* Because of her suspension, she has had to pay expensive cab fares, walk long distances in hot, cold, and wet weather, and take slow public transit systems. *Id.* ¶ 11. She has missed funeral services for family members and tribal events. *Id.* Walking is difficult for her because she gets exhausted and experiences soreness in her back, legs, and feet, but without a driver's license, she has to walk long distances every day. *Id.* ¶ 16.

Mendoza lives in Portland and has had difficulty finding a job without a valid driver's license. Mendoza Decl. ¶¶ 2, 4, 21. She still drives occasionally to get her children to medical appointments, to buy clothes and school supplies, and to access food pantries. *Id.* ¶¶ 17-19. She tries to take the bus or light rail but for groceries, food pantries, and medical appointments, she relies on her car. *Id.* ¶ 20. Uber and Lyft are too expensive for her. *Id.*

Roberts lives in Baker City where there is very little public transportation. Roberts Decl. ¶ 17. His wife also does not have a driver's license and needs transportation to frequent medical appointments required by a health condition. *Id.* ¶ 16. He tries to avoid driving but still does so on a limited basis because he does not see an alternative in Baker City given his and his wife's health issues. *Id.* ¶ 18. He has ridden his bicycle as an alternative, even through the harsh Baker City winters, to purchase groceries but as he has aged, it has become more difficult and his doctor has now advised against it for health reasons. *Id.* ¶ 15. It is "pretty much impossible" to fish and hunt or to visit his adult children in Idaho and Missouri without a car. *Id.* ¶¶ 13, 14.

Finally, Chase, who lives in Vancouver, Washington, states that he uses public transportation to get around, but the inability to drive is still a hardship. Chase Decl. ¶ 25. Using public transportation in the Vancouver-Portland area typically takes ninety minutes and two transfers with trains and buses often delayed. *Id.* He has been stranded multiple times. *Id.* Having a driver's license would make it much easier to take care of basic life necessities such as buying groceries and going to medical appointments. *Id.* Without the ability to drive, he does not feel like a full participant in society. *Id.* ¶ 26.

Defendants do not dispute that Plaintiffs' traffic debt remains unpaid only because they cannot afford to pay it, not because of a willful refusal to pay. Defendants do not dispute Plaintiffs' descriptions of their economic, social, or employment circumstances or how the loss of their driver's licenses for nonpayment of traffic debt has contributed to their poverty and added challenges to their lives. Defendants do not dispute that the ability to drive a car plays a central role in one's life, whether living in a large metropolitan area, a small city, or a rural area. Thus, I rely on these facts, which are supported by Declarations and undisputed by Defendants, in this Opinion.

## III. Judicial Officers' Adjudication of Traffic Violations & Fine Impositions

Three judges of municipal or justice courts submitted Declarations explaining Oregon's statutory scheme for traffic debt and how each carries forth his or her duties in that regard. Judge Jad Lemhouse, a Justice of the Peace for the Linn County Justice of the Peace District 4A, regularly conducts proceedings on traffic offenses, both misdemeanor crimes and violation offenses. Lemhouse Decl. ¶ 2, ECF 25. He states that in his experience, "most judges in Oregon are willing to work with people to get them out of the system." Lemhouse Decl. ¶ 16. But, he

explains, a person must appear in court and follow the court's directions and procedures "for that to happen." *Id.*

When a person with a suspended license comes into Lemhouse's court for a driving while suspended violation, he talks to the person about whether the person wants to get her or his driving privileges reinstated. *Id.* ¶ 12. If the person does, he defers sentencing and discusses what is required for reinstatement and what kind of timeline is necessary to accomplish certain tasks such as contacting each of the courts to which the person owes a fine to try and make payment arrangements, contacting the state support enforcement division to address the person's unpaid child support, if any, and contacting five or six insurance agents to ascertain the cost of obtaining insurance. *Id.* Lemhouse works with the person to schedule proposed payments to the courts or the support enforcement division along with the monthly insurance cost. *Id.* ¶ 13. At this point, the person can show each of the courts that he or she is seriously making an effort. *Id.* If necessary, Lemhouse writes to the judge or judges in question supporting the person's proposal. *Id.*; *see also id.*, Attach. A. With this process, Lemhouse reports that more than half of the individuals succeed. *Id.* Lemhouse allows equitable relief from judgment when a person has made twenty-four consecutive payments on their payment plans and has received no new convictions in that period. *Id.* ¶ 15. If those requirements are successfully completed, any remaining fine balance is remitted in full. *Id.*

Judge Karen Brisbin is a Municipal Judge for the City of Sandy and a Justice of the Peace for Clackamas County Justice Court. Brisbin Decl. ¶ 1, ECF 26. She hears traffic violation cases and states that when a fine is imposed, the person may pay in full or set up a payment plan. *Id.* ¶ 2. The monthly payment may be different for each person based on the ability to pay. *Id.* If

the person is unable to make a payment after the payment plan is set, and the person is in contact with the court, the court will work with the person to assure compliance with the court's order. *Id.* In such cases, the person may be allowed to skip a monthly payment or reduce the amount of the monthly payment until the person can get back to work. *Id.* She states: "The key is to keep in contact with the court." *Id.*

When individuals do not appear or do not contact the court, or fail to continue to make their payments as part of a payment plan, and when the court "cannot get the convicted person's attention for compliance," the court will issue the notice of suspension to the DMV to initiate suspension procedures. *Id.* ¶ 3. Once the DMV sends the sixty-day suspension notice, the person can contact the court and get into compliance by paying the fine or setting up a payment plan. *Id.* This allows the person to entirely avoid the license suspension and the DMV reinstatement fee. *Id.* Even post-suspension, the person can obtain reinstatement by working with the court to pay the fine via a payment plan. *Id.* According to Brisbin, "[p]ersons may provide a letter to the judge stating their financial hardship along with documentation to resolve the license suspension." *Id.* Brisbin observes that the notice of suspension issued by the DMV "often . . . works so that the person contacts the court who then works with the person to facilitate payment of the fine. The system would not work nearly as well without the suspension provisions in the statute." *Id.* ¶ 4.

Finally, Judge Kathy Stinnett is a Justice of the Peace for Grant County and is the President of the Oregon Justice of the Peace Association. Stinnett Decl. ¶ 1, ECF 35. There are twenty-eight justices of the peace who preside in twenty-eight justice courts. *Id.* ¶ 1. They heard 125,918 traffic violation cases in the 2017-18 fiscal year. *Id.* She submits her Declaration on

behalf of the Association. *Id.* After explaining how traffic violation cases come to courts and what options the individual has upon receiving a violation, she states that "[j]udges are aware that the purpose of a traffic fine is to get the attention of the driver to change or reinforce driving behavior consistent with the rules of the road in Oregon for traffic safety." *Id.* ¶ 4.

According to Stinnett, a person may pay the fine in full or set a payment plan with the court. *Id.* She observes that "[c]ourts routinely work with individuals regarding payment of fines." *Id.* ¶ 5. When payments are missed, the court may reach out to the person by letter or telephone. *Id.* If the person is in contact with the court, the court will review the individual circumstances to determine how, when, and if the fine will be paid. *Id.* In cases where a suspension is initiated for failure to pay the fine, in "numerous cases" the person contacts the court within the sixty-day period and works with the court to pay the fine or get back on track with the payment plan. *Id.* ¶ 7. Courts also work with persons after suspension. *Id.* She states that the license suspension is an important tool used by courts when working with persons who owe traffic debt. *Id.* ¶ 8.

Plaintiffs argue that Judges Lemhouse and Brisbin may speak to how they personally handle collection of traffic debt but not to how every circuit, municipal, or justice court judge does so. Pls.' Reply 6, ECF 33.[5] Although Judges Lemhouse and Brisbin do not expressly state how they have acquired knowledge of court practices generally, it is presumably from talking to

---

[5] Because Stinnett's Declaration was filed after Plaintiffs' Reply, Plaintiffs do not mention it with their argument addressed to Lemhouse's and Brisbin's Declarations. Given that Stinnett's Declaration is submitted on behalf of the Oregon Justice of the Peace Association, it is unclear if Plaintiffs would make the same objection to her characterization of how justice courts handle traffic violation fines and debt.

their peers.  Assuming that is the case and thus, that they rely on out-of-court statements for the truth of the matter asserted, the evidence may be inadmissible hearsay.  However, "the rules of evidence do not apply strictly to preliminary injunction proceedings" given the urgency of obtaining an injunction and the limited factual development that has occurred.  *Herb Reed Enters, LLC v. Fla. Entm't Mgmt., Inc.*, 736 F.3d 1239, 1250 n.5 (9th Cir. 2013).  "[I]n deciding a motion for a preliminary injunction, the Court has broad discretion to consider all arguments and evidence, including hearsay and other inadmissible evidence, [and] declarations from interested parties[.]"  *Brinton Bus. Ventures, Inc. v. Searle*, 248 F. Supp. 3d 1029, 1032 (D. Or. 2017) (citing *Johnson v. Couturier*, 572 F.3d 1067, 1083 (9th Cir. 2009); *Lane v. Dep't of Interior*, 523 F.3d 1128, 1140 (9th Cir. 2008)).  Thus, even assuming that the Declarations are based on potential inadmissible hearsay, the statements are appropriately considered for the purposes of this motion.

IV.  Oregon's Scheme in Law & in Practice

Oregon courts adjudicate traffic violations.  Punishment for a traffic violation is a fine.  Citations give notice of the court date and time that the violator must appear to address the citation.  Some violators do not wish to contest guilt and are willing and able to pay the assessed fine, which is the presumptive fine as set by the Oregon Legislature.  This may be accomplished without a formal court appearance.  Otherwise, the violator must appear.  The statutes addressing the contents of citations and summonses do not require that the violator be told that even when guilt is admitted, a payment plan may be worked out in cases of indigency or that failure to pay could result in suspension of a license.

The statutes also do not require that an Oregon court assessing a fine for a traffic

violation notify the violator of the possibility of a payment plan for the fine. Nonetheless, several

Oregon courts, as demonstrated by the judicial officers' Declarations as well as the Declarations

of several Plaintiffs, do consider a person's indigency and will offer a payment plan. Whether

this occurs frequently, regularly, occasionally, or otherwise is unclear. The evidence indicates

that each time a Plaintiff requested an initial payment plan from a court, he or she was given

one.[6] It may not have been one that suited the Plaintiff's ability to pay, for example when Chase

was told the fine had to be paid over twelve months making for untenable monthly payments, but

a payment plan was initially offered.

While the statutes provide for a minimum fine for each type of violation, they also

provide that a judge may suspend any part of the judgment, including the fine, "upon condition

that the defendant pay the nonsuspended portion of a fine within a specified period of time."

O.R.S. 153.090(4). This suggests that judges have flexibility to work with a violator so that the

total fine paid may be less than the minimum statutory fine. In fact, Judge Lemhouse notes that

he remits the unpaid portion of a fine upon completion of his requirements of consecutive

payments of twenty-four months with no new violations.

The lack of consistency among the courts in whether they affirmatively account for

violators' indigency and notify violators of the possibility and terms of a payment plan is

troubling. What may benefit a violator in one jurisdiction may be unavailable in another.

Certainly, the statutes do not *prohibit* a court from offering a payment plan or from accounting

for an individual's financial circumstances. But, the statutes undisputably do not *require* a court

---

[6] Some Plaintiffs do not recall a payment plan being offered but the record shows that when a Plaintiff requested a payment plan, one was given.

to make an assessment of an individual violator's ability to pay a fine and structure a fine and payment plan accordingly.

It is also clear that the suspension of a driver's license is within the discretion of the court. The statute unambiguously states that when a fine is unpaid, the "court *may* . . . issue a notice of suspension to the [DMV] that directs the department to implement procedures under ORS 809.416[.]" O.R.S. 809.210(1)(a) (emphasis added). It is not mandatory for the court to issue the notice. However, once issued, it is *mandatory* for the DMV to suspend the license after issuing the sixty-day suspension notice when no reinstatement order from the court is received by the DMV before the sixty-day period expires. In contrast to the discretion afforded the court, there is no discretion for the DMV.

The sixty-day notices in the record expressly direct the recipients to the court to address the outstanding fine, but they fail to mention anything about options if one is unable to pay. While the statute contemplates that the court has the authority to work out a payment plan at that point, or even after suspension has begun, the sixty-day notices do not specifically inform the recipients that a payment plan may be an option. Instead, recipients are told that they can stop the suspension by contacting the court and "completing all the requirements necessary to clear this matter," or by "meeting the court's requirements." In the more recent version of the notices, the recipient is told to "[c]ontact the court to determine how to obtain a court clearance for the docket(s) shown." Unless one knows to ask for a payment plan, it may not occur to a person receiving the sixty-day notice that anything other than full payment is possible. Nonetheless, it is undisputed that based on the examples of the sixty-day notices in the record, notice recipients are clearly informed to contact the court to address the matter.

The judicial officers' Declarations indicate that some courts do not always exercise their discretion to send a suspension notice to the DMV without first attempting to contact the person and assess the situation. Courts may use the threatened suspension as leverage to obtain compliance with a payment plan or to at least initiate a conversation about options. And, some courts remain open to such a discussion during the sixty-day period or after suspension is effective.

Finally, it is undisputed that the statutes do not provide for the DMV to consider an individual's ability to pay before suspending a driver's license for failure to pay traffic debt.

## STANDARDS

A party seeking a preliminary injunction "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The plaintiff "must establish that irreparable harm is *likely*, not just possible[.]" *Alliance For The Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011). The court may apply a sliding scale test, under which "the elements of the preliminary injunction test are balanced, so that a stronger showing of one element may offset a weaker showing of another." *Id.* Thus, a party seeking an injunction may show greater irreparable harm as the probability of success on the merits decreases. *Id.* (noting also that the relevant test in the Ninth Circuit is described as the "serious questions" test where the likelihood of success is such that "serious questions going to the merits were raised and the balance of hardships tips sharply in plaintiff's favor") (internal quotation marks and brackets omitted).

The party requesting a preliminary injunction must carry its burden of persuasion by a "*clear showing*" of the four required elements set forth above. *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam); *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012) (a preliminary injunction is an "'extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing,* carries the burden of persuasion'") (quoting *Mazurek*, 520 U.S. at 972).

In considering whether to issue a preliminary injunction, courts "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 23 (internal quotation marks omitted); *see also Univ. of Haw. Prof'l Assembly v. Cayetano*, 183 F.3d 1096, 1108 (9th Cir. 1999) ("To determine which way the balance of the hardships tips, a court must identify the possible harm caused by the preliminary injunction against the possibility of the harm caused by not issuing it.").

When the relief sought would "order[] a responsible party to take action," the injunction is viewed as mandatory rather than prohibitory. *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (en banc) (describing the requested relief as requiring the defendant to take "affirmative action" to remove a video from YouTube and other sites) (internal quotation marks omitted). "A prohibitory injunction prohibits a party from taking action and 'preserves the status quo pending a determination of the action on the merits.'" *Innovation Law Lab v. Nielsen*, 310 F. Supp. 3d 1150, 1157 (D. Or. 2018) (quoting *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 878-79 (9th Cir. 2009) (brackets omitted)). In contrast, a "'mandatory injunction orders a responsible party to take action.'" *Id.* (quoting *Marlyn*

*Nutraceuticals*, 517 F.3d at 878-79.  Mandatory injunctions "'go[] well beyond simply maintaining the status quo[.]'" *Id.* (quoting *Marlyn Nutraceuticals*, 517 F.3d at 878-79).

Mandatory injunctions trigger a higher standard.  *See Hernandez v. Sessions*, 872 F.3d 976, 999 (9th Cir. 2017).  Mandatory injunctions require a showing that "extreme or very serious damage will result[.]" *Id.* (internal quotation marks omitted).  The merits of the case must not be "doubtful" and injury must be incapable of compensation in damages.  *Id.*

DISCUSSION

I.  Nature of the Claims and the Injunctive Relief Sought

A.  First Amended Complaint

Plaintiffs bring three claims.  The first relies on the "fundamental fairness" concept of substantive due process and equal protection as explained by the Supreme Court in cases such as *Griffin v. Illinois*, 351 U.S. 12 (1956), and *Bearden v. Georgia*, 461 U.S. 660 (1983).  First Am. Compl. ¶¶ 207-212, ECF 38.  Plaintiffs contend that under *Griffin*, "states must provide an evaluation of ability to pay to assess an individual's indigence prior to [] taking any measures that could result in any additional punishment beyond that imposed upon financially solvent individuals." *Id.* ¶ 210; *see also id.* ¶ 211 (citing *Bearden* and alleging that the "Fourteenth Amendment's Due Process and Equal Protection Clauses prohibit punishing individuals for non-payment without first determining that they had the ability to pay and willfully refused to make a monetary payment.").  The "gist" of this claim, according to Plaintiffs, "is that the Fourteenth Amendment prohibits a government from treating indigent defendants worse than non-indigent defendants, because of their poverty."  Pls.' Reply 14.

In their second claim, Plaintiffs rely only on the Equal Protection Clause.  *Id.* ¶¶ 213-15.

Specifically, they rely on *James v. Strange*, 407 U.S. 128 (1972), to contend that the state may not distinguish indigent traffic debt debtors from other indigent debtors. *Id.* They assert that under *Strange*, equal protection principles are violated by statutes which result in the DMV treating indigent traffic debtors worse than indigent debtors who commit bicycle, pedestrian, or parking offenses, private debtors with delinquent credit card debt, and child support debtors. *Id.* ¶ 215; *see also* Pls.' Mot. 32 ("Under *Strange,* ORS § 809.416 is unconstitutional because it empowers the DMV to treat indigent traffic debtors worse than other kinds of indigent debtors.").

The third claim is a procedural due process claim. *Id.* ¶¶ 216-18. Plaintiffs allege that they have property and liberty interests in their driver's licenses and their ability to drive legally. *Id.* ¶ 217. They assert that Defendants violate their procedural due process rights by suspending their driver's licenses without affording them a pre-suspension or post-suspension hearing to determine if they are able or unable to pay their traffic debt. *Id.*

Plaintiffs seek both declaratory and injunctive relief. *Id.* § X. They seek a declaration that Defendants' practices with respect to the suspension of driver's licenses as alleged have violated and continue to violate the Due Process and Equal Protection Clauses of the Constitution. *Id.* § X(b). They seek injunctive relief in the form of an order (1) prohibiting Defendants from suspending Plaintiffs' and class members' driver's licenses for unpaid traffic debt until such time as the DMV and the State of Oregon implement a system that complies with the Constitution; and (2) requiring Defendants to remove Plaintiffs' and class members' suspensions for nonpayment of traffic debt that were effected before the date of judgment, and as part of that removal, prohibiting Defendants from requiring Plaintiffs and class members to pay reinstatement fees as a condition of reinstatement. *Id.*; *see also* X(c), (d).

B.  Preliminary Injunction Motion

In the preliminary injunction motion, Plaintiffs seek a preliminary injunction (1) compelling Defendants to remove the license suspensions on Plaintiffs' licenses for nonpayment of their traffic debt under O.R.S. 809.416 and, if Plaintiffs are then eligible for reinstatement of their licenses, compelling Defendants to waive the reinstatement and issuance fees under O.R.S. 870.370; and (2) ordering Defendants to refrain from suspending Plaintiffs' licenses for failure to pay their traffic debt unless and until Plaintiffs have had the opportunity to demonstrate their inability to pay, entitling them to be exempt from suspension, through a procedure that comports with due process.

As I understand the injunctive relief sought in the motion, Plaintiffs do not seek only the opportunity to demonstrate their inability to pay the outstanding traffic debt.  They seek as well an order from this Court requiring the DMV to exempt them from paying the outstanding debt upon a determination that they are indigent and cannot pay the debt.  Additionally, they seek an order requiring the DMV to reinstate their driver's licenses at this point, notwithstanding the outstanding debt, and without a reinstatement fee.

Defendants argue that the injunctive relief sought is mandatory because Plaintiffs seek to alter rather than preserve the status quo.  Plaintiffs contend the requested relief is prohibitory but even if any portion of it is considered mandatory, they have demonstrated the strength of their claims.

An injunction preventing future unconstitutional conduct is "a classic form of prohibitory injunction."  *Hernandez*, 872 F.3d at 998.  Thus, in *Hernandez*, the requested preliminary injunctive relief preventing the defendant from conducting future initial bond hearings under

unconstitutional procedures was prohibitory. *Id.* In contrast, ordering the defendant to provide new bond hearings to individuals currently detained on bonds set pursuant to allegedly unconstitutional procedures was arguably mandatory. *Id.* at 998-99. "The relevant status quo is that between the parties pending a resolution of a case on the merits." *Ariz. Dream Act Coalition v. Brewer*, 757 F.3d 1053, 1061 (9th Cir. 2014) (internal quotation marks omitted).

In this case, the relevant status quo at the inception of the case is that Plaintiffs' licenses are suspended. I agree with Plaintiffs that the portion of their requested relief seeking to prevent Defendants from suspending their licenses without giving Plaintiffs the opportunity to demonstrate their inability to pay and entitling them to an exemption consistent with procedural due process, is prohibitory. But, I agree with Defendants that the requested relief requiring Defendants to revoke Plaintiffs' suspensions and reinstate their licenses without any additional fee, is mandatory because it orders Defendants to take action instead of prohibiting them from future allegedly unconstitutional conduct. And, in this case, the requested injunctive relief that is prohibitory is unavailable to Plaintiffs unless the mandatory injunctive relief is granted. Because the status quo is one of current suspensions, it is only if Defendants first rescind Plaintiffs' suspensions and restore their driving privileges that a future prohibition on suspending Plaintiffs' licenses without an exemption upon demonstrated inability to pay would matter. Thus, in this case, I analyze the motion as one seeking a mandatory injunction.

II. *Younger* Abstention

Defendants argue that this Court should abstain from considering this case under the principles of *Younger v. Harris*, 401 U.S. 37 (1971). *Younger* abstention recognizes that principles of equity and comity preclude federal courts from enjoining state criminal proceedings

and state "civil enforcement actions akin to criminal proceedings." *ReadyLink Healthcare, Inc. v. State Comp. Ins. Fund*, 754 F.3d 754, 758 (9th Cir. 2014) (citing *Younger*, 401 U.S. at 43-54; *Huffman v. Pursue, Ltd.*, 420 U.S. 592, 604 (1975)) (internal quotation marks omitted). For state civil enforcement proceedings, the *Younger* analysis looks at whether the state proceedings "(1) are ongoing, (2) are quasi-enforcement criminal actions or involve a state's interest in enforcing the orders and judgments of its courts, (3) implicate an important state interest, and (4) allow litigants to raise federal challenges." *Id.* at 959.

Because I resolve the preliminary injunction motion in favor of Defendants, I decline to address the *Younger* abstention issue at this time.

III. First Claim for Relief - *Griffin/Bearden* Fundamental Fairness

Plaintiffs contend that under the *Griffin/Bearden* line of cases, due process and equal protection principles combine to prohibit penalizing people simply because they are poor. Plaintiffs suggest that under these cases, the appropriate inquiry is not based solely on either substantive due process or equal protection. Instead substantive due process and equal protection considerations converge into considerations of "fundamental fairness." Thus, in cases involving the treatment of indigent criminal defendants, the court must engage in a "more searching inquiry," Pls.' Mot. 23, which requires analyzing factors such as "the nature of the individual interest affected, the extent to which it is affected, the rationality of the connection between legislative means and purpose, and the existence of alternative means for effectuating the purpose." *Bearden*, 461 U.S. at 666-67 (internal quotation marks and brackets omitted).

Under this analysis, Plaintiffs argue that the nature of the individual interest involved is the "right to basic self-sufficiency" and the constitutional right to travel. Pls.' Mot. 25-28. Next,

they argue that the interests involved are greatly affected as demonstrated by Plaintiffs'
unchallenged Declarations detailing the burdens they experience when deprived of their driver's
licenses.  Third, Plaintiffs contend that there is no rational connection between suspending a
license for failure to pay traffic debt and the challenged means of doing so without an inquiry
into the debtor's ability to pay before or during suspension.  Plaintiffs concede that O.R.S.
809.416 may be a rational means for coercing payment of traffic debt for those who can afford to
pay it.  But, that is not the case for those low-income individuals who cannot afford to make
payments on the debt.  "Visiting a harsh consequence on 'someone who through no fault of his
own is unable to make' the payment sought 'will not make [payment] suddenly forthcoming.'"
*Thomas I*, 303 F. Supp. 3d at 614 (quoting *Bearden*, 461 U.S. at 670) (brackets in *Thomas*).  In
fact, Plaintiffs argue, depriving traffic debtors of their driver's licenses based on a failure to pay is
counterproductive because it undermines the objective of obtaining payments on traffic debt by
adversely affecting the debtors' ability to find and maintain a job.  Finally, Plaintiffs argue that
there are "robust, alternative means for collecting traffic debt." Pls.' Mot. 30.  They note that the
state can send collection letters, assign a delinquent account to a private collection agency or to
the ODOR for set offs, and garnish a traffic debtor's wages.  *Id.* at 30-31.

      Defendants argue that the *Griffin/Bearden* cases have a more limited application than
Plaintiffs suggest, that driving is not a fundamental right, that poverty is not a protected class,
and that the statutory scheme has a rational basis.  Based on these arguments, Defendants
contend that Plaintiffs fail to establish substantive due process or equal protection claims.

      *Griffin* addressed the constitutionality of requiring criminal defendants to pay for
transcripts in order to appeal.  351 U.S. at 13.  Undisputably, the issue arose in the criminal

context. Several times in the plurality decision the Court referred to criminal trials. *E.g.*, *id.* at 17 ("our own constitutional guarantees of due process and equal protection both call for procedures in criminal trials which allow no invidious discriminations between persons and different groups of persons"; "all people charged with a crime must, so far as the law is concerned, stand on an equality before the bar of justice.") (internal quotation marks omitted). While the plurality decision did not make clear if it was addressing the issue as one of due process or equal protection, Justice Frankfurter, concurring in the judgment, relied on equal protection principles. *E.g.*, *id.* at 21 (equal protection does not deny a state "the right to make classifications in law when the classifications are rooted in reason").

Cases following *Griffin* also addressed rights implicated when one is a criminal defendant. Like *Griffin*, which ultimately concerned the right to be free of wrongful imprisonment/right to liberty, the right at issue in *Williams v. Illinois* concerned the imprisonment of an indigent criminal defendant when a non-indigent criminal defendant in the same circumstances would not have faced that punishment. 399 U.S. 235 (1970). In *Williams*, the criminal defendant received the maximum punishment for theft of one year in jail and a $500 fine, plus $5 in court costs. *Id.* at 236. The judgment provided that if the defendant did not pay the fine and court costs by the end of his one-year jail term, he would remain in jail until that debt was paid, to be calculated at the rate of $5 per day. *Id.* at 236-37. This equaled 101 days in addition to the maximum term of imprisonment he had already received. *Id.* The Court held that it was unconstitutional to subject an indigent individual to imprisonment beyond the maximum sentence when he was not willfully refusing to pay. *Id.* at 244. The defendant presented this as an equal protection argument which the Court relied on to hold that the "Equal Protection Clause

of the Fourteenth Amendment requires that the statutory ceiling placed on imprisonment for any substantive offense be the same for all defendants irrespective of their economic status." *Id.*; *see also id.* at 242 ("By making the maximum confinement contingent upon one's ability to pay, the State has visited different consequences on two categories of persons since the result is to make incarceration in excess of the statutory maximum applicable only to those without the requisite resources to satisfy the money portion of the judgment.").  The Court made clear that it did not preclude imprisonment for one who willfully refused to pay the fine.  *Id.* at 242 n.19.

The next year, the Court struck down a Texas law which allowed conversion of the defendant's fine into a jail term even though the traffic offense violation limited punishment to a fine and even though the fine was unpaid due to the defendant's indigency.  *Tate v. Short*, 401 U.S. 395 (1971).  The Court observed that *Tate* involved offenses punishable by fines only, but it analogized to *Williams* nonetheless because, the Court explained, an individual's imprisonment for nonpayment is the same unconstitutional discrimination as in *Williams* given that the individual is subjected to imprisonment solely because of his indigency.  *Id.* at 397-98.  The Court explained that because Texas had legislated a "fines only" policy for traffic offenses, that statutory ceiling could not, consistent with the Equal Protection Clause, limit punishment to payment of a fine for a defendant able to pay but convert it to a prison term for a defendant unable to pay.  *Id.* at 399.  Although *Tate* involved a traffic violation and not a more serious charge, the statute at issue, like the statutes in *Griffin* and *Bearden*, implicated the defendant's right to be free from wrongful incarceration.

Finally, in *Bearden*, the Court once again was concerned with the imprisonment of a criminal defendant solely because the defendant could not pay a fine.  461 U.S. at 661.  In that

case, the Georgia sentencing court revoked the defendant's probation for failure to pay a fine and make restitution. *Id.* at 662-63. Justice O'Connor summarized the prior holdings of *Griffin* and subsequent cases after noting that the Court had "long been sensitive to the treatment of indigents in our criminal justice system." *Id.* at 664. She also noted, however, that the Court had "recognized limits on the principle of protecting indigents in the criminal justice system." *Id.* For example, the Court held that indigents had no constitutional right to appointed counsel for a discretionary appeal. *Id.* at 664-65 (citing *Ross v. Moffitt*, 417 U.S. 600 (1974)). It also rejected an equal protection challenge to a federal statute permitting a district court to provide an indigent with a free trial transcript only if the court certified that the challenge to the conviction was not frivolous and the transcript was needed to prepare the petition. *Id.* at 665 (citing *United States v. MacCollum*, 426 U.S. 317 (1976) (plurality opinion)).

The *Bearden* Court explained that "[d]ue process and equal protection principles converge in the Court's analysis in these cases." *Id.* at 665. Acknowledging that most decisions relied on an equal protection analysis, Justice O'Connor explained that the Court "generally analyze[s] the fairness of relations between the criminal defendant and the State under the Due Process Clause, while we approach the question whether the State has invidiously denied one class of defendants a substantial benefit available to another class of defendants under the Equal Protection Clause." *Id.* The parties presented arguments based on equal protection and strenuously argued whether strict scrutiny or rational basis was the correct standard of review. *Id.* There was no doubt that the state had treated the defendant differently from a person who did not violate probation by failing to pay the fine. *Id.* But, the Court believed that the question of whether the differential treatment violated the Equal Protection Clause required the

determination of whether, and under what circumstances, a defendant's indigent status may be considered in the decision whether to revoke probation. *Id.* at 665-66. This, the Court explained, was "substantially similar to asking directly the due process question of whether and when it is fundamentally unfair or arbitrary for the State to revoke probation when an indigent is unable to pay the fine." *Id.* at 666.

Continuing, the Court enunciated the four-part test Plaintiffs rely on here:

Whether analyzed in terms of equal protection or due process, the issue cannot be resolved by resort to easy slogans or pigeonhole analysis, but rather requires a careful inquiry into such factors as "the nature of the individual interest affected, the extent to which it is affected, the rationality of the connection between legislative means and purpose, and the existence of alternative means for effectuating the purpose."

*Id.* at 666-67 (quoting *Williams*, 399 U.S. at 260 (Harlan, J., concurring)) (footnote and brackets omitted).

Following *Williams* and *Tate*, the Court concluded in *Bearden* that if a state determines that a fine or restitution is the appropriate sentence for the crime, it is unconstitutional for the state to thereafter imprison the defendant solely because she or he lacks the resources to pay. *Id.* at 667-68. The Court was careful to distinguish situations where a defendant is at fault for failing to pay the fine. *Id.* at 668 (noting that "[i]f the probationer has willfully refused to pay the fine or restitution when he has the means to pay, the State is perfectly justified in using imprisonment as a sanction to enforce collection."). In reaching its conclusion, the Court rejected the state's rationales for why it had to revoke probation in such circumstances. *Id.* at 671-72. The Court also noted alternatives such as extending time for payments, reducing the fine, or performing public service. *Id.* at 671-72. In the end, the Court held that "in revocation proceedings for

failure to pay a fine or restitution, a sentencing court must inquire into the reasons for the failure to pay." *Id.* at 672. If the probationer willfully refused to pay or failed to make sufficient bona fide legal efforts to acquire the funds to pay, the court could, consistent with the Constitution, revoke probation and sentence the defendant to imprisonment. *Id.* If the probationer satisfied the court that he could not pay despite such bona fide efforts, the court had to consider alternatives. *Id.* The court could revoke probation and order imprisonment only if alternative measures were inadequate to meet the state's interests in punishment and deterrence. *Id.* "To do otherwise would deprive the probationer of his conditional freedom simply because, through no fault of his own, he cannot pay the fine. Such a deprivation would be contrary to the fundamental fairness required by the Fourteenth Amendment." *Id.* at 672-73.

The *Griffin/Bearden* line of cases firmly establishes that the government may not imprison a criminal defendant solely due to the person's non-willful inability to pay a fee or a fine. Grounded in concepts of due process and equal protection, the Court has found such statutes to be "fundamentally unfair." The Ninth Circuit has applied this line of reasoning, including in a case challenging a federal sentencing guideline provision which imposed additional criminal history points at sentencing, and thus increased the defendant's period of incarceration, because of the defendant's failure to pay a fine imposed in a prior state-court conviction. *United States v. Parks*, 89 F.3d 570 (9th Cir. 1996). The court, relying on *Bearden*, concluded that the imposition of criminal history points for failure to pay a fine without a finding that the failure to pay was willful, violated the Fifth Amendment Due Process Clause. *Id.* at 572-73. Imposition absent such inquiry solely based on nonpayment would be "'fundamentally unfair.'" *Id.* at 573 (quoting *Bearden*, 461 U.S. at 668).

These cases have all arisen in the context of the criminal justice system where fundamental rights of liberty are implicated. Few cases have extended these principles beyond that context. The Supreme Court addressed this issue in *M.L.B. v. S.L.J*, a case in which the state court had terminated a mother's parental rights and then dismissed her appeal because of her financial inability to comply with statutes requiring her to pay more than $2,000 in record and transcript preparation fees. 519 U.S. 102 (1996). Justice Ginsburg explained that *Griffin* was the "foundation case" for issues concerning access to appeal in general and transcripts required for appeal in particular. *Id.* at 110. Before analyzing the particulars of the statute at issue in *M.L.B.*, she discussed the application of *Griffin* beyond "cases in which imprisonment is at stake." *Id.* at 111.

One of those cases was *Mayer v. Chicago*, 404 U.S. 189 (1971), which involved an indigent defendant convicted on non-felony charges who received a fine for each offense. He intended to appeal based on prosecutorial misconduct and insufficient evidence, but the state provided free transcripts only for felony cases. The *Mayer* Court rejected the argument that *Griffin* was distinguishable because the defendant in that case, and defendants in other "transcript" cases, were sentenced to confinement. 404 U.S. at 196. The city argued that a defendant's interest in a transcript for a fine-only non-felony case was outweighed by the state's fiscal and other interests in not burdening the appellate process. According to *Mayer*, such an argument "misconceives" *Griffin*'s principle. *Id.* *Griffin*, the *Mayer* Court stated, did not "represent a balance between the needs of the accused and the interests of society[.]" *Id.* Instead, "its principle is a flat prohibition against pricing indigent defendants out of as effective an appeal as would be available to others able to pay their own way." *Id.* at 196-97. "The invidiousness of

the discrimination that exists when criminal procedures are made available only to those who can pay is not erased by any differences in sentences that may be imposed." *Id.* at 197.

As discussed by Justice Ginsburg in *M.L.B.*, the *Mayer* Court was concerned with access to the courts. *M.L.B.*, 519 U.S. at 112 (noting statements in *Mayer* that *Griffin* prohibited "'making access to appellate processes from even the State's most inferior courts depend upon the convicted defendant's ability to pay,'" and that an "impecunious party, . . . whether found guilty of a felony or conduct only 'quasi criminal in nature,' 'cannot be denied a record of sufficient completeness to permit proper appellate consideration of his claims[.]'") (quoting *Mayer*, 404 U.S. at 196-98) (citation and brackets omitted). Justice Ginsburg also noted, however, that the Court had limited the application of the "flat prohibition of bolted doors that the *Griffin* line of cases securely established[.]" *Id.* at 112 (internal quotation marks omitted) (noting that under its cases, the right to counsel was "less encompassing" given that a state must provide trial counsel for an indigent felon charged with a felony but not when charged with a non-felony with no term of imprisonment actually imposed, and that a state must provide appellate counsel to poor defendants facing incarceration who file appeals as of right but not those pursuing a discretionary appeal or petitioning for review with the Supreme Court).

Next, Justice Ginsburg discussed the "narrow category of civil cases in which the State must provide access to its judicial processes without regard to a party's ability to pay court fees." *Id.* at 113. Summarizing her discussion of those cases which involved access to the courts for those seeking to dissolve their marriages and tenants seeking to appeal adverse decisions in eviction cases, she concluded that "this Court has not extended *Griffin* to the broad array of civil cases." *Id.* at 116. The narrow set of cases which the Court "set apart from the mine run of [civil]

cases" was limited to those "involving state controls or intrusions on family relationships." *Id.*

"In that domain," the *M.L.B.* Court wrote, "to guard against undue official intrusion, the Court

has examined closely and contextually the importance of the governmental interest advanced in

defense of intrusion." *Id.*

The Court turned to the specific issue presented in the case and noted the state's argument

that the case belonged with "the generality of civil cases, in which indigent persons have no

constitutional right to proceed" *in forma pauperis* and the mother's contrary argument that the

"accusatory" state action she was trying to "fend off" was "barely distinguishable from criminal

condemnation in view of the magnitude and permanence" of the loss she faced. *Id.* at 119.

Discussing the "character and intensity of the individual interest at stake" and the "state's

justification for its exaction," the Court found the mother's "stakes," which it described as the

forced dissolution of her parental rights, to be large and substantial. *Id.* at 120-21 (noting that

"[p]arental status termination is irretrievably destructive of the most fundamental family

relationship") (brackets omitted). While the state had a legitimate interest in offsetting the costs

of the court system, the Court concluded that the "tightly circumscribed category of parental

status termination cases," where appeals are few, would not impose an undue burden on the state.

*Id.* at 122.

Seeking to allay concerns that its holding would open "floodgates" if *Griffin* was not

restricted to criminal cases, *id.* at 127, the Court affirmed the general rule that fee requirements

are ordinarily examined only for rationality and that the state's need for revenue to offset costs

generally "satisfies the rationality requirement[.]" *Id.* at 123. But, the Court allowed that there

were two exceptions to the general rule: (1) the "basic right to participate in the political process

as voters and candidates cannot be limited to those who can pay for a license"; and (2) "access to judicial processes in cases criminal and quasi-criminal in nature" cannot "turn on ability to pay." *Id.* (internal quotation marks omitted). Although a parental termination order did not fit neatly into either of those exceptions, the Court found that under its prior decisions, "parental termination decrees are among the most severe forms of state action." *Id.* at 128. Thus, the Court concluded, it was satisfied that the parental status termination cases "work a unique kind of deprivation" and are therefore set apart from "mine run civil actions" and even other domestic relations matters such as divorce, paternity, and child custody. *Id.* at 127 (internal quotation marks omitted). Such cases involve the "awesome authority of the state to destroy permanently all legal recognition of the parental relationship," and the "label 'civil' should not entice [the Court] to leave undisturbed the state courts' disposition of this case." *Id.* at 128 (internal quotation marks omitted).

The Ninth Circuit discussed *M.L.B.* in *Hernandez* which involved the detention of non-citizens in removal proceedings who were eligible for release on bond but who could not afford to pay the bond. *Hernandez*, 872 F.3d 976. The bond determinations were made without considering the detainee's ability to pay or alternatives which would ensure the detainee's future appearance. *Id.* at 983. The plaintiffs raised due process, equal protection, and excessive bail claims, but the court addressed only the Fifth Amendment due process claim. *Id.* at 990 n.16. The court noted that the right to be free from imprisonment, meaning government custody, detention, or other forms of physical restraint, was at the heart of the Due Process Clause, and asked whether consideration of the detainees' financial circumstances, as well as of possible alternative release conditions, was necessary to ensure that the conditions of release would be

reasonably related to the government's interest in securing their appearance at a future hearing. *Id.* at 990-91. The court affirmed the district court's grant of a preliminary injunction because it was likely the plaintiffs would succeed on the merits. In reaching its conclusion, the court compared immigration cases to the parental termination decree in *M.L.B. Id.* at 993. Both were "set 'apart from mine run civil actions'" because they "'involve the awesome authority of the State' to take a 'devastatingly adverse action,'" which in immigration cases, is the state's power to remove individuals from their homes and separate them from their families. *Id.* (quoting *M.L.B.*, 515 U.S. at 127-28).

What all of these cases teach is that the "fundamental fairness" principles of due process and equal protection originating in *Griffin* have been applied when either incarceration or access to the courts, or both, is at stake. The incarceration cases clearly implicate the fundamental right to be free from wrongful detention, meaning the fundamental right to liberty. The access to courts cases have arisen in either (1) the criminal context where the rights to both a fair trial and a conviction only upon proof beyond a reasonable doubt are implicated by effectively denying an appeal to an indigent defendant, or (2) the narrow circumstance of a parental termination where the state's "awesome" authority to permanently destroy what the Supreme Court had already recognized as "the most fundamental family relationship" was at stake. *M.L.B.*, 519 U.S. at 121 (citing *Santosky v. Kramer*, 455 U.S. 745, 753 (1982)).

None of those rights or interests are present here. As the *Fowler I* court recognized, the *Griffin/Bearden* line of cases does not establish "that it is fundamentally unfair in a *constitutional* sense (i.e. in violation of the Due Process Clause) for a state to deprive a person of a property interest– such as a driver's license– because of the person's inability to pay a fine associated with

that interest." 2017 WL 6379676, at *7. The case law, the court concluded, does not support

extending the Due Process Clause that far. *Id.* The court analogized to a state legally foreclosing

on a residence for failure to pay property taxes. *Id.* Such action may lead to the homeowner

becoming homeless but, the state's "action is not barred by the Due Process Clause." *Id.* To be

sure, the *Fowler I* court explained, it is unfair and unwise to deprive individuals of their driver's

licenses because of an inability to pay. *Id.* But, it is not "unfair" in a constitutional sense. *Id.*

Absent a fundamental right or suspect class, the government must act only rationally and afford

certain procedural protections before the deprivation of a protected interest. *Id.* Putting aside the

procedural issue, which the court addressed later, the court concluded that the plaintiffs'

"fundamentally unfair" argument based on *Griffin/Bearden* was not likely to succeed. *Id.*

The judge in the *Robinson* and *Thomas* cases reached the opposite conclusion. The

discussion in those cases is extensive, but even under a rational basis review which the court felt

bound to apply by *Johnson v. Bredesen*, 624 F.3d 742 (6h Cir. 2010), a controlling Sixth Circuit

case, the court determined that the plaintiffs' *Griffin/Bearden* claims had merit. *Robinson I*, 2017

WL 4418134, at *7-9 (concluding likelihood of success on the merits of the *Griffin/Bearden*

claim); *Robinson II*, 326 F.R.D. at 149-59 (denying defendants' motion to dismiss

*Griffin/Bearden* claim); *Thomas I*, 303 F. Supp. 3d at 607-19 (denying motion to dismiss

*Griffin/Bearden* claim). Under that analysis, the judge concluded that the license suspensions for

indigent traffic or court debtors were not rationally related to a state interest.

The *Robinson/Thomas* court believed that the *Griffin* line of cases required it to consider

the suspension of driver's licenses for nonpayment of traffic debt absent an exception for those

willing but unable to pay, as "the equivalent of a statute that imposes a harsher sanction on

indigent debtors than their non-indigent peers." *Thomas I*, 303 F. Supp. 3d at 614. Then, the

court explained, if the statutory scheme affords no adequate exception for indigence, *Griffin* and

the cases following it "instruct this court to consider that scheme as the constitutional equivalent

of the state's using, as the sole justification for its action, the poverty of the defendant." *Id.*

(internal quotation marks omitted). The court's discussion of the issue in these cases emphasized

the impact of the law on the indigent debtor's right to self-sufficiency. *Thomas I*, 303 F. Supp. 3d

at 613, 615; *Robinson II*, 326 F.R.D. at 154 (noting that the Sixth Circuit recognized that the

right to self sufficiency justified "an at least somewhat more searching standard of review")

(citing *Johnson*); *but see id.* at 153 (noting that self-sufficiency and self-respect had not been

recognized by the Sixth Circuit or Supreme Court as fundamental rights in a constitutional

sense). It also discussed the impact on the right to travel, and while acknowledging that the right

does not generally prohibit the state from denying a single mode of transportation, the court

noted that the law may still impact driving in a way that potentially triggers a heightened level of

scrutiny. *Thomas I*, 303 F. Supp. 3d at 613; *Robinson II*, 326 F.R.D. at 153-54.

I respectfully disagree with *Robinson* and *Thomas* and believe that the *Fowler* court made

the correct ruling. Although *Robinson* and *Thomas* purported to apply a rational basis review,

the conclusions reached suggest that the court in those cases applied a more stringent level of

scrutiny. As a result, I find these decisions somewhat internally inconsistent.

I find no support in the caselaw for Plaintiffs' assertions of a constitutional right to self-

sufficiency. Additionally, wealth/poverty is not a suspect class. *E.g.*, *Harris v. McRae*, 448 U.S.

297, 323 (1980) ("this Court has held repeatedly that poverty, standing alone is not a suspect

classification"); *see also Kadrmas v. Dickinson Pub. Sch.*, 487 U.S. 450, 458 (1988) ("We have

previously rejected the suggestion that statutes having different effects on the wealthy and the poor should on that account alone be subjected to strict equal protection scrutiny.").

As for the right to travel, neither the Supreme Court nor the Ninth Circuit has recognized a constitutional right to intrastate travel. *Nunez ex rel. Nunez v. City of San Diego*, 114 F.3d 935, 944 n.7 (9th Cir. 1997); *see also Mem'l Hosp. v. Maricopa Cty.*, 415 U.S. 250, 255-56 (1974) (declining to decide whether the Constitution guarantees the fundamental right of intrastate travel); *Fruitts v. Union Cty.*, No. 2:14-cv-00309-SU, 2015 WL 5232722, at *6 (D. Or. Aug. 17, 2015) (finding no constitutional right to intrastate travel; explaining that the right had not been recognized by the Ninth Circuit or Supreme Court and that district courts in the Ninth Circuit have "refused to expand" the constitutional interest in interstate travel to include such a right); *adopted by J. Simon*, 2015 WL 5232696 (D. Or. Sept. 8, 2015).

A burden on a single mode of transportation does not implicate the constitutional right to interstate travel. *Miller v. Reed*, 176 F.3d 1202, 1205 (9th Cir. 1999). There is no fundamental right to drive. *Id.* at 1206 (citing *Dixon v. Love*, 431 U.S. 105, 112-16 (1977)). Nor is there a fundamental right to a driver's license. *Franceschi v. Yee*, 887 F.3d 927 (9th Cir. 2018), *cert. denied*, No. 18-585, 2018 WL 5792470 (U.S. Dec. 10, 2018). And in *Miller*, the court rejected the plaintiff's argument that driving was an essential mode of transportation given the importance of cars in modern society. *Miller*, 176 F.3d at 1205. Although, as Plaintiffs note, the Supreme Court has acknowledged, in a case invalidating a New York law awarding civil service preference points to veterans who lived in New York at the time they entered military service, that the right to interstate travel may be implicated when "it actually deters such travel, when impeding travel is its primary objective, or when it uses any classification which serves to

penalize the exercise of that right," the Court noted that "heightened scrutiny [is] triggered" "only where a State's law operates to penalize those persons who have exercised their constitutional right to interstate migration[.]" *Attorney Gen. of N.Y. v. Soto-Lopez*, 476 U.S. 898, 903, 905 (1986) (citations and internal quotation marks omitted). That is not the situation here.

I agree with Plaintiffs that the loss of their driver's licenses causes serious problems in many areas of their lives from employment to health care to recreation. There is no doubt that for most Americans, driving makes life easier, whether one lives in a large city, a small city, or in the country. It is also true that some parts of Oregon are better served by alternative public transportation systems than others. But, as the *Fowler I* court explained, appropriately in my opinion, "[f]undamental rights are not identified by looking so narrowly or locally[.]" 2017 WL 6379676, at *8 (rejecting the plaintiffs' argument that the court should recognize a fundamental right where public transportation is "woefully inadequate" and plaintiffs lacked access to other modes of travel). Fundamental rights, the *Fowler I* court noted, are those rooted in the nation's history and tradition. *Id.* Geography and transportation systems cannot control constitutional rights. A resident of Mission, Oregon cannot have a constitutional right to travel while a resident of Portland, Oregon does not. Thus, despite difficulties presented by alternative transportation systems, or the lack thereof, a challenge to the suspension of a driver's license is not "fundamental in a national or constitutional sense." *Id.*

My reading of the *Robinson* and *Thomas* cases indicates that the court there inappropriately found or implied fundamental rights which have not been recognized as having *constitutional* protection. The court inappropriately applied a heightened level of scrutiny to the statutory scheme. This in turn, prompted the court to extend the *Griffin/Bearden* cases beyond

the parameters of criminal justice or quasi-criminal justice cases where incarceration or equal access to the courts was at stake, and beyond that rare civil case such as *M.L.B.* where the state wields its "awesome" power to potentially deprive a parent of her or his most fundamental of family relationships. I do not believe the *Griffin/Bearden* "more searching" or "more careful" inquiry or "close examination" of the government's interest is required in this case.

In *Franceschi*, a recent Ninth Circuit case, the court considered a statutory scheme which suspended the driver's licenses of individuals who appeared on the state's "top 500" list of delinquent taxpayers who owed at least $100,000. 887 F.3d at 933-34. The court explained that "[g]overnmental conduct, such as revocation of a driver's license, that neither proceeds along suspect lines nor infringes fundamental constitutional rights, is subject to rational basis review[.]" *Id.* at 940. There, the plaintiff argued that the "top 500" list and suspension statutes created selection criteria that had "the effect of meting out unequal treatment to similarly situated individuals" and was arbitrary and unreasonable. *Id.* The court reviewed the argument under a rational basis analysis and concluded that the state had legitimate and significant interests supporting a rational basis. *Id.* at 940-41.

Oregon's challenged statutes are rationally related to a legitimate state interest.[7]

---

[7] Here, even though the statute is facially neutral, it has a disparate impact on indigent drivers. *Fowler I* concluded that with a facially neutral suspension statute and no evidence of discriminatory intent, even rational basis review was unnecessary. 2017 WL 6379676, at *8. The court there explained that when a "challenged law neither creates classifications nor burdens a fundamental right," "'even the deferential rational basis scrutiny that is applied to ordinary governmental classifications is not appropriate.'" *Id.* (quoting *Johnson v. Rodriguez*, 110 F.3d 299, 306 (5th Cir. 1997)). Absent discriminatory intent, a facially-neutral law remained so even if it had a disparate impact, such as the Michigan driver's license suspension statute which adversely affected indigent drivers. *Id.* (citing *Washington v. Davis*, 426 U.S. 229, 248 (1976)). Defendants here do not make that argument and argue instead that the state's laws have a rational

Defendants argue that the state has a strong interest in enforcing traffic laws to deter future misdeeds. Defs.' Mem. 12, ECF 24; *see also id.* at 9 ("the suspension of driving privileges is effective in obtaining compliance through payment of traffic fines"). Certainly, traffic laws exist as a basic manifestation of the state's undisputed interest in protecting the health and safety of its citizens. *Rubin v. Coors Brewing Co.*, 514 U.S. 476, 485 (1995) ("the Government . . . has a significant interest in protecting the health, safety, and welfare of its citizens"). Thus, the state has a legitimate interest in punishing, in some form, violations such as speeding, driving while talking on a cell phone, failure to obey a traffic control device, failure to use proper car seats, etc. Even a broken tail light implicates visibility and thus, safety. Fines, therefore, are rationally related to enforcement of traffic laws and to the deterrence of continued violations. The sting of paying a fine will hopefully prevent future unsafe driving practices. Even those who can pay the fine likely do not desire to part with their money for this reason.

Methods by which the state can enforce compliance with the fine requirement, therefore, are rationally related to the safety goal. Without a compliance mechanism, the fine is toothless and without deterrent effect. Accordingly, fines are reduced to a judgment, subject to payment or collection by a number of methods, and eventually or additionally, can result in the violator's license suspension if the fine is unpaid. Nonetheless, as the judicial officers explain, the threat of

---

basis. *Franceschi* suggests that rational review should be used. Cases addressing an adverse impact on indigent individuals indicate that as well. *See, e.g.*, *M.L.B.*, 519 U.S. at 126-27 (rejecting the defendants' argument that under *Washington v. Davis*, the transcript law was facially neutral and no equal protection violation was shown just because of an allegedly disparate impact on the indigent; noting that a facially discriminatory law may be discriminatory in operation and that the statute was not merely "*disproportionate* in impact" but "wholly contingent on one's ability to pay" and thus "visit[ed] consequences on two categories of persons.") (internal quotation marks and brackets omitted).

suspension is an effective tool to coerce payment. Of course, compliance efforts may be ineffective as to those whose life circumstances leave them on the edge of economic survival every day. But, the evidence in the record shows that even as to those individuals, the threat of suspension, or an actual suspension, has motivated the individual to return to the court to attempt to establish a payment plan or to obtain a reduction in the traffic debt. While not always successful, the threat of suspension has resulted in compliance in some occasions.

Under rational basis review, the law will be upheld "if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *Franceschi*, 887 F.3d at 940 (internal quotation marks omitted). Moreover, that the statute may be overinclusive by its enforcement as to indigent traffic debtors with no means of paying the fine, does not, under rational basis review, render it unconstitutional. *E.g., Vance v. Bradley*, 440 U.S. 93, 108 (1979) (perfection is not required); *Dandridge v. Williams*, 397 U.S. 471, 485 (1970) (classification need not be made with "mathematical nicety") (internal quotation marks omitted); *Gallinger v. Becerra*, 898 F.3d 1012, 1018 (9th Cir. 2018) (rejecting the plaintiffs' argument that a classification was too broad to be rationally related to a legitimate government interest as contrary to Supreme Court precedent upholding classifications that are underinclusive and overinclusive under rational basis review). Finally, even if the challenged statute sometimes produces unequal and unfair results, it does not necessarily fail rational basis review. *United States v. Padilla-Diaz*, 862 F.3d 856, 862 (9th Cir. 2017); *see also Nat'l Ass'n for Advancement of Psychoanalysis v. Cal. Bd. of Psychology*, 228 F.3d 1043, 1051 (9th Cir. 2000) (indicating that under rational basis review, a state law is constitutional even if it is "'unwise, improvident, or out of harmony with a particular school of thought,'" as long as it bears a rational relationship to

some legitimate end) (quoting *Williamson v. Lee Optical of Okla., Inc.*, 348 U.S. 483, 488 (1955)).  Oregon's driver's license suspension statutes for the nonpayment of traffic debt are reasonably related to the state's legitimate interest in enforcing fines for violation of traffic laws.

Based on my determinations that the challenged statute, either facially or in its application, does not implicate a fundamental constitutional right, does not implicate a suspect classification, and is rationally related to a legitimate state interest, Plaintiffs are not likely to succeed on a "fundamental fairness" claim under *Griffin/Bearden*.

IV.  Second Claim for Relief - *Strange* Equal Protection

Plaintiffs' second claim addresses the distinction between indigent traffic debtors subject to driver's license suspensions and indigent debtors who are exempted from such suspensions. Plaintiffs argue that there are three kinds of similarly-situated indigent debtors who, unlike Plaintiffs, are not subject to license suspension for unpaid debt, or are given the ability to demonstrate inability to pay:  (1) traffic debtors who committed bicycle, pedestrian, or parking offenses; (2) private debtors generally; and (c) child support debtors.

Plaintiffs base this claim on *Strange*, which held that a Kansas recoupment statute violated the Equal Protection Clause by permitting the state to recoup court-appointed attorney's fees from indigent criminal defendants without permitting them to raise any of the defenses available to other civil judgment debtors.  407 U.S. at 141-42.  Exemptions available generally to other civil judgment debtors included restrictions on the amount of disposable income subject to garnishment and protection from wage garnishment.  *Id.* at 135.  The Court indicated that under appropriate circumstances, a state's claim to reimbursement may take precedence over the claims of private creditors, and that enforcement procedures with respect to judgments did not need to

be identical. *Id.* at 138. But, while the Kansas statute stated that a judgment lien as to a criminal defendant was comparable to other judgments under the state's civil procedure code, the statute then omitted the exemptions in the civil procedure code which were designed "primarily to benefit debtors of low and marginal incomes," from the enforcement of reimbursement judgments. *Id.* at 139. The Court explained that the Equal Protection Clause "imposes a requirement of some rationality in the nature of the class singled out" and that such rationality is "lacking where . . . the State has subjected indigent defendants to such discriminatory conditions of repayment" that are not imposed on other judgment debtors. *Id.* at 140 (internal quotation marks omitted).

Two years after *Strange*, the Court revisited the issue in *Fuller v. Oregon*, 417 U.S. 40 (1974). There, an Oregon recoupment statute retained all of the exemptions accorded to other judgment debtors. *Id.* at 47-48. The Court held that the statute did not violate equal protection. *Id.* The statute was directed only to convicted defendants who were indigent at the time of the criminal proceeding and who later gained the ability to pay the expenses of legal representation. *Id.* at 46. The *Fuller* Court explained that in *Strange*, the "offending aspect of the Kansas statute was its provision that in an action to compel repayment of counsel fees, none of the exemptions provided for in the code of civil procedure (for collection of other judgment debts) shall apply to any such judgment[.]" *Id.* at 47 (internal quotation marks omitted). *Strange*, the *Fuller* Court noted, "found that the elimination of the exemptions normally available to judgment debtors 'embodied elements of punitiveness and discrimination which violate the rights of citizens to equal treatment under the law.'" *Id.* (quoting *Strange*, 407 U.S. at 142) (brackets omitted).

"[N]o such infirmity" was present in the Oregon statute. *Id.* No express denials of

exemptions from execution given to other judgment debtors were included in the Oregon statute. *Id.* Instead, the "convicted person from whom recoupment is sought" retained "all the exemptions accorded other judgment debtors," as well as the ability to show that the recovery of the costs would impose a hardship. *Id.* Thus, the Oregon statute was "wholly free of the kind of discrimination that was held in [*Strange*] to violate the Equal Protection Clause." *Id.* at 47-48.

Plaintiffs argue that the central holding of *Strange* requires "striking down statutes that provide more of a safety net to indigent private debtors than to indigent criminal debtors, and upholding statutes relating to debt collection that do provide for an indigency determination and exception." Pls.' Mot. 32-33. Because Oregon's license suspension scheme singles out indigent traffic debtors for "uniquely worse treatment relative to other kinds of indigent debtors," Plaintiffs argue that the statute violates equal protection under *Strange*. Defendants argue that *Strange* does not apply "because the challenged statutory scheme does not expressly eliminate any exemptions that would ordinarily be available to judgment debtors with respect to the collection of government debt." Defs.' Mem. 8.

Defendants' argument is taken directly from the *Fowler I* decision which concluded that the plaintiffs' *Strange* claim was unlikely to succeed on the merits. *Fowler I*, 2017 WL 6379676, at *9-10. The Michigan license suspension statutes, the court explained, were like the Oregon statutes at issue in *Fuller* and "do not expressly eliminate any exemptions normally available to judgment creditors with respect to the collection of a government debt." *Id.* at 9. In reaching its conclusion, the court observed that "[n]othing in *Strange* suggests that the Court's holding would apply here[.]" *Id.* (further remarking that the plaintiffs cited no case "reading the Equal Protection Clause's guarantees in a way that Plaintiffs assert *Strange* does.").

I agree with the *Fowler I* case. The issue presented in *Strange* and considered again in *Fuller* is not present here. Nothing in the Oregon statutory scheme regarding the collection of a judgment for unpaid traffic debt provides for treatment different from any civil judgment debtor by creating exemptions from ordinary collection methods. And, under my reading of *Strange*, it was the explicit exemption from the wage garnishment protections available to other civil judgment debtors that the Court found unconstitutional. Thus, I disagree with the *Robinson* court's determination that the *Robinson* plaintiffs showed a likelihood of success on the merits or stated a claim under *Strange* because Tennessee "heaped on additional tools of coercion." *Robinson II*, 326 F.R.D. at 160-61 (acknowledging that the Kansas statute in *Strange* removed protections but concluding that Tennessee's additional "tools of coercion" were analogous). As a result, Plaintiffs fail to establish a likelihood of success on the merits of the *Strange* claim.

Even if I were to consider Plaintiffs' argument to properly arise under *Strange*, I would still determine that Plaintiffs had not met their preliminary injunction burden on this claim. In a 1987 case, the Ninth Circuit observed that the *Strange* Court struck down the Kansas statute because it found the "'requirement of some rationality in the nature of the class singled out' not to have been met." *United States v. Smith*, 818 F.2d 687, 692 (9th Cir 1987) (quoting *Strange*, 407 U.S. at 140); *see also Strange*, 407 U.S. at 138, 139 (asserting that a state's judgment enforcement procedures need not be identical and indicating that the issue is whether there is a rational basis for singling out a class). Thus, rational basis is the relevant inquiry.

Here, fines imposed for traffic safety violations committed by those in a car, are, as explained above, rationally related to the state's interest in modifying driving conduct to comply with traffic laws. The fine is a behavior modification tool and the driver's license suspension

assists in obtaining compliance with fine payment. Private debt does not originate in the same way. Violations of pedestrian, bicycle, and parking laws do not trigger the same need to address violation of traffic laws such as speeding, failure to obey a traffic control device, etc. Moreover, a driver's license is not even needed to cross a street or ride a bicycle. Child support obligations also do not originate in the same context. Thus, for each of the categories of distinguishable indigent debtors, there is a rational basis for the classification. No *Strange* equal protection claim is likely to succeed here.

V. Third Claim for Relief - Procedural Due Process

Plaintiffs argue that Oregon's license suspension statutes for traffic debtors violate procedural due process because the statutes fail to provide an ability-to-pay hearing before suspension is effective. *See* Pls.' Reply 19 ("The absence of an ability-to-pay determination is the due process that plaintiffs assert is missing[.]"). They contend that the private interests at stake are fundamental, the risk of an erroneous deprivation is high, and any government interest in collecting traffic debt is actually harmed by the absence of an indigency determination given that indigent debtors cannot pay and the suspension actually interferes with the debtors' means of obtaining income to repay the debt. Plaintiffs argue that an assessment of these factors establishes that only a pre-deprivation notice and pre-deprivation hearing on the ability to pay satisfies due process. In response, Defendants contend that no fundamental rights are at issue, Plaintiffs received substantial process before suspension, and the government has a significant interest in enforcing traffic laws.

*Mathews v. Eldridge* is the foundational Supreme Court procedural due process case. 424 U.S. 319 (1976). "Procedural due process imposes constraints on governmental decisions which

deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process

Clause of the Fifth or Fourteenth Amendment." *Id.* at 332. The "fundamental requirement of

due process is the opportunity to be heard at a meaningful time and in a meaningful manner." *Id.*

at 333 (internal quotation marks omitted). Due process, however, "is flexible and calls for such

procedural protections as the particular situation demands." *Id.* at 334 (internal quotation marks

omitted).

Under *Mathews*, the court weighs three factors to evaluate the sufficiency of procedural

protections: (1) "the private interest that will be affected by the official action," (2) "the risk of an

erroneous deprivation of such interest through the procedures used, and the probative value, if

any, of additional or substitute procedural safeguards," and (3) "the Government's interest,

including the function involved and the fiscal and administrative burdens that the additional or

substitute procedural requirement would entail." *Id.* at 335; *see also Yagman v. Garcetti*, 852

F.3d 859, 864 (9th Cir. 2017) (explaining that "there are no hard and fast rules for determining

the requisite timing and adequacy of pre- and post-deprivation procedures" and that once it is

determined that a protected interest is at stake, a court applies the three-part balancing test

established in *Mathews* to determine whether a pre-deprivation hearing is required and what

specific procedures must be employed at that hearing given the particularities of the deprivation)

(internal quotation marks and citation omitted).

A driver's license is a significant enough property interest to warrant procedural due

process protections. *Dixon v. Love*, 431 U.S. 105, 112 (1977); *Franceschi*, 887 F.3d at 935.

Plaintiffs argue that the private interests at stake, the right to self-sufficiency and travel, are

fundamental rights and are of significant interest. They rely on the *Thomas* court's observation

that the "substantive nature of the rights and facts at issue affects the application of the *Eldridge* factors." *Thomas I*, 303 F. Supp. 3d at 632. However, as previously explained, I find no fundamental rights implicated here. No one is losing his or her freedom or parental rights. The right to drive is simply not *constitutionally* fundamental. Thus, the private interests at stake are not as significant as Plaintiffs assert.

There is little risk of erroneous deprivation given that the suspensions are triggered by the objective fact of nonpayment of the fines. *Mackey v. Montrym*, 443 U.S. 1, 13 (1979) (upholding license suspension based on "objective facts either within the personal knowledge of an impartial government official or readily ascertainable by him"); *Crawford v. Blue*, 271 F. Supp. 3d 316, 329 (D. Mass 2017) (discussing three-part *Mathews* test in case challenging driver's license suspension and citing *Mackey*). I understand Plaintiffs' position that the risk of erroneous deprivation is high under the procedures currently used because absent the opportunity to establish indigency, Plaintiffs' fundamental rights will be wrongfully deprived. But, Plaintiffs' characterization of the deprivation is founded upon an assumption that there is a constitutional right to an indigency determination in the first place and that the rights implicated by the suspensions are fundamental in a constitutional sense. As stated previously, I disagree with Plaintiffs on this point.[8] I do not intend my conclusion to suggest that I am blind to the

---

[8] The *Fowler I* court, although concluding that the plaintiffs' *Griffin/Bearden* and *Strange* claims were unlikely to succeed, nonetheless concluded that the plaintiffs were likely to succeed on their procedural due process claim. The court faulted the Michigan statutes for failing to inform individuals of the ability, with court approval, to pay traffic debt under a payment plan. 2017 WL 6379676, at *11. But, because the court had rejected the constitutional claims, it was error to consider the lack of such payment plan notice as procedurally deficient. Thus, I do not find the *Fowler I* opinion persuasive in regard to the procedural due process claim. In any event, the Michigan statutes which suspend the license upon extremely short notice are distinguishable

fundamental effect that driver's license suspensions for nonpayment of traffic debt have on Plaintiffs' lives. I do not underestimate the adverse effects on their employment opportunities, recreational opportunities, access to medical care, and more. But, for the reasons previously explained, I do not find support in the caselaw for concluding that the rights they assert have been recognized as "constitutionally fundamental." Thus, Plaintiffs' articulation of the risk of erroneous deprivation is misplaced.

The second *Mathews* factor also looks at the probative value, if any, of additional or substitute procedural safeguards. Here, the fine is imposed only after a violation has been adjudicated by a court. *See Franceschi*, 887 F.3d at 937 (noting that the facts supporting suspension related to the plaintiff's tax deficiency had already been established through prior proceedings). If the court exercises discretion to initiate suspension of the license for nonpayment of the fine, the DMV issues a pre-deprivation sixty-day notice informing the violator that she or he may resolve the issue by returning to the court. Again, because I conclude that the Constitution does not require Plaintiffs' indigence to be assessed, the fact that the DMV sixty-day notice does not expressly inform the violator that the court may be willing to entertain a payment plan does not render the notice ineffective. Thus, the procedures currently used allow the violator to appear in court to contest the violation and then, if a fine is imposed and remains unpaid and the court notifies the DMV, the violator receives a pre-deprivation notice directing

---

for that reason alone. *See Fowler I*, 2017 WL 6379676, at *1 (under Michigan statutes, Secretary of State must suspend license within fourteen days of nonpayment with no pre-suspension notification); *Fowler II*, 2017 WL 6540926, at *2-3 (further explaining Michigan statutory scheme under which payment extensions for a maximum of two weeks are given only to a defendant who asks and only if the defendant can immediately pay half of the fine).

him or her to return to the court.  At that point, the court may consider indigency and can create a payment plan or adjust the fine. The pre-deprivation notice also advises the violator of the right to administrative, albeit limited, review.  Additional procedures here would be of little probative value.

Finally, the government has a strong interest in enforcing traffic fines to deter continuing traffic violations.  *E.g.*, *Crawford*, 271 F. Supp. 3d at 329 ("Massachusetts has a substantial interest in securing public safety on its roads by suspending the operating privileges of drivers who default on [civil motor vehicle infractions].") (internal quotation marks omitted).

When weighing all of these factors, I conclude that the Oregon scheme complies with procedural due process.  The nature of the private interest, the nature of the government interest, and the low risk of erroneous deprivation support a determination that the opportunity to initially contest the violation and the pre-deprivation notice with its instructions to return to court and information regarding the  right to administrative review, sufficiently protect an individual's property interest in his or her driver's license.

VI.  Remaining Preliminary Injunction Considerations

Having found that Plaintiffs are not likely to succeed on the merits of any of their claims, I do not need to consider the remaining preliminary injunction factors of the likelihood of irreparable harm in the absence of preliminary relief, balancing of the equities, and whether an injunction is in the public interest.  *Garcia*, 786 F.3d at 740 ("Because it is a threshold inquiry, when a plaintiff has failed to show the likelihood of success on the merits, we need not consider the remaining three *Winter* elements.") (internal quotation marks and brackets omitted). Nonetheless, I briefly address the factors to provide the parties, and the Ninth Circuit should this

ruling be appealed, my analysis.

A.  Irreparable Harm

Plaintiffs argue that any constitutional violation is, by definition, irreparable harm. *Hernandez*, 872 F.3d at 994 ("the deprivation of constitutional rights unquestionably constitutes irreparable injury") (internal quotation marks omitted).  They also rely on the facts in their Declarations which show the harm they have suffered from their license suspensions and which will continue absent injunctive relief.  Every day, they state, they are faced with the impossible choice between driving with a suspended license and risking deeper debt, and providing the basic necessities of life for themselves and their families.

Defendants note that under the heightened standard for a mandatory injunction, Plaintiffs must show that serious and extreme damage will occur absent preliminary injunctive relief. Defendants argue that the harm here is speculative.  They acknowledge that Plaintiffs have described difficult lives in their Declarations.  But, Defendants argue that Plaintiffs have not proven that without an immediate injunction some specific factors will cause an additional and irreparable harm.  They note that any injunctive relief will not address past harm and the future harms are only speculative.

Defendants' evidence establishes that there is no irreparable harm because even if I granted the requested relief, Plaintiffs' licenses would remain suspended.  According to Mary Garcia, a Driver Control Operations and Policy Analyst for the DMV, the DMV driving records for each Plaintiff[9] show that each one would need to resolve additional suspensions and satisfy

---

[9]  At the time, Chase had not yet been added as a Plaintiff and thus, Garcia's review excluded him but included all the Plaintiffs named in the original Complaint.

other requirements, separate from the suspensions for failure to comply and related reinstatement fees which they challenge here, before they could drive with an Oregon driver's license. Garcia Supp'l Decl. ¶¶ 1, 3, ECF 36. Some Plaintiffs are unable to reinstate his or her driver's license without submitting an insurance certificate. *Id.* ¶¶ 4, 5, 7, 8 (Mendoza, Roberts, Bermudez, Ganuelas). All but Heath have additional suspensions for failure to appear. *Id.* Some need to take a new driver's test. *Id.* ¶¶ 5, 6, 7 (Roberts, Heath, Bermudez, Ganuelas). I agree with Defendants that Plaintiffs cannot satisfy the standard required to show serious and extreme damage which will be relieved by the injunctive relief sought. *See Robinson I*, 2017 WL 4418134, at * 6 (holding the temporary restraining order motion in that case in "abeyance" until the two named plaintiffs filed proof that they had obtained the necessary insurance to comply with the Tennessee driver financial responsibility laws which were not challenged).

B. Balance of Equities

This factor requires the court to "balance the competing claims of injury" and "consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24 (internal quotation marks omitted). Plaintiffs argue that the balance of hardships "tips sharply" in their favor. Pls.' Mot. 40. Absent injunctive relief, they risk (1) additional traffic violations; (2) additional debt, (3) loss of employment opportunities that could alleviate their poverty, opportunities for family bonding, important life events, and cultural activities; and (4) continued struggles to provide food and ensure medical treatment of children being raised by single parents.

Defendants rely on the administrative burden it would take to process about 90,000 license suspensions each year if it were required to assess a driver's ability to pay each time. At

this point, absent certification of a class, the relief is restricted to only the six named Plaintiffs. Thus, the balance of equities goes to Plaintiffs.

C. Public Interest

"The public interest inquiry primarily addresses impact on non-parties rather than parties." *League of Wilderness Defs/Blue Mountain Biodiversity Project v. Connaughton*, 752 F.3d 755, 766 (9th Cir. 2014) (internal quotation marks omitted). Plaintiffs note that if this Court certifies the class, the injunction sought will affect thousands of other indigent traffic debtors. Plaintiffs rely on the discussion in *Hernandez* which found that the interests of the general public would be served by granting a preliminary injunction requiring immigration officials to consider a detainee's financial ability to obtain a bond and alternative conditions of release. 872 F.3d at 996-97. The court there noted "[g]enerally, public interest concerns are implicated when a constitutional right has been violated, because all citizens have a stake in upholding the Constitution." *Id.* at 996 (internal quotation marks omitted). Plaintiffs argue that similar concerns are implicated here. The *Hernandez* court also noted that in addition to the hardships experienced by the Plaintiffs in the absence of an injunction, the court may consider the "indirect hardship to their friends and family." *Id.* (internal quotation marks omitted). Plaintiffs note the evidence here showing the collateral harm to Plaintiffs' children and spouses due to the loss of their driver's licenses. *Id.* Finally, the *Hernandez* court observed that the "general public's interest in the efficient allocation of the government's fiscal resources favors granting the injunction." *Id.* Plaintiffs argue that while discovery will reveal the actual financial and administrative resources expended by DMV in suspending the licenses of indigent traffic debtors, any money spent supporting this "irrational and counterproductive policy is a wasted one." Pls.

Reply 26.

Defendants make no separate "public interest" argument other than to state that their administrative burden argument supports a conclusion that Plaintiffs cannot show that an injunction would be in the public interest.

Given that Plaintiffs are not likely to succeed on their constitutional claims and that their' argument relies on the class certification motion being granted, which it has not, at this point, I find the public interest to be a neutral factor.

## SUMMARY

For the reasons explained above, I conclude that Plaintiffs have not demonstrated a likelihood of success on the merits as to any of their three claims. Plaintiffs may be correct that suspending driver's licenses for indigent traffic debtors is an exercise in futility. While the record shows that the threat of suspension, or the actual suspension, of a driver's license has prompted some Plaintiffs to make payments on traffic debt from time to time, I assume that for the majority of indigent traffic debtors, suspension is misguided and counterproductive. I recognize that Plaintiffs' economic situations are marginal and the loss of their driver's licenses for their inability to pay their traffic debt burdens their lives with little chance that the state will actually collect full payment. Nonetheless, their predicaments, as desperate as they may be, do not raise constitutional claims. Absent constitutional implications, it is not the court's position to determine if the statutory scheme is "unwise," whether it "best fulfills the relevant social and economic objections" that the state "might ideally espouse," or if "a more just and humane system could not be devised." *Dandridge*, 397 U.S. at 487. As sympathetic as I am to Plaintiffs' plight, I am compelled to deny their motion. The solution here belongs in the legislative and

executive branches of government.

CONCLUSION

Plaintiffs' motion for preliminary injunction [2] is denied.

IT IS SO ORDERED.

Dated this ___12___ day of ___December___, 2018

_____
Marco A. Hernandez
United States District Judge